# Exhibit 49, Part 1 of 4

**U.2024.746**
**U.2024.746**
**SKM2024.123.HR**

*Bech-Bruun was liable for damages in the amount of DKK 400 million for the tax administration's losses as a result of unjustified refunds of dividend tax.*

*Non-contractual compensation 111.4, 21.1, 22.9, 3.9, 4.2, 5 and 7.5.*

In 2014, Bech-Bruun advised the German bank, North Channel Bank, on the bank's potential liability by participating in transactions with Danish listed shares. The transactions involved the bank issuing dividend notes that could be used when submitting applications to the Danish Tax Administration for refund of dividend tax. During 2014 and 2015, North Channel Bank issued the above-mentioned dividend notes, which were attached to applications for refund of dividend tax. Based on the applications, the tax authorities paid out approximately DKK 1.135 billion. The refund applications subsequently turned out to be unjustified, as the applications were based on fictitious transactions, as there were no shares, dividends or cash flows. The main issue in the case was whether Bech-Bruun, based on its advice to North Channel Bank, was liable for the Tax Administration's losses as a result of the unauthorized refunds of dividend tax. The Supreme Court stated that when assessing whether a lawyer, when advising a client, has acted in a manner that gives rise to liability towards the tax administration, it is decisive whether the lawyer has recklessly disregarded the interests of the tax authorities. Whether this is the case depends on an overall assessment of the circumstances at the time of the lawyer's advice. A key element in the assessment is whether the transactions advised by the lawyer had a commercial purpose and whether the transactions were of an unusual nature. In addition, the specific content of the lawyer's assignment and the advice provided by the lawyer in the individual case are also included. After an overall assessment of the circumstances of the case, the Supreme Court found that attorney A from Bech-Bruun during his advice to North Channel Bank had to realize that there was an obvious risk that the bank, together with others, was involved in preparing a model for unjustified refund of dividend tax. A had therefore recklessly disregarded the interests of the tax authorities by advising the bank as happened during the case, including by stating in a legal opinion that the bank "should not be subject" to civil or criminal liability for its participation. The Supreme Court thus found that the bank had acted in breach of its responsibility towards the Tax Administration. Furthermore, the Supreme Court found that it had to be assumed that there was the necessary causal connection between Bech-Bruun's negligent advice and the fact that the Tax Administration had suffered a loss as a result of the wrongful refund of dividend tax. The case concerned an amount of just over DKK 700 million plus interest, as the Tax Administration had reduced its claim totaling approximately DKK 1.135 billion with payments that the Tax Administration had received through settlements with various parties. The Supreme Court stated that in the situation at hand, it was well-founded that the Tax Administration entered into the settlements in question, and that under the circumstances, the Tax Administration was entitled to make deductions from the settlement payments.

the parties' payments as made. In addition, the Supreme Court stated that there were no circumstances,

**747**

that could justify Bech-Bruun's liability to pay damages lapsed or was limited based on considerations of own fault or assumption of risk. In addition, the tax administration's claim was not time-barred. Based on considerations of adequacy, the Supreme Court found that Bech-Bruun's liability for damages, based on an overall assessment, should only include an amount of DKK 400 million and thus not the Tax Administration's full claim of just over DKK 700 million. The claim should be subject to interest from the time the case was brought.[1]

**H.D. November 20, 2023** *in case BS-20331/2022 (1st dept.)*

(Jens Peter Christensen, Ole Hasselgaard, Rikke Foersom, Peter Mørk Thomsen and Mohammad Ahsan).

*Tax Administration (adv. Boris Frederiksen og adv. Steffen Sværke, Copenhagen)*
mod
*Bech-Bruun I/S (attorneys Ole Spiermann and Jakob Lentz, Copenhagen)*

## Eastern High Court's judgment of April 28, 2022 (12. afd.), BS- 26436/2020-OLR

### Introduction and claims etc.

District judges Bloch Andersen, Ib Hounsgaard Trabjerg and Ane Røddik Christensen participated in the decision.

The case was brought before the Copenhagen City Court on June 8, 2020. By the City Court's order of July 1, 2020, the case was referred to the High Court pursuant to section 226(1) of the Danish Administration of Justice Act.

The case concerns whether Bech-Bruun I/S (hereinafter Bech-Bruun) has incurred liability for damages to the Danish Tax Administration in connection with the advice that attorney A from Bech-Bruun provided to North Channel Bank in 2014 regarding a possible liability for the bank by participating in a planned tax arrangement with refund of Danish dividend tax.

*The applicant, Skatteforvaltningen,* submits the following claims:
"*Principal*
*y Claim 1*
Order Bech-Bruun I/S to pay DKK 722,290,313.77 to the Tax Administration plus interest from September 3, 2021 and until payment is made.

*Claim 2*
Order Bech-Bruun I/S to pay DKK 447,357,276.28 to the tax administration.

*Claim 3*
Order Bech-Bruun I/S to pay DKK 78,129,171.06 to the Danish Tax Administration.

*Alternatively*
Bech-Bruun I/S must acknowledge that Bech-Bruun I/S is liable to pay compensation to the Tax Administration for its advice to North Channel Bank.

*More subsidiary*
Bech-Bruun I/S must acknowledge that it is liable to pay compensation for the Tax Administration's losses as a result of applications for refund of withheld dividend tax dated in the period May 12, 2014 to July 22

---

**1**    U 1997.364H, U 2000.365/2H, U 2006.145H, U 2012.1978H and U 2022.4515H and Henry Ussing in Obligationsretten: almindelig del (4th edition

1961)

p. 310-11, Anders Vinding Kruse in Erstatningsretten (3rd ed. 1976) p. 203, Henrik Kure in Finansieringsret (3rd ed. 2021) p. 492, Vibeke Ulfbeck in Erstatningsretlige grænseflader I (3rd ed. 2021) p. 76-79, Søren Halling Overgaard in Advokaters erstatningsansvar (4th ed. 2022) pp. 362-67 and 448- 49, Mads Bryde Andersen et al. in Advokatretten (2nd ed. 2022) pp. 854, 871-72 and 876, Søren Halling Overgaard et al. in Skatterådgiverens erstatnings- ansvar (1st ed. 2023) pp. 48-52, 64, 68, 207-30 and 253-60 and Advokatsamfundets vejledning i afgivelse af Legal Opinions (September 2000).

2015 based on Credit Advices issued by North Channel Bank or, in the alternative, for a shorter period determined at the court's discretion." *The defendant, Bech-Bruun, makes the* following claims:

"*1. Allegations.*

1.1 *Against the Tax Administration's main claims*

Acquittal, alternatively acquittal for the time being.

1.2 Rejection of the *Tax Administration's alternative claim, alternatively* acquittal.

1.3 *In relation to the Tax Administration's more alternative claim,* acquittal."

During the preparation of the case, the High Court ruled on September 29, 2021, which ordered the Tax Administration to produce the creditors' agreement of September 11, 2019 between North Channel Bank and the Tax Administration/Tax Agency and the settlement agreement of May 28, 2019 between 61 American pension plans et al. and the Danish Tax Administration/Tax Agency, both with appendices, as regards the parts of the agreements with appendices concerning the basis for and amount of the claims against the individual settlement parties, including information about which items are included in the settlement amounts, what has already been paid by the individual settlement parties, terms for payment of the settlement amount and information about interest. During the main hearing, the High Court ruled on February 28, 2022 that the Tax Administration's plea that a dividend note, or so-called "Dividend Credit Advice", could only be issued upon the bank's receipt of dividends directly from the dividend distributing company, but not upon receipt of a compensation payment, regardless of the payment corresponding to and representing such dividends, was not allowed.

**748**

## Case presentation

*The advisory process*

By email dated February 3, 2014, attorney V5, Bech-Bruun, was contacted by attorney H from the law firm Jones Day in Germany.

The email states:

"...

We work for a client (North Channel Bank GmbH & Co.KG, a German bank) who has been asked to provide certain banking services in relation to a dividend stripping transaction involving shares in a Danish listed company. Our client will not be part of the transaction itself, but will provide services to the parties to the transaction. We understand that the parties to the transaction will realize a tax benefit in Denmark, which presumably consists of a double refund of withheld dividend tax (but we have not seen a structure document). Maybe you know these structures?

The client is concerned about whether there are issues for them in Denmark that they need to be aware of (tax fraud, anti-circumvention legislation, etc.). Can you think of any relevant issues they could face in Denmark (including reputational issues)?

We need to prepare a memo to the client confirming that they won't run into problems in Germany (regulatory) or your country respectively.

Until recently, there were loopholes in German tax law that allowed for double withholding tax refunds. Tax authorities are now investigating these transactions and trying to claim that they are abusive or even criminal offenses.

We're having a conference call with the client tomorrow and it would be great if you could give me your initial thoughts. Of course, we can also talk on the phone to go through this issue."

On the same date, attorney A, Bech-Bruun, answered the inquiry

from H as follows:

"I received the email below from F who also left you a voicemail.

The type of transaction you describe, which may involve the possibility of two shareholders claiming a refund of the same withholding tax, has been presented to us before ("cum/ex transactions"). As I believe F also indicated, in our experience, the transactions are generally problematic from a legal perspective and it is often not possible to provide the kind of opinion on legal and liability issues that the parties involved usually seek.

If you would like to discuss or discuss further, we would be happy to join you on a call and elaborate on our analysis if desired."

In an email dated February 5, 2014, H wrote the following to A and V5:

"...

We spoke to the client yesterday and presented them with your initial response. They would like a fee quote from you for an opinion on the risks that may arise for them under Danish law. We will get a copy of the opinion that one of the parties in the cum/ex transaction received from a Danish lawyer and will share it with you. This opinion will hopefully give us more information about the transaction. The role of the client will be limited to providing custodian services to the parties in the cum/ex transaction.

The client will be North Channel Bank GmbH & Co.KG (HYPER-      LINK      "http://www.northchannelbank.com" www.northchannel- bank.com). We have not (yet) been informed of the identity of the parties to the cum/ex transaction."

On the same day, V5 wrote the following email to H:

"...

Based on the very limited information available right now, I believe we can do this analysis for somewhere between 6,000-7,000 EUR ex VAT for the opinion itself. Is this acceptable? Please note that these structures are typically problematic under Danish law."

By email dated February 6, 2014, H answered V5's inquiry accordingly:

"Thank you for that. I'll pass this on to the client.

Do you think your opinion can be a reasoned "should" opinion (i.e.

"NCB should not be subject to criminal prosecution etc.") with certain reasonable preconditions (e.g. acting in good faith, relying on expert opinion, no participation in - potentially - unjustified tax advantage etc.) and reservations (no precedent/case law etc.)."

By email dated February 7, 2014, A replied to this inquiry:

"I refer to your email to F below.

As mentioned, the transaction is problematic from a Danish legal point of view, and exchange level cannot be promised. To make this assessment, we need to have a full overview of the transaction and the client's role, including what is going on in Denmark."

H then wrote to A in an email dated February 7, 2014:

"Understood.

We hope that all the details of the transaction will become clearer once we have seen the opinion that the parties have received from their advisors."

In an email dated February 10, 2014 to V5 and A, H forwarded a draft opinion on tax matters prepared by attorney I and attorney J from Hannes Snellman Advokatpartnerselskab. The email states:

"I attach a draft opinion on the proposed transaction that [I] just received. Can you already look at this document to see if it relates to the type of transaction you have already seen. (I have forwarded your offer to the client and am awaiting confirmation)."

**749**

The opinion of June 27, 2012 referred to in the email reads as follows:

"*DANISH TAX*

*OPINION 1*

*INTRODUCTION*

This opinion (*"Opinion"*) has been prepared at the request of [*deleted*] LLP.

This Opinion addresses the Danish tax consequences of certain transactions in Danish listed shares entered into by a US pension fund (*"USPF"*).

*2 SCOPE*

This Opinion assesses the Danish tax consequences for USPF of the proposed transactions. This Opinion does not address the potential tax consequences for any counterparties to the proposed transactions.

*3 TRANSACTIONS CONTEMPLATED*

USPF intends to enter into the following transactions:

1) USPF purchases Danish listed shares (*the "Shares"*) (either through a regulated inter-dealer broker or by purchasing Eurex single shares, physically delivered listed flex futures contracts relating to the relevant Shares).

2) The purchase of the Shares will take place prior to the ex-dividend date but no later than the Dividend Approval Date, which means the date on which the dividend is finally approved for distribution (generally the date of the annual general meeting) (*the "*Dividend Approval Date*")*. The Settlement Date for the purchase of the Shares will be on or after the Dividend Record Date. In the case of physically delivered listed futures contracts, the expiration date of the futures contract will be on or before the Dividend Approval Date.

3) USPF will receive the dividend declared on the Shares on the Dividend Approval Date (the *"Danish Dividend"*).

4) When purchasing the Shares, USPF hedges its long exposure on the Shares by selling listed, cash-settled single share futures on the Shares (the *"Short Derivative"*). The price of the Short Derivative takes into account a portion of the expected Danish Dividend in calculating the strike price of the Short Derivative, but no adjustment is made if the actual dividend amount is more or less than the expected dividend amount.

5) On or after the Ex-Dividend Date, USPF will sell the Shares through an interdealer broker. The Settlement Date for the sale of the Shares is the same date as the Settlement Date for the purchase of the Shares in 2) above. At the same time, USPF will enter into a long futures position in respect of the Shares to close out the short futures position created in step 4 above. The long futures position will expire on the same date as the short futures position created in step 4 above.

6) It is possible that in the period leading up to the sale, the Shares will be lent by way of a stock loan (using a standard Global Master Securities Lending Agreement) to an unrelated party (which may be resident in any jurisdiction) to minimize financing costs. The term of the share loan is not expected to exceed 3 months and the share loan is granted against cash collateral. The Share Loan transaction may be entered into on or after the Dividend Record Date (with settlement of the Share Loan on the same day) but always after the Dividend Ap- proval Date and the borrower of the Shares will not receive any dividends on the Shares.

Copyright © 2024 Karnov Group Denmark A/S

For the purpose of this Opinion, we have assumed the following:

1) USPF is a resident of the United States for tax purposes.
2) USPF does not have a permanent office in Denmark.
3) Dividends received by USPF on the Shares are not derived from the conduct of business by USPF or through a related entity.
4) USPF is covered by Article 22(2)(e) of the current double tax treaty between Denmark and the US *"Double Tax Treaty between Denmark and the United States"*), which means that USPF is:
   a) a legal entity means a legal entity organized under the laws of the United States for the purpose of providing pension or similar benefits under a defined benefit plan to employees, including self-employed persons; and
   b) more than 50% of USPF's beneficiaries, members or participants are natural persons who are residents of either the United States or Denmark.
5) Upon purchase of the Shares, USPF will acquire unconditional ownership of the Shares and will have full ownership rights over the Shares on the Dividend Approval Date, including the right to receive the dividends declared on that date
6) The Shares will be held by USPF through a custodian bank. USPF's ownership of the Shares will be registered with the custodian bank and, depending on the other long and short positions of the custodian bank and sub-custodian bank, the Danish Central Securities Depository.
7) The records of the Custodian will show that USPF is the legal and beneficial owner of the Shares on the Dividend Approval Date and that the Danish Dividend represents actual dividends on the Shares as remitted to USPF by the Custodian.

**750**

*5 OPINION*

Based on the facts and assumptions set out in sections 3 and 4 above, it is our opinion that:

1) The contemplated transactions in the Shares should not be subject to Danish tax other than withholding tax on dividends distributed on the Shares.
2) USPF should be entitled to claim a full refund of the Danish dividends withheld on the Shares pursuant to the Double Tax Treaty between Denmark and the United States.

*6 APPLICABLE DANISH TAX RULES*

*6.1 Tax treatment of outbound dividends*

Dividends distributed by a Danish company are generally taxable to the person or entity registered as the holder of the dividend-paying shares on the Dividend Approval Date.

If the holder of the dividend-paying shares is a foreign person or entity, the dividend is generally subject to Danish dividend tax of 27%.

However, there are certain exceptions under which certain foreign shareholders may be entitled to full or partial exemption from Danish dividend tax.

A US pension fund is entitled to full exemption from Danish withholding tax on dividends if the pension fund meets the following conditions in Articles 10(3)(c) and 22(2)(e) of the Double Taxation Treaty between Denmark and the US:

1) The US pension fund is resident in the US for tax purposes.
2) The US pension fund is the rightful owner of the dividend.

3) The dividend in question does not derive from the exercise of activities of the pension fund or through a related undertaking.

4) The US Pension Fund is a legal entity organized under the laws of the United States for the purpose of providing pension or similar benefits under a defined benefit plan to employees, including self-employed persons, and more than 50% of its beneficiaries, members or participants are natural persons who are residents o f  the United States or Denmark.

A US pension fund that meets the above conditions is entitled to full exemption from Danish withholding tax on Danish sources.

However, this exemption is not at source and the Danish entity distributing the dividend must withhold tax on the dividend (at the standard rate of 27%), regardless of the exemption. To obtain the exemption, a US pension fund must file a refund application with the Danish tax authorities as described in section 6.2 below.

*The condition for rightful ownership*

As stated above, the right to exemption from Danish dividend tax under the Double Taxation Treaty between Denmark and the United States requires that the US pension fund qualifies as the *beneficial owner of* the dividends. The concept of beneficial owner does not exist in Danish national law, and thus there is no formal distinction in Danish law between beneficial and legal ownership of shares and dividends received therefrom. The general view is therefore that the condition for beneficial ownership must be understood in accordance with the treaty meaning of the term. The Danish tax authorities have so far based their interpretation of the condition of beneficial ownership on the guidance in the OECD's comments to the dividend and interest provisions of the OECD Model Tax Convention.

The Danish tax authorities have questioned a number of dividend withholding tax claims on the grounds that the foreign dividend recipient is not the beneficial owner of the dividend and is therefore not entitled to treaty benefits. However, such claims have only been raised in cases where dividends have been paid to an intermediate parent/holding company controlled by an investor in an offshore jurisdiction. The Danish tax authorities have taken the position that such holding companies should be regarded as pure flow-through companies, which cannot be considered to be the beneficial owner of the dividends received.

So far, the Danish tax authorities have not denied exemption from Danish dividend tax paid to entities other than intermediate holding companies and we have seen no indication that they would consider extending the application of the beneficial owner condition to other categories of shareholders.

A recent ruling of the Swiss Federal Administrative Court strongly suggests that the beneficial owner condition in double tax treaties cannot be used to deny dividend withholding tax exemption on the grounds that the recipient of the dividend has entered into a derivative transaction on the shares in question.

*6.2 Procedure for refund of withheld Danish dividend tax*

In order to obtain exemption from Danish withholding tax under the Double Taxation Treaty between Denmark and the United States, a US pension fund must submit an application for refund of the withheld tax amount to the Danish tax authorities. There is a special form (form no. 06.003) to be used for this purpose. This form is attached to this Opinion. The form is also available on the tax authorities' website.

The request for reimbursement must be accompanied by documentation showing that the US pension fund is

**751**

resident for tax purposes in the United States. Furthermore, the US pension fund must provide documentation that the US pension fund meets the conditions in Article 22(2)(e) of the Double Tax Treaty between Denmark and the US. The refund process usually takes one month. The right to interest compensation arises if the withheld tax amount is not refunded by the Danish tax authorities within six months of filing the application. In this case, interest compensation is offered at a rate of 0.5% per month for the period exceeding the six-month period.

*6.3 Tax treatment of capital gains on shares* Foreign shareholders are unconditionally exempt from Danish taxation of capital gains on Danish shares. Therefore, neither the holding nor the sale of Danish shares by a foreign shareholder will give rise to Danish capital gains taxation.

This also means that entering into a share loan transaction with Danish shares will not give rise to capital gains taxation for the foreign lender or foreign borrower of the share.

*6.4 Tax treatment of share futures transactions*

A share futures transaction with Danish shares does not give rise to Danish taxation of a foreign resident party to the transaction.

*6.5 Transfer taxes*

No stamp duty or other transfer taxes are charged on transactions with Danish shares.

*7 ANALYSIS*

*7.1 Danish dividend tax*

Based on our understanding that USPF will have full ownership rights over the Shares on the Dividend Approval Date and that USPF will only lend the Shares after the Dividend Approval Date without any associated dividend rights, we believe that USPF should be considered the recipient of the Danish Dividend from a Danish national law perspective.

We therefore find that the Danish Dividend should be taxed at USPF. However, USPF will be entitled to full exemption from Danish withholding tax if the conditions in Articles 10(3)(c) and 22(2)(e) of the Denmark-US Double Taxation Treaty are met. Based on the facts and assumptions set out in paragraphs 3 and 4 above, we find that USPF must be considered to meet these conditions.

Regarding the condition of beneficial ownership, we note the following:

- USPF has no legal obligation to pay any part of the Danish Dividend to any person.
- The price of the Short Derivative takes into account a proportion of the expected Danish Dividend when calculating the strike price of the Short Derivative, but no adjustment is made if the actual dividend amount is higher or lower than the expected dividend amount.
- The obligations under the Short Derivative exist and must be fulfilled by USPF regardless of whether USPF acquires the Danish Shares.

Under these circumstances, we find that USPF should be considered to be the beneficial owner of the Danish Dividend under the Double Taxation Treaty between Denmark and the United States. We therefore find that USPF should be entitled to full exemption from Danish withholding tax on the Danish Dividend.

However, in order to obtain the exemption, USPF must submit a refund application to the Danish tax authorities accompanied by documentation showing that USPF is a resident of the United States for tax purposes and that the conditions of Article 22(3)(e) of the Double Taxation Treaty are met.

the tax treaty between Denmark and the US is fulfilled. This means that the USPF must submit documentation showing that the USPF is a legal entity organized under the laws of the United States for the purpose of providing pension or similar benefits under a defined benefit plan to employees, including self-employed persons, and that more than 50 percent of its beneficiaries, members or participants are natural persons who are residents of the United States or Denmark.

*7.2 Other Danish tax consequences of the proposed transactions*

No other Danish taxes should apply to the contemplated transactions, and the contemplated transactions should therefore not give rise to any Danish tax consequences other than withholding and subsequent claim for refund of Danish tax on the Danish Dividend. For the avoidance of doubt, it is noted that the issuance of bank fees or similar fees as a result of registration of ownership with the Danish Central Securities Depository or equivalent foreign central securities depository will not be taken into account.

*8. APPLICABLE LAW AND JURISDICTION*

This Opinion shall be governed by and construed in accordance with Danish law and any dispute arising out of or in connection with this Opinion shall be subject to the exclusive jurisdiction of the Danish courts.

*9. INVOCATION*

This Opinion is provided solely for your use and may only be relied upon in connection with this matter and the context set forth herein. This Opinion may not be disclosed to any other person without your prior written consent, except that it may be disclosed without such consent to your legal counsel.

**752**

We undertake no obligation to notify you of any change in the statements contained herein as a result of facts or circumstances that may come to our knowledge in the future or as a result of any subsequent change in Danish law."

In an email dated February 11, 2014, H wrote to V5 and A as follows:

"I have read the Danish opinion. I understand that the purpose of this opinion is to confirm that the US pension fund is entitled to a refund of withholding tax even though it only owns the shares for a very short time.

I was concerned that in the transaction there would be a double refund of withholding tax or some other tax benefit in addition to the refund of withholding tax to the pension fund. (This was actually the purpose of the cum/ext transactions we have seen in Germany under previous legislation).

When I read this opinion, I did not find any indication of such additional tax benefits. Do you expect there to be an additional tax benefit for any of the counterparties to the transaction?"

A replied to the email the same day as follows:

"Based on a preliminary review, I agree that the described transaction does not reveal a factual pattern that certainly implies a cum/ex trade, although the pattern does reflect a transaction in which a stock purchase occurs before (or on) the record date and the delivery occurs after the record date, which we have also typically seen in cum/ex trades. To be on the safe side, I would normally also build in an assumption that the seller of the shares to the US pension fund was actually the owner of the cum dividend shares that will ultimately be delivered, at the time of sale or at least at the dividend record date. However, this could presumably be read into assumptions 5-7.

As far as the short period of ownership is concerned, we have been able to find a solution in the past in light of the facts if this is

the concern. However, I would hesitate to put forward my opinion on a buy and sell,

both of which occur on the record date - even if the purchase and sale occur just a few days apart.

The fact that the transaction involves derivatives and stock lending transactions usually creates challenges with respect to the comfort level of a tax opinion, but we often find that we can find a comfort level that is satisfactory to the client." By email dated February 12, 2014, attorney K from Jones Day wrote to A that Jones Day's client would like to proceed with the project on the basis of the sales estimate, and at the same time K requested A to begin work on preparing "a draft tax opinion".

A then wrote to K in an email dated February 12, 2014:

"We are happy to proceed. We just have a couple of preliminary questions: Can you confirm that we can proceed on the basis of the factual pattern that emerges from the second Danish opinion that we have received?

Can you tell us which points our opinion should cover?"

On February 13, 2014, K replied to this email as follows:

"Thank you very much for your email. I understand that you have been briefed by H on the factual background and structure of this transaction. As our client is involved solely as a custodian bank, we do not need a reconfirmation of the transaction from a tax perspective, but a reasoned tax analysis of the risk that our client may be exposed to if they act as a custodian bank in this project. I am not a tax expert, but the question to be answered in my opinion is whether the client, from a Danish tax law perspective, can be held liable or even prosecuted for supporting/facilitating a tax evasion committed by one of the other actors in this transaction (which was the reason why we requested the Danish tax opinion).

For the sake of your analysis, you can refer to Danish public opinion and assume the following:

The structure was not developed by our client.

Our client will fill the role of securities custodian, but no other role.

Our client has been asked to fulfill the [*role of*] custodian bank, i.e. the client is not actively marketing this structure to others. Our client has no information or knowledge as to whether the application for tax refund will be filed twice by another person.

Will it be possible to get a first draft of your analysis early next week?

Is there anything else that A should be aware of?"

H was the copy recipient of the email.

On February 14, 2014, A wrote the following in an email to K and H:

"Based on the email from K, we will focus our opinion solely on the issue of the client's liability as custodian bank in a transaction that - as we understand it - is outlined in the factual description in the received tax opinion from Hannes Snellman. To the extent necessary, we will make the assumptions set forth therein as well as the assumptions in K's email below, unless otherwise instructed.

With this in mind, we aim to provide you with a first draft on Tuesday, February 18.

Please let me know if the above gives rise to any comments at this time."

On February 18, 2014, A sent the first draft of the legal opinion to K and H from Jones Day by email. The email accompanying the draft states:

**753**

"Please find attached our draft Danish opinion regarding North Channel Bank in relation to the proposed transaction where NCB acts as custodian bank.

We welcome any comments or questions you may have. Please note in particular the elaborations of the assumptions we have made, with the most important ones highlighted in yellow. We note that the Danish tax opinion presented to us assumes that the NCB will make a declaration of beneficial ownership in its records, which seems unusual and we have actually assumed that there is no such record, but please comment. If there is indeed a record of beneficial ownership and this will also be reflected in a certificate issued by the NCB for the Shares, we would like to know as it may have an impact on our analysis." The first draft legal opinion of February 18, 2014 reads as follows:

"*Danish opinion*

*1. Introduction*

This opinion (*"Opinion"*) has been prepared at the request of Jones Day, Germany, on behalf of North Channel Bank GmbH & Co. KG (*"NCB"*).

This Opinion addresses the Danish liability consequences for the NCB of acting as custodian bank in certain transactions in Danish listed shares entered into by a US pension fund (*"USPF"*).

*2. Scope*

This Opinion only assesses whether NCB is subject to tax in Denmark, NCB's civil liability for a loss suffered by the Danish State and Danish criminal law issues for NCB as a result of the transaction based on the factual background and assumptions set out in 3 and 4 below.

In this Opinion is not considered:

- the tax treatment in Denmark of parties to the proposed transaction other than the NCB
- NCB's liability for claims raised by parties other than the Danish state if the intended Danish tax treatment is not ultimately achieved
- the calculation of the amount of non-contractual liability potentially incurred by the NCB
- issues of liability of parties other than NCB for claims raised by the Danish state as a result of the transaction
- whether Danish law is applicable for the purposes of determining liability under the international conflict of laws rules
- questions relating to the contemplated transactions under legislation other than Danish law
- the Danish tax authorities' possibilities to pursue a Danish or criminal claim or civil liability in connection with a small loss, where relevant.

*3. Intended transactions*

We understand that USPF intends to engage in the following transactions:

1. USPF purchases Danish listed shares (*the "Shares"*) (either through a regulated inter-dealer broker or by purchasing Eurexenkel shares, which are physically delivered listed flex futures contracts relating to the relevant Shares).

2. The purchase of the Shares will take place prior to the ex-dividend date but no later than the Dividend Approval Date, which means the date on which the dividend is finally approved for distribution (generally the date of the annual general meeting) (*the "*Dividend Approval Date*")*. The Settlement Date for the purchase of the Shares will be on or after the Dividend Record Date. In the case of physically delivered listed futures contracts, the expiration date of the futures contract will be on or before the Dividend Approval Date.

3. USPF will receive the dividend declared on the Shares on the Dividend Approval Date (the *"Danish Dividend"*).

4. When purchasing the Shares, USPF hedges its long exposure on the Shares by selling listed, cash-settled single share futures on the Shares (the *"Short Derivative"*). The price of the Short Derivative takes into account a portion of the expected Danish Dividend in calculating the strike price of the Short Derivative, but no adjustment is made if the actual dividend amount is more or less than the expected dividend amount.

5. On or after the Ex-Dividend Date, USPF will sell the Shares through an inter-dealer broker. The Settlement Date for the sale of the Shares is the same date as the Settlement Date for the purchase of the Shares in 2) above. At the same time, USPF will enter into a long futures position on the Shares to close out the short futures position created in step 4 above. The long futures position will expire on the same date as the short futures position created in step 4 above.

6. It is possible that in the period leading up to the sale, the Shares will be lent by way of a stock loan (using a standard Global Master Securities Lending Agreement) to an unrelated party (who may be resident in any jurisdiction) to minimize financing costs. The term of the share loan is not expected to exceed 3 months and the share loan is provided against cash collateral. The share loan transaction may be entered into on or after the dividend date (with settlement of the share loan on the same day), but always after the Dividend Approval Date.

**754**

[Dividend Approval Date] and the borrower of the Shares will not receive any dividend on the Shares.

7. USPF has obtained a tax opinion from a Danish tax lawyer confirming that USPF in the above factual scenario should be entitled to obtain a full refund of Danish withholding tax paid on the Shares.

*4. Prerequisites*

For the purpose of this Opinion, we have assumed the following:

1. USPF is a resident of the United States for tax purposes.
2. USPF does not have a permanent office in Denmark.
3. Dividends received by USPF on the Shares are not derived from the conduct of business by USPF or through a related entity.
4. USPF is covered by Article 22(2)(e) of the current double tax treaty between Denmark and the US *"Double Tax Treaty between Denmark and the United States"*), which means that USPF is:

   a) a legal entity means a legal entity organized under the laws of the United States for the purpose of providing pension or similar benefits under a defined benefit plan to employees, including self-employed persons, and

   b) more than 50% of USPF's beneficiaries, members or participants are natural persons who are residents of either the United States or Denmark.

5. Upon purchase of the Shares, USPF will acquire unconditional ownership of the Shares and will have full ownership rights over the Shares on the Dividend Approval Date, including the right to receive the dividends declared on that date

6. The Shares will be held by USPF through a custodian bank. USPF's ownership of the Shares will be registered with the custodian bank

U.2024.746H - SKM2024.123.HRH

and, depending on the other long and short positions of the custodian and sub-custodian, the Danish Central Securities Depository.

7. NCB's records will show that USPF is the legal [*but not beneficial*] owner of the Shares on the Dividend Approval Date and that the Danish Dividend represents actual dividends on the Shares as remitted to USPF by the depositary bank. *It is further assumed that NCB will, at the request of USPF, provide standard documentation on the Shares in the custody account showing the legal ownership of the Shares and the dividends received.*

8. NCB will not issue ownership documentation relating to the Shares involved in the proposed transaction to any party other than USPF during the period from the purchase of the Shares by USPF until dividends are paid to USPF on the Shares.

9. The proposed transaction was not developed by the NCB.

10. NCB will perform the role of custodian but no other role *and NCB will perform its role as custodian in relation to the proposed transaction in accordance with its standard procedures, which are consistent with the normal procedures of custodian banks generally.*

11. *The NCB charges a fee for the custodian services provided in this transaction which does not differ from the fees charged for custodian services in general.*

12. The NCB has been requested to perform the role of custodian, i.e. the client does not actively market this structure to others.

13. NCB has no information or knowledge as to whether the application for tax refund will be submitted twice/by a different person.

*5. Opinion*

Based solely on our understanding of the facts described in paragraph 3 and the assumptions described in paragraph 4, which we have not separately examined or verified, and with the qualifications described in paragraph 7, we find that:

5.1 NCB will not be subject to Danish tax liability as a result of the proposed transaction.

5.2 The NCB should not be subject to Danish civil liability, which entails an obligation to compensate the Danish state for any losses resulting from its role in the proposed transaction.

5.3 The NCB should not be subject to Danish criminal liability as a result of its role in the proposed transaction.

*6. Danish tax rules and analysis*

6.1 Responsibility for Danish withholding tax

6.1.1 The legal basis in brief

Under Danish national law, foreign shareholders holding less than 10% of the share capital of a Danish company (listed or unlisted) will initially be subject to Danish withholding tax of 27% of the dividends received, unless (for listed companies) the relevant dividend distributing company or the Central Securities Depository has specifically agreed with the Danish tax authorities that a reduced tax rate applies to dividends from the distributing company to the relevant foreign company in accordance with the double tax treaty applicable to the shareholder concerned.

Any Danish withholding tax may be refunded by the Danish tax authorities in accordance with the applicable double tax treaty by filing a dividend refund form with the Danish tax authorities.

Since 2002, the Danish tax authorities have focused on the concept of beneficial ownership. In 2010 they changed

**755**

Danish tax authorities have officially interpreted the Danish rules on withholding tax on dividends for foreign shareholders to mean that the Danish tax rules contain a non-avoidance requirement in the form of a beneficial ownership condition.

When a foreign dividend recipient does not pass a beneficial ownership test as applied by the Danish tax authorities, withholding tax on dividends may thus be required. The beneficial ownership test is based on the beneficial ownership requirement in Article 10 of the OECD Model Tax Convention and as further explained in the OECD comments.

In all cases where the Danish withholding tax is waived or reduced under a double tax treaty, the recipient of the dividend must submit an application for refund of the excess withholding tax to the Danish tax administration. The Danish tax administration will then refund the excess amount of withholding tax withheld.

To apply for a refund of excess withholding tax, the dividend recipient must complete a refund form 06.003 EN, which is available on the Danish tax authorities' website (www.skat.dk). On the refund application form, the dividend recipient must confirm that they are the rightful owner of the dividend and will be required to attach a dividend advice, typically in the form of a valid SWIFT payment message, as proof that tax has been withheld on dividends paid on Danish shares.

The payment is normally made by the Danish tax authorities within one month. Recent amendments to the current interest rules stipulate that if withholding tax on dividends is not repaid within six months from the tax authorities' receipt of the refund application and documentation for the refund application, an interest rate of 0.5% (2014) per month or part thereof will be charged.

6.1.2 Danish tax liability on dividends for NCB

As NCB does not at any time directly or indirectly acquire the Shares, NCB will not for Danish tax purposes be deemed to be subject to Danish withholding tax on the Shares as this will only apply to the owner of the Shares.

6.2 Civil liability

6.2.1 The legal basis in brief

Under Danish civil law, non-contractual liability generally requires that three criteria are met:

- There must be a legal basis for liability, usually negligence or misconduct.

- There must be a financial loss.

- There must be a causal link between the negligence/offense and the financial loss.

The Danish state (the tax authorities) will generally only suffer a loss if the taxable person or entity (the taxpayer) does not pay or is unable to pay the taxes due. Furthermore, a loss is only incurred if the tax due would have been paid by or on behalf of the taxpayer but for the negligence or misconduct.

In general, the relevant issues in relation to liability for losses suffered by the state in tax matters will be the existence of negligence or wrongdoing and the connection with the loss suffered.

Legal precedent shows that managers, board members and liquidators etc. who have an executive or controlling function in a legal entity may, under certain circumstances, be liable for losses suffered by the tax authorities as a creditor if the legal entity becomes insolvent or goes bankrupt.

Furthermore, but less frequently, auditors and legal advisors have been held liable for tax authorities' losses.

To our knowledge, a custodian bank has never been held liable in Danish case law for losses incurred by the tax authorities as a result of having granted an incorrect application for refund of

withholding tax.

withholding tax. Furthermore, we are not aware of any cases tried before Danish courts or in the Danish administrative system where Danish tax authorities have erroneously paid out a refund amount and attempted to recover a loss from such incorrect payment from parties other than the recovering party.

In a series of court cases ("the company steamer cases") initiated by the tax authorities in the late 1990s and early 2000s, civil claims for damages were brought against various participants in a certain type of transaction whereby "empty" Danish companies that owned an amount in cash and owed an equivalent amount in Danish taxes were sold to buyers who essentially withdrew the cash, used it for their own benefit and thus never paid the taxes due. It was immediately clear that the buyers of such companies were liable for the tax authorities' losses, and many also faced criminal sanctions. However, the tax authorities also pursued the selling shareholders of the companies as well as their advisors and the banks that were involved in the financing or simply made the cash transfers in connection with the acquisitions. A number of cases against the sellers of the companies were won by the tax authorities, including in the Danish Supreme Court, when it was ruled that the sellers had not fulfilled a specific obligation to ensure that the taxes due would ultimately be paid, even though the sellers (or their advisors/banks) were not directly involved in the company's failure to pay such taxes as this occurred after the sale.

In a 1999 Supreme Court case, the bank involved in the sale of the "empty" company was held liable for the tax authorities' losses on the basis that

**756**

the bank was aware of every single transaction leading up to the purchase which resulted in the company's money in a bank account being used to finance the buyer's acquisition thereof, which the bank had considered to be crucial in the risk assessment made by the bank (and resulted in a higher than normal fee to the bank). By its actions, the bank was considered to be irresponsibly contributing to self-financing which was not in accordance with Danish company law, and the bank had done nothing to prevent the risk that the interests of the tax authorities would be infringed.

The above cases concerning the empty companies are generally considered to be somewhat extraordinary. The legal basis for the claims raised is also - at least partly - found in special rules in the Danish Companies Act prohibiting certain forms of self-financing. However, the case also demonstrates the ability and determination of the Danish legal system to place liability on parties other than the Danish tax authorities if the tax authorities are deemed to suffer a loss as a result of the actions of several parties, even if a single party has only played a limited role.

6.2.2 Civil liability of NCB in the proposed transaction

Generally, there is no case law to support a claim against NCB for acting as custodian bank for USPF in relation to the Shares.

If parties other than the USPF apply for a refund of Danish withholding tax, the NCB's role, if any, in such refund application process will, in our view, be so remote as to be unrelated to the loss suffered in connection with the payment of the refund application.

The occurrence of a claim against NCB would, in our opinion and based on the circumstances and assumptions set out above, initially require that USPF has erroneously applied for a refund of withheld dividend tax in Denmark. In order to make such a refund application, the Danish tax authorities will generally require that the refund form is accompanied by documentation that the tax has been applied to the taxpayer applying for the refund.

often in the form of a dividend certificate issued by the custodian bank. If the NCB issues such (standard) documentation to the USPF, and the USPF is deemed not to be entitled for Danish tax purposes to apply for a refund of withheld Danish dividend tax - after the refund has been made - the role and actions of the NCB will be relevant for the analysis of liability of the NCB under Danish law.

It should be noted that we have assumed that NCB will only issue standard documentation regarding USPF's ownership, that a Danish tax opinion regarding USPF's Danish tax position has been obtained and submitted to NCB, and that NCB - apart from possibly issuing standard documentation - has had no role in the refund application process or the overall information or documentation submitted to the Danish tax authorities.

It is therefore our opinion that NCB should not be liable for incorrect repayment of withholding tax to USPF by the Danish tax authorities.

The outcome of the cases described in 6.2.1. above regarding the sale of "empty" companies has shown the willingness of the Danish tax authorities and the Danish courts to place liability for the tax authorities' losses on other parties involved in the transactions that have triggered the loss when the transactions are deemed to be of a questionable nature. In light of this, it is not certain how the Danish tax authorities would perceive the contemplated transaction regarding the Shares and, if deemed doubtful, how the Danish legal system would react. However, even if it were to be deemed doubtful, we believe that NCB's role in the proposed transaction cannot be compared to the role of the responsible parties, including the banks, in the "company steamer cases", which were more serious and contributed to the tax authorities' losses.

6.3 Criminal liability of the NCB

6.3.1 The legal basis in brief

According to section 13 of the Danish Tax Control Act, anyone who, with intent to evade tax, provides false or misleading tax information for tax assessment or the amount thereof, is punishable by a fine or imprisonment. If the taxpayer is not a natural person, the sanction is a fine. This also applies if the false or misleading tax information was provided as a result of negligence. Aiding and abetting such tax fraud is subject to the same sanctions.

According to section 15 of the Tax Control Act, anyone who with intent to evade tax fails to file a tax return is subject to criminal sanctions in the form of a fine or imprisonment. If the taxpayer is not a natural person, the sanction is a fine.

Any failure to correctly submit information to the Danish tax authorities will not be subject to criminal sanctions if such failure is not due to gross negligence or intent.

According to section 23 of the Danish Criminal Code, an offense is considered to have been committed by any person who by incitement, advice or connivance has contributed to the criminal offense.

Criminal liability generally requires the perpetrator to have criminal intent, but in certain circumstances negligence is sufficient. However, the applicable criminal sanctions in cases of negligence are generally significantly less severe.

Case law has shown a high degree of reluctance to consider others than the taxpayer to have

**757**

aiding and abetting tax evasion or tax fraud, and generally this will require quite direct involvement in the criminal offense, such as assisting in completing and filing an incorrect tax return.

6.3.2 Criminal liability of the NCB

As a general rule, NCB will not be required to submit information to the Danish tax authorities as a result of the Transaction. NCB will,

if at all, only be indirectly involved in the refund application by issuing the dividend certificate required by the Danish tax authorities

Based on the circumstances and assumptions stated in 2 above and in particular taking into account the same circumstances as described under 6.2.2 regarding civil liability, there should be no basis in Danish law to consider NCB as contributing to Danish tax fraud.

*7. Qualifications*

7.1 This Opinion is limited to matters of Danish law as currently in force and enacted by Danish legislative authorities and expresses no opinion on the laws of any other jurisdiction. In particular, we do not purport to be familiar with the laws of Germany or the laws of any jurisdiction other than Denmark and we express no opinion on matters governed by or construed in accordance with such laws.

7.2 In this Opinion, Danish legal terms are described using English terms and not their original Danish terms. The terms in question may not correspond to the terms described by the same English terms used under the laws of other jurisdictions. This Opinion may therefore only be relied upon on the express condition that any questions of interpretation or liability arising in connection herewith are governed by Danish law and are brought before a Danish court.

7.3 This Opinion is provided on the basis that it is governed by and construed in accordance with Danish law.

7.4 This Opinion is strictly limited to the matters set forth herein and should not be read as implying any other matters in connection with the proposed transaction.

*8. How to use*

This Opinion is addressed to NCB for its benefit and use and may not be relied upon by any other person or for any purpose other than in connection with the proposed transaction and may not be used, circulated, quoted or otherwise referred to for any other purpose, except (i) to NCB's legal or tax advisors in connection with the Transaction, (ii) where required by law, court order or by a relevant regulatory body or (iii) in connection with any dispute or litigation to which NCB is a party, in which case we must be informed of such use."

By email dated February 20, 2014, K provided "some minor comments" on the draft (in handwriting) that they would have incorporated and asked to receive a revised draft, which Jones Day intended to send to North Channel Bank the following day.

On February 21, 2014, A sent a revised draft legal opinion to Jones Day by email. The forwarding email states:

"Attached you will find our revised draft in cleaned up version and with change marks.

The section in point 2, which now reads as follows:

"whether Danish law is applicable to determine the non-contractual liability of the NCB, which is a non-Danish entity, under the international conflict of laws rules"

must address that we have not prepared an assessment of - or an investigation of - whether Danish law is applicable law according to international conflict of law rules in the current cross-border scenario where it is a German entity acting in Germany, which could have a loss-making effect in Denmark for the Danish state.

Please contact me if our changes raise any comments or do not address any concerns you may have." The revised draft legal opinion of February 20, 2014 contained - with correction marks compared to the original draft

- in particular the following changes in section 2 and section 4, points 9, 12 and 13, and section 6.3.2:

"...

*2. Scope*

This Opinion only assesses whether NCB is subject to tax in Denmark, NCB's civil liability for a loss suffered by the Danish State and Danish criminal law issues for NCB as a result of the transaction based on the factual background and assumptions set out in 3 and 4 below.

In this Opinion is not considered:

- the tax treatment *of* parties other *than the NCB* in the proposed transaction
- NCB's liability for claims raised by parties other than the Danish state if the intended Danish tax treatment is not ultimately achieved
- the calculation of the amount of non-contractual liability potentially incurred by the NCB
- the issue of liability of parties other than the NCB for claims raised by the Danish state as a result of the transaction
- whether Danish law *is applicable* to determine a *non-contractual* response *for NCB, which is a non-Danish entity*, under the international conflict of laws rules
- questions relating to the contemplated transactions under legislation other than Danish law

**758**

- the Danish tax authorities' possibilities to pursue a Danish or criminal claim or civil liability *against NCB in Germany* in connection with a small loss where relevant.

*4. Prerequisites*

...

9.     The proposed transaction was not *structured* by the NCB.

...

12.    The NCB has been requested to perform the role of custodian bank,

13.    NCB has no *reason to believe that, or* information or knowledge as to whether, any *person other than USPF will make an application for a tax refund in respect of the dividend withholding tax withheld on the Shares.*

...

*6. Danish tax rules and analysis*

...

6.3.2 Criminal liability of the NCB arising from *the proposed transaction*

As a general rule, NCB will not be required to submit information to the Danish tax authorities as a result of the Transaction. NCB will, if at all, only be indirectly involved in the refund application by issuing the dividend certificate *generally* required by the Danish tax authorities.

Based on the circumstances and assumptions set out in 2 ... above and in particular taking into account the same circumstances as described under 6.2.2 regarding civil liability, there should be no basis in Danish law to consider NCB as contributing to Danish tax fraud.

..."

By email dated April 3, 2014, A wrote to K and H that Bech-Bruun was in the process of preparing an invoice for the assistance provided. It was stated that the fee based on time spent would amount to EUR 8,700 excluding VAT compared to the original estimate of EUR 6,000-7,000 excluding VAT, and A requested confirmation that this was acceptable to the client. On the same day, H wrote the following to A by email

"The client has just sent an update on the structure that we a r e r e v i e w i n g , which may affect our opinion(s) - and which may justify an increase in the fee.

We will get back to you shortly with a proposal on how to proceed with new facts and the invoice. Thank you for your patience!" By email dated April 7, 2014, H wrote the following to A and V5:

"In the meantime, we can look at the updated information we have received. The change in structure that the client is considering is that the transaction will no longer be settled/resolved with a future but with a forward trade. As we understand it, there will otherwise be no changes to the overall transaction. Will this change your analysis?

The client has provided us with a German summary of the transaction, which contains a technical description of the different steps and the related book entries. We can of course share the document with you and/or walk you through the different steps if you think it would be helpful. Let us know what you think."

In an email dated April 7, 2014, A wrote the following to H :

"Is it correctly understood that this means that the parties to the transaction will thus seek to use an OTC instrument instead of a standardized financial instrument? Or will the forward also be in a standardized form?"

H replied the same day by email:

"As I understand it, this will be some kind of OTC transaction, but the description of the trade is not quite clear. Is this something we can ask the client about?"

A then wrote to H on the same day:

"I think this information can be useful for a Danish analysis. It is too early to say whether it is of great importance."

In an email dated April 8, 2014, H then wrote to A that the customer had confirmed "that forwards are OTC transactions".

K then wrote to A in an email dated April 10, 2014, at 3.29 pm:

"I think H has confirmed to you that the futures that X and Z will enter into will be replaced by OTC forward transactions.

I am attaching an updated diagram from the client showing the various steps and specifying the dates on which transactions are entered and settled. Unfortunately, it is only available in German, so please let me know if you have any questions or need further clarification. I would be grateful if you could send us an updated draft of your opinion (and a comparison with the previous draft) as soon as possible."

On the same date, at 15:51, A wrote an email to K:

"Thank you for that. We will review the material/information received and amend our draft opinion accordingly and send it to you. I aim to be able to send it to you tomorrow COB." The German transaction description is included as Annex 1 to this judgment.

On April 11, 2014, A wrote an email to K stating that he could not finish the new draft until Monday, and on April 14, 2014, A then wrote the following in an email to K:

"I have tried to review the German structure description that was attached to your email last week, a few

**759**

times. With regard to German language skills, which I believe are unfortunately [quite] inadequate to the required level, I am not confident that I can determine to what extent the description therein reflects the factual assumptions of our first draft opinion, except for the deviation from the initial assumption of using Futures, now replaced by forwards.

I therefore suggest that either i) we base our opinion on the same factual description as last time (which was based on the factual description in the tax opinion given to the US pension fund), but replace futures with OTC forwards, ii) that you

H changes the factual description in our draft opinion, or iii) that an English version of the submitted structure document is obtained/prepared. I have briefly checked with our internal translator, who expects to be able to translate the structure document into

1,000 EUR excluding VAT and expects to deliver the translation to me within a day.

Please call us if you would like to discuss the options further before you decide on the above."

In response to this email, K wrote the following to A on April 14, 2014:

"Thank you for that. I don't think we need a formal translation of the document and suggest that you base your opinion on the previous factual description and replace futures with forwards (as discussed). Once we receive the updated draft, we will review the description and confirm any factual changes."

By email dated April 15, 2014, A then sent a new draft legal opinion to K. The forwarding email states:

"Attached you will find our amended draft opinion with change marks compared to the latest version from February 20th.

As you can see, we have changed the opinion slightly because OTC contracts are replacing futures. What we are most concerned about is that there is now no tax opinion that specifically covers the transaction for which NCB will act as custodian.

Please contact me if the attached gives rise to any comments or questions."

The revised draft legal opinion of April 15, 2014 contained - with correction marks compared to previous drafts - in particular the following changes in section 3, section 5 and section 6, point 6.2.2:

"...

*3. intended transactions*

We understand that USPF intends to engage in the following transactions:

1. USPF purchases Danish listed shares (*the "Shares"*) (either through a regulated inter-dealer broker or by purchasing Eurexenkel shares, physically delivered listed flex futures contracts *[will these also be changed to OTC contracts?]* relating to the relevant Shares).

2. The purchase of the Shares will take place prior to the ex-dividend date but no later than the Dividend Approval Date, which means the date on which the dividend is finally approved for distribution (generally the date of the annual general meeting) (*the "Dividend Approval Date"*). The Settlement Date for the purchase of the Shares will be on or after the Dividend Record Date. In the case of physically delivered exchange-traded futures contracts, the expiration date of the futures contract will be no later than the Dividend Approval Date [will these also be changed to OTC contracts?

3. USPF will receive the dividend declared on the Shares on the Dividend Approval Date (the *"Danish Dividend"*).

4. When purchasing the Shares, USPF hedges its long exposure on the Shares by *entering into an OTC forward contract with USPF on the short side with reference to* the Shares (the *"Short Derivative"*). The price of the Short Derivative takes into account a proportion of the expected Danish Dividend in the calculation of the strike price of the Short Derivative, but no adjustment is made if the actual dividend amount is more or less than the expected dividend amount.

5. On or after the Ex-Dividend Date, USPF will sell the

Shares through an inter-dealer broker. The Settlement Date for the sale of the Shares is the same date as the Settlement Date

[Settlement Date] for the purchase of the Shares in 2) above. At the same time, the USPF will enter into an *OTC forward contract in which it has a* long position in the Shares to close out the short position created in step 4 above. The long position will expire on the same date as the short position created in step 4 above.

6. It is possible that in the period leading up to the sale, the Shares will be lent by way of a stock loan (using a standard Global Master Securities Lending Agreement) to an unrelated party (who may be resident in any jurisdiction) to minimize financing costs. The term of the share loan is not expected to exceed 3 months and the share loan is granted against cash collateral. The Share Loan transaction may be entered into on or after the Dividend Record Date (with settlement of the Share Loan on the same day) but always after the Dividend Ap- proval Date and the borrower of the Shares will not receive any dividends on the Shares.

7. USPF has obtained a tax opinion from a Danish tax lawyer, which confirms that USPF in the above factual scenario, *assuming, however, that USPF*

**760**

*enter into futures contracts instead of OTC contracts to hedge their position in the Shares* should be entitled to a full refund of Danish withholding tax paid on the Shares.

…

*5. Opinion*

Based solely on our understanding of the facts described in paragraph 3 and the assumptions described in paragraph 4 above, which we have not separately examined or verified, and with the qualifications described in paragraph 7, we find that:

5.1 NCB will not be subject to Danish tax liability as a result of the proposed transaction.

5.2 The NCB should not be subject to Danish civil liability, which entails an obligation to compensate the Danish state for any losses resulting from its role in the proposed transaction.

However, the following circumstances prevent us from reaching a more definitive assessment of *NCB's position:*

*1. The fact that USPF enters into OTC forward contracts (and not, for example, listed futures) to hedge its position may in principle allow for a "perfect hedge" of USPF's position in the Shares and may possibly also point to another identified party who may be deemed to be the beneficial owner of the dividends received on the Shares instead of USPF as beneficial owner. This could present an opportunity for arbitrage that is identifiable to the NCB and where the standard ownership documentation issued by the NCB may be misleading.*

*2. The fact that USPF has not obtained a tax opinion on the exact transaction carried out by USPF (the tax opinion assumes futures and not OTC forward contracts) will make it more difficult for NCB to claim that the bank by definition has acted in good faith (and thus is not liable) with regard to the Danish tax treatment of the transaction.*

*3. The cases described in 6.2.1 below regarding the sale of "empty" companies have demonstrated the willingness of the Danish tax authorities and the Danish courts to place liability for the tax authorities' losses on other parties involved in the transactions that triggered the loss when the transactions are deemed to be of a questionable nature. In light of this, it is not certain how the Danish tax authorities would perceive the proposed transaction.*

*regarding the Shares and, if deemed doubtful, how the Danish legal system will react. However, even if deemed doubtful, we believe that NCB's role in the proposed transaction is not comparable to the role of the responsible parties, including the banks, in the "company steamer" cases, which were more serious and contributed to the tax authorities' losses.*

5.3 The NCB should not be subject to Danish criminal liability as a result of its role in the proposed transaction.

*6. Danish tax rules and analysis*

…

6.2.2 Civil liability of NCB in the proposed transaction

Generally, there is no case law to support a claim against NCB for acting as custodian bank for USPF in relation to the Shares.

If parties other than the USPF apply for a refund of Danish withholding tax, any role of the NCB in such a refund application process will, in our view, be so remote that it has no connection to the loss suffered in connection with the payment of the refund application.

The occurrence of a claim against NCB would, in our opinion and based on the circumstances and assumptions set out above, initially require that USPF has erroneously applied for a refund of withheld dividend tax in Denmark. In order to make such a refund application, the Danish tax authorities will generally require that the refund form is accompanied by documentation that the tax has been applied to the taxpayer seeking the refund, often in the form of a dividend certificate issued by the depositary bank. If the NCB issues such (standard) documentation to the USPF, and the USPF is deemed not entitled for Danish tax purposes to apply for a refund of withheld Danish dividend tax - after the refund has been made - the role and actions of the NCB will be relevant for the analysis of liability of the NCB under Danish law.

It should be noted that we have assumed that NCB will only issue standard documentation relating to USPF's ownership, *which does not address beneficial ownership,* that a Danish tax opinion regarding USPF's Danish tax position has been obtained and submitted to NCB and that NCB - apart from possibly issuing standard documentation - has had no role in the refund application process or the overall information or documentation submitted to the Danish tax authorities.

It is therefore our opinion that NCB should not be liable for incorrect repayment of withholding tax to USPF by the Danish tax authorities.

*However, the following circumstances prevent us from reaching a more definitive assessment of the NCB's position:*

*4. The fact that USPF enters into OTC forward contracts (and not, for example, listed futures) to hedge its position may in principle allow for a "perfect hedge" of USPF's position in the Shares and may possibly also point to another identified party which may be deemed to be the*

**761**

*beneficial owner of the dividends received on the Shares instead of USPF as the beneficial owner. This could present an opportunity for arbitrage that is identifiable to the NCB and where the standard ownership documentation issued by the NCB may be misleading.*

*5. The fact that USPF has not obtained a tax opinion on the precise transaction carried out by USPF (tax opinion assumes futures and not OTC forward contracts) will make it more difficult for NCB to argue that it has, by definition, acted in good faith (and thus is not liable) with respect to the Danish tax treatment of the transaction.*

*6. The fact that USPF has not obtained a tax opinion on the precise transaction carried out by USPF (tax opinion assumes futures and not OTC forward contracts) will make it more difficult for NCB to argue that it has, by definition, acted in good faith (and thus is not liable) with respect to the Danish tax treatment of the transaction.*

*6.* The cases described in 6.2.1 above regarding the sale of "empty" companies have demonstrated the willingness of the Danish tax authorities and the Danish courts to place liability for the tax authorities' losses on other parties involved in the transactions that have triggered the loss when the transactions are deemed to be of a questionable nature. In light of this, it is uncertain how the Danish tax authorities would perceive the contemplated transaction regarding the Shares and, if deemed doubtful, how the Danish legal system would react. However, even if deemed questionable, we believe that the role of NCB in the proposed transaction cannot be compared to the role of the responsible parties, including the banks, in the "corporate fraud cases", which were more serious and contributed to the tax authorities' losses.
...''

In an email dated April 15, 2014, K wrote the following to A:

"Thank you very much for the updated draft. To align your understanding of the transaction with the client's description and to avoid confusion about forwards, we have prepared a descriptive summary of the transaction, which I attach. I would suggest that you replace your description in point 3 of the opinion with the attached description (with the necessary adjustments to the terminology). If you have any questions or if anything is unclear, please let me know so we can discuss it.

As soon as we have received your updated draft, we will send it to the client. We will also ask the client if they will provide an updated tax opinion to USFP (see your comment in sections 5.2 and 6.2.2)."

The summary of the transaction mentioned in the email, which is written in English, has the following wording in the Danish translation:

"...
1.  On the trade date (*the "Trade Date"*), the US-FP/Partnership will purchase Danish/Belgian listed shares (*the "Shares"*) through a regulated inter-dealer broker (*the "Broker"*). The purchase will take place prior to the ex-dividend date but after the Dividend Ap- proval Date (cum dividend). The Settlement Date for the transaction (*the "Settlement Date")* [Settlement Date] will be after the Dividend Record Date (ex-dividend).
2.  On the Trade Date, the seller (the *"Seller") will* sell the Shares through the Broker. The sale will take place prior to the Ex-Dividend Date but after the Dividend Approval Date (cum dividend). The Settlement Date will be after the Dividend Record Date (ex-dividend).
3.  Both USFP/Partnership and the Seller have a securities account with North Channel Bank GmbH & Co. KG (the *"Custodian Bank")*.
4.  The USFP/Partnership will receive the dividend (excluding withholding tax) declared on the Shares on the Dividend Approval Date (*the "Dividend")* through the Custodian. The Custodian will provide the USFP/Partnership with a credit advice on the receipt of the Net Dividend. At the same time, the Custodian will provide the Seller with a debit advice on the Net Dividend.
5.  On the Trade Date [Trade Date]:
    a.  The Seller agrees with a third party (unrelated to the Seller) to enter into a share lending transaction (the *"Share Lending Transaction")* on the Settlement Date pursuant to which the third party agrees to lend the Shares (plus dividends) to the Seller on the Settlement Date. As the Shares are delivered ex dividend, the third party will make a compensation payment to the Seller; and

    b.  USFP/Partnership agrees with a third party (unrelated to USFP/Partnership) to enter into a Share lending transaction on the Settlement Date pursuant to which USFP/Partnership agrees that on the Settlement Date it will lend the Shares (plus dividends) to this third party. As the Shares are delivered ex dividend, the USFP/Partnership will make a compensation payment to the third party.
6.  On the Trade Date [Trade Date]:
    a.  The Seller enters into a forward transaction with a third party (not related to the Seller) (the *"Forward Transaction")* pursuant to which the third party will deliver the Shares (ex dividend) to the Seller on the Settlement Date; and
    b.  The USFP/Partnership will enter into a Forward Transaction with a third party (unrelated to the USFP/Partnership) pursuant to which the USFP/Partnership will deliver the Shares (ex dividend) to the third party on the Settlement Date.
7.  On the settlement date [Settlement Date]:
    a.  The Share Lending Transaction and the Forward Transaction between the Seller and the third party are settled, i.e.

    **762**

    the third party delivers the Shares to the Seller pursuant to the Forward Transaction and the Seller returns the Shares to the third party pursuant to the Share Lending Transaction; and
    b.  The Share Lending Transaction and the Forward Transaction between the USFP/Partnership and the third party are settled, i.e. the USFP/Partnership delivers the Shares to the third party under the Forward Transaction and the third party returns the Shares to the USFP/Partnership under the Share Lending Transaction.

By email dated April 15, 2014, A replied to the email from K as follows:

"Thank you for your email. I will adapt the factual description and consider the possible impact on public opinion as such.

I aim to send you an amended draft tomorrow." By email dated April 16, 2014, A then wrote the following to K:

"Further to the receipt of the new factual description, I may be misunderstanding, but I have reviewed the description and I read it as if there is indeed an indication that the transaction is a cum/ex transaction, which was our original concern but which we felt we could rule out after reading the tax opinion.

I understand that in the new factual description, USPF acquires shares from the seller upon payment of a cum dividend price, but that the seller will deliver ex dividend in the form of borrowed ex dividend shares plus a dividend

"compensation payment".

Furthermore, no. 1 of the factual description states that the acquisition will even take place after the "Dividend Approval Date". If the "Dividend Approval Date" means the date on which the general meeting of the Danish distributing company approves the dividend distribution, it is from a tax perspective the decisive date for the ownership of the dividend, so that the shareholder on this date is also the owner of the dividend. Thus, if USPF does not even acquire the Shares until after this date, this in itself should in our analysis prevent USPF from being deemed to acquire cum dividend shares for Danish tax purposes and thus presumably prevent NCB from issuing a dividend ownership certificate to USPF, which USPF can use as a basis for applying for a refund

of withheld Danish dividend tax.

The above seems, as I read it, in any case to preclude us from retaining assumption 5 in our draft opinion, as USPF acquires cum dividend shares from a Seller that does not own (or deliver) cum dividend shares, and USPF therefore by definition cannot be the owner of cum dividend shares on the Dividend Approval Date, which in our view is a precondition for being considered the owner of the shares and thus the dividend itself for Danish tax purposes. Our assumption 5 in our draft opinion is therefore crucial for us to reach a market level for NCB, even if we were presented with a new tax opinion that achieves market level in the analysis of withheld Danish dividend tax to USPF in light of the above and on which NCB may be able to base its good faith action in the transaction.

As NCB acts for both the Seller and USPF and knows the nature of the transaction, we believe this will make it even more difficult for NCB to distance its role in relation to the transaction.

I would welcome your thoughts on the above and whether you think our prerequisite 5 can be maintained and I would be happy to call and discuss the above to determine the best course of action from here."

On the same day, K responded to A's inquiry as follows:

"I think it's best to call together to go over your points and concerns, which I'm sure can be resolved. As H is away this week, I suggest we call together next Tuesday if that is convenient for you. I'll check with H and L to see if they are available." There are no minutes of the telephone meeting in question in the case. In an email dated April 22, 2014, lawyer L from Jones Day wrote the following to A:

"Thank you for taking the time for a conference call.

As discussed, I am attaching a revised summary of the transaction (with change marks) based on K's earlier email. I hope it reflects our discussions appropriately.

For our client, it will probably be useful to add two aspects to the opinion:

1. An assumption that the Dividend Approval Date is identical to the Dividend Record Date (all as defined), as is common Danish corporate practice.

2. A clarification that, under Danish civil law, ownership of the Shares passes when a buyer and a seller agree on the purchase (object of sale and price) of the Shares (regardless of the later Settlement Date).

Please call us if you need further clarification."

The revised summary of the transaction referred to in the email dated

22. April 2014 only contains changes to points 1 and 2, which hereafter have the following wording in the Danish translation:

"...

1.  *On the trade date (the "Trade Date") [Trade Date], USPF/Partnership acquires Danish listed*

    **763**

    *shares (the "Shares") by a regulated inter-dealer broker (the "Broker"). The purchase will take place on or before the date on which the general meeting of the issuer of the Shares (the "Issuer") resolves to apply all or part of the earnings and profits to pay a dividend (the "Dividend Approval Date") but no later than the Dividend Record Date (cum dividend), i.e. before the ex-dividend date. The settlement date of the Transaction (the "Settlement Date") [Settlement Date] will be after the Dividend Record Date [Dividend Record Date] (ex dividend). The "Dividend Record Date" [Dividend*

*Record Date] is the end of the trading day ending immediately before the ex-dividend date.*

2.  *On the Trade Date, the seller (the "Seller") will sell the Shares through the Broker. The sale will therefore take place before the Ex-Dividend Date, i.e. before or on the Dividend Approval Date but no later than the Dividend Record Date (cum dividend). The Settlement Date will be after the Dividend Record Date (ex dividend).*

..."

In an email dated April 22, 2014 to, among others, K, A thanked for the email and telephone meeting on the same date and stated further:

"...

I amend the factual description and opinion on the basis thereof to the extent necessary."

On April 23, 2014, A then sent a revised draft legal opinion by email to L H and K. The revised draft legal opinion of April 23, 2014 had - with corrections to the previous draft - the following wording:

"Danish Opinion

*1 Introduction*

This opinion (*"Opinion"*) has been prepared at the request of Jones Day, Germany, on behalf of North Channel Bank GmbH & Co. KG (*"NCB"*).

This Opinion addresses the Danish liability consequences for NCB of acting as custodian bank in certain transactions in Danish listed shares entered into by a US pension fund (*"USPF"*).

*2 Scope*

This Opinion only assesses whether NCB is subject to tax in Denmark, NCB's civil liability for a loss suffered by the Danish State and Danish criminal law issues for NCB as a result of the transaction on the basis of the factual background and assumptions in 3 and 4 below. This Opinion does not assess:

*2.1.1 the tax treatment in Denmark of parties other than NCB in the proposed transaction*

*2.1.2 NCB's liability for claims raised by parties other than the Danish state if the intended Danish tax treatment is not ultimately achieved*

*2.1.3 the calculation of the amount of non-contractual liability potentially incurred by the NCB*

*2.1.4 the issue of liability of parties other than the NCB for claims raised by the Danish state as a result of the transaction*

*2.1.5 whether Danish law is applicable to determine the non-contractual liability of the NCB, which is a non-Danish entity, under the international conflict of laws rules*

*2.1.6 questions relating to the contemplated transactions under legislation other than Danish law*

*2.1.7 the Danish tax authorities' possibilities to pursue a Danish or criminal claim or civil liability against NCB in Germany in connection with a small loss, where relevant.*

*3 Intended transactions*

We understand that USPF intends to engage in the following transactions:

*3.1 On the trade date (the "Trade Date") [Trade Date], USPF/Partnership will purchase Danish listed shares (the "Shares") from a regulated inter-dealer broker (the "Broker") [which holds the Shares on the Trade Date]. The acquisition will take place on or before the date on which the general meeting of the issuer of the Shares (the "Issuer") resolves to apply all or part of the earnings and profits to pay a dividend (the "Dividend Approval Date"), but no later than the Dividend Record Date (cum dividend), i.e. before the ex-dividend date. The settlement date of the Transaction (the "Settlement*

date") [Settlement Date] will be after the Dividend Record Date (ex dividend). The "Dividend Record Date" [Dividend Record Date] is the end of the trading day ending immediately before the ex-dividend date.

3.2 On the Trade Date, the seller (the "Seller") will sell the Shares through the Broker. The sale will therefore take place before the Ex-Dividend Date, i.e. before or on the Dividend Approval Date but no later than the Dividend Record Date (cum dividend). The Settlement Date will be after the Dividend Record Date (ex dividend).

3.3 Both USPF/Partnership and the Seller have a securities account with North Channel Bank GmbH & Co. KG (the "Custodian").

3.4 The USPF/Partnership will receive the dividend (excluding withholding tax) declared on the Shares on the Dividend Approval Date (the "Dividend") through the Custodian. The Custodian will provide the USPF/Partnership with a certificate (credit ad- vice) of

**764**

the receipt of the net proceeds. At the same time, the Custodian provides the Seller with a debit advice on the net proceeds.

3.5 On the Trade Date [Trade Date]:

3.5.1 The Seller agrees with a third party (unrelated to the Seller) to enter into a share lending transaction (the "Share Lending Transaction") on the Settlement Date pursuant to which the third party agrees to lend the Shares (plus dividends) to the Seller on the Settlement Date. As the Shares are delivered ex dividend, the third party will make a compensation payment to the Seller, and

3.5.2 USPF/Partnership agrees with a third party (unrelated to USPF/Partnership) to enter into a Share Lending Transaction on the Settlement Date pursuant to which USPF/Partnership agrees that on the Settlement Date it will lend the Shares (plus dividends) to the third party. As the Shares are delivered ex dividend, USPF/Partnership will make a compensation payment to the third party. 3.6 On the Trade Date:

3.6.1 the Seller enters into an OTC forward transaction with a third party (unrelated to the Seller) (the "Forward Transaction") pursuant to which the third party will deliver the Shares (ex dividend) to the Seller on the Settlement Date; and

3.6.2 The USPF/Partnership will enter into an OTC Forward Transaction with a third party (unrelated to the USPF/Partnership) pursuant to which the USPF/Partnership will deliver the Shares (ex dividend) to the third party on the Settlement Date.

3.7 On the Settlement Date:

3.7.1 The Share Lending Transaction and the Forward Transaction between the Seller and the third party are settled, i.e. the third party delivers the Shares to the Seller under the Forward Transaction and the Seller returns the Shares to the third party under the Share Lending Transaction; and

3.7.2 The Share Lending Transaction and the Forward Transaction between the USPF/Partnership and the third party are settled, i.e. the USPF/Partnership delivers the Shares to the third party under the Forward Transaction and the third party returns the Shares to the USPF/Partnership under the Share Lending Transaction.

3.8 USPF has obtained a tax opinion from a Danish tax lawyer confirming that in the above factual scenario USPF should be entitled to a full refund of Danish withholding tax paid on the Shares. [when the Forward Transaction described in 3.6 is carried out with futures and not forward contracts].

4. Prerequisites

For the purpose of this Opinion, we have assumed the following:

1. USPF is a resident of the United States for tax purposes.
2. USPF does not have a permanent office in Denmark.
3. Dividends received by USPF on the Shares are not derived from the conduct of business by USPF or through a related entity.
4. USPF is covered by Article 22(2)(e) of the current double tax treaty between Denmark and the US *"Double Tax Treaty between Denmark and the United States"*), which means that USPF is:
   a. a legal entity organized under the laws of the United States for the purpose of providing pension or similar benefits under a defined benefit plan to employees, including self-employed persons, and
   b. more than 50% of USPF's beneficiaries, members or participants are natural persons who are residents of either the United States or Denmark.
5. On the Trade Date, USPF will acquire unconditional ownership of the Shares and will have full ownership rights over the Shares on the Dividend Approval Date, including the right to receive the Dividend declared on that date.
6. The Shares will be held by USPF through NCB as custodian bank. USPF's ownership of the Shares will be registered with NCB and, depending on the other long and short positions of NCB/sub-custodian bank, the Danish Central Securities Depository.
7. NCB's records will show that USPF is the legal owner but will not contain information on the beneficial ownership of the Shares on the Dividend Approval Date and that the Danish Dividend represents actual dividends on the Shares as remitted to USPF by the depositary bank. It is further assumed that NCB will, at the request of USPF, provide standard ownership documentation in respect of the Shares in the custody account showing the legal ownership of the Shares and the dividends received.
8. NCB will not issue ownership documentation relating to the Shares involved in the proposed transaction to any party other than USPF during the period from the purchase of the Shares by USPF until dividends are paid to USPF on the Shares *or issue documentation showing ownership other than USPF during that period.*
9. The proposed transaction was not structured by the NCB.
10. NCB will perform the role of securities custodian, but no other role, such *as assistance in applying for a refund of Danish withholding tax withheld on the Shares,* and NCB will perform its role as custodian in connection with the contemplated transaction in accordance with its standard procedures, which are consistent with the normal procedures of custodian banks generally.
11. **765**
    The NCB charges a fee for the custodian services provided in this transaction which does not differ from the fees charged for custodian services in general.
12. The NCB has been requested to perform the role of custodian bank.
13. NCB has no reason to believe, or information or knowledge, that any person *or entity* other than USPF will file an application for a tax refund with respect to the dividend withholding tax withheld on the Shares.

*5. Opinion*

Based solely on our understanding of the facts described in paragraph 3 and the assumptions described in paragraph 4, which we have not separately examined or verified, and with the

qualifications described in paragraph 7, we find that:

5.1 NCB will not be subject to Danish tax liability as a result of the proposed transaction.

5.2 The NCB should not be subject to Danish civil liability, which entails an obligation to compensate the Danish state for any losses resulting from its role in the proposed transaction.

However, the following circumstances prevent us from reaching a more definitive assessment of NCB's position:

1. The fact that USPF *in the Forward Transaction* enters into OTC forward contracts (and not, for example, listed futures) to hedge their position may in principle allow for a "perfect hedge" of USPF's position in the Shares*, which eliminates the ownership risk* and may possibly also point to another identified party *assuming such ownership risk,* who may *thus* be deemed to be the beneficial owner of the dividends received on the Shares instead of USPF. This could present an arbitrage opportunity that is identifiable to the NCB and where the standard ownership documentation issued by the NCB may be misleading.

2. The fact that USPF *(or NCB)* has not obtained a tax opinion on the precise transaction carried out by USPF (tax opinion assumes futures and not OTC forward contracts) will make it more difficult for NCB to argue that it has by definition acted in good faith (and is thus not liable) with respect to the Danish tax treatment of the transaction, *which could reasonably be considered by a professional party to contain problematic issues in relation to the ownership of the Shares*

3. The cases described in 6.2.1 below regarding the sale of "empty" companies have demonstrated the willingness of the Danish tax authorities and the Danish courts to place liability for the tax authorities' losses on other parties involved in the transactions that have triggered the loss when the transactions are deemed to be of a questionable nature. In light of this, it is not certain how the Danish tax authorities would perceive the contemplated transaction regarding the Shares and, if deemed doubtful, how the Danish legal system would react. However, even if it were to be deemed questionable, we believe that NCB's role in the proposed transaction cannot be compared to the role of the responsible parties, including the banks, in the "company steamer cases", which were more serious and contributed to the tax authorities' losses.

5.3 The NCB should not be subject to Danish criminal liability as a result of its role in the proposed transaction.

*6. Danish tax rules and analysis*

6.1 Responsibility for Danish withholding tax

6.1.1 The legal basis in brief

*Generally, the legal owner of the shares on the date of the resolution to distribute the dividend will also be considered the owner of the dividend from a Danish tax and company law perspective, even if the purchaser is not (yet) registered as the owner of the shares, which constitutes the security deed under Danish law, on the date of the general meeting (both Dividend Approval Date and Dividend Record Date). The standard settlement terms for a sale and purchase transaction relating to listed Danish Shares registered with VP Securities A/S are T+3.*

*VP Securities A/S thus generally settles dividend payments on day 4 after the general meeting of the Issuer. The actual dividend payment is based on the Issuer's share register as of the date of the general meeting of the Issuer and as updated at the end of day 3. Distribution on day 4 is therefore based on the assumption that all T+3 share trades executed up to and including the date of the general meeting are registered when the dividend is paid. The shareholder information to be submitted to the Danish tax authorities by (or on behalf of) the Issuer is the list of*

*shareholders.*

*on the date of the general meeting of the Issuer as updated at the end of day 3.*

*For trades executed on standard T+3 terms, an application by the buyer of the Danish shares for a refund of withheld Danish withholding tax should therefore generally not give rise to disagreements between the dividend recipient and the legal owner of the shares, and furthermore, the legal owner of the shares should not have problems in obtaining a refund of excess withholding tax as the legal owner will also be registered with the Danish tax authorities as recipient of the dividend.*

Under Danish national law, foreign shareholders holding less than 10% of the share capital of *an Issuer* (listed or unlisted) will initially be subject to Danish withholding tax of 27% of the dividends received, unless (for listed or unlisted

**766**

companies) the *Issuer* or the Danish Central Securities Depository has specifically agreed with the Danish tax authorities that a reduced tax rate applies to dividends from the distributing company to the relevant foreign company in accordance with the double tax treaty applicable to the relevant shareholder.

*In practice, the dividend distributing company withholds and remits 27% tax on all dividends that do not qualify for a lower withholding tax rate. If the Issuer withholds insufficient withholding tax on dividends, it is liable for the tax not withheld unless the failure to withhold cannot be considered* negligence.

*The shareholder (if the shareholder is the beneficial owner) may apply to the* Danish tax authorities *for a refund of any Danish withholding tax* in accordance with the applicable double taxation treaty by filing a dividend refund form with the Danish tax authorities.

Since 2002, the Danish tax authorities have focused on the concept of beneficial ownership. In 2010, the Danish tax authorities officially changed their interpretation of the Danish rules on withholding tax on dividends for foreign shareholders to the effect that the Danish tax rules contain a non-avoidance requirement in the form of a beneficial ownership condition.

When a foreign dividend recipient does not pass a beneficial ownership test as applied by the Danish tax authorities, withholding tax on dividends may thus be required. The beneficial ownership test is based on the beneficial ownership requirement in Article 10 of the OECD Model Tax Convention and as further explained in the OECD comments.

In all cases where the Danish withholding tax is waived or reduced under a double tax treaty, the recipient of the dividend must submit an application for refund of the excess withholding tax to the Danish tax administration. The Danish tax administration will then refund the excess amount of withholding tax withheld.

To apply for a refund of excess withholding tax, the dividend recipient must complete a refund form 06.003 EN, which is available on the Danish tax authorities' website (www.skat.dk). On the refund application form, the dividend recipient must confirm that they are the rightful owner of the dividend and will be required to attach a dividend advice, typically in the form of a valid SWIFT payment message as proof that tax has been withheld on dividends paid on Danish shares.

The payment is normally made by the Danish tax authorities within one month. Recent amendments to the current interest rules stipulate that if withholding tax on dividends is not repaid within six months from the tax authorities' receipt of the refund application and documentation for the refund application, an interest rate of 0.5% (2014) per month or part thereof will be charged.

### 6.1.2 Danish tax liability of dividends for NCB

As NCB does not at any time directly or indirectly acquire the Shares, NCB will not for Danish tax purposes be deemed to be subject to Danish withholding tax on the Shares as this will only apply to the owner of the Shares *and, in case of negligence with respect to withholding and/or settlement of withholding tax, the Issuer.*

### 6.2 Civil liability

### 6.2.1 The legal basis in brief

Under Danish civil law, non-contractual liability generally requires that three criteria are met:

- There must be a legal basis for liability, usually negligence or misconduct.
- There must be a financial loss.
- There must be a causal link between the negligence/offense and the financial loss.

The Danish state (the tax authorities) will generally only suffer a loss if the taxable person or entity (the taxpayer) does not pay or is unable to pay the taxes due. Furthermore, a loss is only incurred if the tax due would have been paid by or on behalf of the taxpayer but for the negligence or misconduct.

In general, the relevant issues in relation to liability for losses suffered by the state in tax matters will be the existence of negligence or wrongdoing and the connection with the loss suffered.

Legal precedent shows that directors, board members and liquidators etc. who have a managerial or controlling function in a legal entity may, under certain circumstances, be liable for losses suffered by the tax authorities as a creditor if the legal entity becomes insolvent or goes bankrupt.

Furthermore, but less frequently, auditors and legal advisors have been held liable for tax authorities' losses.

To our knowledge, a custodian bank has never been held liable in Danish case law for losses incurred by the tax authorities as a result of having granted an incorrect application for a refund of withheld dividend tax. Furthermore, we are not aware of any cases tried before Danish courts or in the Danish administrative system, where Danish tax authorities have erroneously paid out a refund amount and attempted to recover a loss from such incorrect payment from parties other than the claiming party.

In a series of court cases (the "company steamer cases") initiated by the tax authorities in the late 90s and

**767**

In the early 2000s, civil claims for damages were brought against various participants in a certain type of transaction whereby 'empty' Danish companies that owned an amount of cash and owed a corresponding amount of Danish tax were sold to buyers who essentially withdrew the cash, used it for their own benefit and thus never paid the taxes due. It was immediately clear that the buyers of such companies were liable for the tax authorities' losses, and many also faced criminal sanctions. However, the tax authorities also pursued the selling shareholders of the companies as well as their advisors and the banks that were involved in the financing or simply made the cash transfers in connection with the acquisitions. A number of cases against the sellers of the companies were won by the tax authorities, including in the Danish Supreme Court, as it was determined that the sellers had failed to fulfill a specific obligation to ensure that the taxes due would ultimately be paid, even though the sellers (or their advisors/banks) were not directly involved in the Partnership's failure to pay such taxes, as this occurred after the sale.

In a 1999 Supreme Court case, the bank involved in the sale of the "empty" company was held liable for the tax authorities' losses on the basis that the bank was aware of every single transaction leading to the purchase, which resulted in the Partnership's money in a bank account being used to finance the buyer's acquisition, which the bank had considered to be crucial in the risk assessment carried out by the bank (and resulted in a higher than normal fee to the bank). By its actions, the bank was considered to have irresponsibly contributed to the financial assistance, which was not in accordance with Danish company law, and the bank had done nothing to prevent the risk that the interests of the tax authorities would be infringed.

The above cases concerning the empty companies are generally considered to be somewhat extraordinary. The legal basis for the claims raised is also - at least partly - found in special rules in the Danish Companies Act prohibiting certain forms of self-financing. However, the case also demonstrates the ability and determination of the Danish legal system to place liability on parties other than the Danish tax authorities if the tax authorities are deemed to suffer a loss ... as a result of *questionable* acts performed by several parties, even if a single party has only played a limited role.

### 6.2.2 Civil liability of NCB in the proposed transaction

Generally, there is no case law to support a claim against NCB for acting as custodian bank for USPF in relation to the Shares.

If parties other than the USPF apply for a refund of Danish withholding tax, the NCB's possible role in such refund application process, if any, will in our view be so remote as to be unrelated to the loss suffered in connection with the payment of the refund application.

The occurrence of a claim against NCB would, in our opinion and based on the circumstances and assumptions set out above, initially require that USPF has erroneously applied for a refund of withheld dividend tax in Denmark. In order to make such a refund application, the Danish tax authorities will generally require that the refund form is accompanied by documentation that the tax has been applied to the taxpayer seeking the refund, often in the form of a dividend certificate issued by the depositary bank. If the NCB issues such (standard) documentation to the USPF, and the USPF is deemed not entitled for Danish tax purposes to apply for a refund of withheld Danish dividend tax - after the refund has been made - the role and actions of the NCB will be relevant for the analysis of liability of the NCB under Danish law.

*In this regard, specific reference is made to our assumptions that (i) USPF will acquire the Shares ex dividend, which means that USPF will become the owner of the actual dividend on the Shares as of the Trade Date, (ii) USPF will only be required to deliver shares ex dividend in the subsequent Share Lending Transaction, (iii) NCB will only issue standard documentation relating to USPF's formal legal documentation. (ii) that USPF will only deliver shares ex-dividend in the subsequent Share Lending Transaction, (iii) that NCB will only issue standard documentation regarding USPF's formal legal ownership, which does not relate to beneficial ownership, (iv) that NCB will only issue such documentation to USPF, (v) that a Danish tax opinion has been obtained regarding USPF's Danish tax position in an almost identical structure, which has been submitted to NCB, and vi) that NCB - apart from the possible issuance of standard documentation to USPF - has had no role in or actual knowledge of the process of applying for a refund of withholding tax in Denmark in respect of the Shares or the information or documentation submitted to the Danish tax authorities.*

It is therefore our opinion that NCB should not be liable for

Copyright © 2024 Karnov Group Denmark A/S

incorrect repayment of withholding tax to USPF by the Danish
tax authorities.

However, the following circumstances prevent us from reaching a more definitive assessment of the NCB's position:

1. The fact that USPF enters into OTC forward contracts (and not, for example, listed futures) to hedge its position may in principle allow for a "perfect hedge" of USPF's position in the Shares and may possibly also point to another identified party who may be deemed to be the beneficial owner of the dividends received on the Shares instead of USPF as beneficial owner. This could present an opportunity for arbitrage that is identifiable to NCB, and where the standard ownership documentation issued by NCB may be misleading.

**768**

2. The fact that USPF has not obtained a tax opinion on the precise transaction carried out by USPF (tax opinion assumes futures and not OTC forward contracts) will make it more difficult for NCB to claim that it has acted in good faith (and thus is not liable) with regard to the Danish tax treatment of the transaction.

3. The cases described in 6.2.1 above regarding the sale of "empty" companies have demonstrated the willingness of the Danish tax authorities and the Danish courts to place liability for the tax authorities' losses on other parties involved in the transactions that have triggered the loss when the transactions are deemed to be of a questionable nature. In light of this, it is not certain how the Danish tax authorities would perceive the contemplated transaction regarding the Shares and, if deemed doubtful, how the Danish legal system would react. However, even if it were to be deemed questionable, we believe that NCB's role in the proposed transaction cannot be compared to the role of the responsible parties, including the banks, in the "company steamer cases", which were more serious and contributed to the tax authorities' losses.

6.3 Criminal liability of the NCB

6.3.1 The legal basis in brief

According to section 13 of the Danish Tax Control Act, anyone who, with intent to evade tax, provides false or misleading tax information for tax assessment or the amount thereof is punishable by a fine or imprisonment. If the taxpayer is not a natural person, the sanction is a fine. This also applies if the false or misleading tax information was provided as a result of negligence. Aiding and abetting such tax fraud is subject to the same sanctions.

According to section 15 of the Tax Control Act, anyone who with intent to evade tax fails to file a tax return is subject to criminal sanctions in the form of a fine or imprisonment. If the taxpayer is not a natural person, the sanction is a fine.

Any failure to correctly submit information to the Danish tax authorities will not be subject to criminal sanctions if such failure is not due to gross negligence or intent.

According to section 23 of the Danish Criminal Code, an offense is considered to have been committed by any person who by incitement, advice or connivance has contributed to the criminal offense.

Criminal liability generally requires the perpetrator to have criminal intent, but in certain circumstances negligence is sufficient. However, the applicable criminal sanctions in cases of negligence are generally significantly less severe.

Case law has shown a high degree of reluctance to consider anyone other than the taxpayer to have participated in tax evasion or tax fraud, and generally this will require quite direct involvement in the criminal offense, such as assistance in completing and filing an incorrect tax return.

6.3.2 Criminal liability of the NCB arising from the proposed transaction

As a general rule, NCB will not be required to submit information to the Danish tax authorities as a result of the Transaction. NCB will, if at all, only be indirectly involved in the refund application by issuing the dividend certificate generally required by the Danish tax authorities.

Based on the circumstances and assumptions stated in 2 above and in particular taking into account the same circumstances as described under 6.2.2 ... regarding civil liability, there should be no basis in Danish law to consider NCB as an accessory to Danish tax fraud.

*7. Qualifications*

7.1 This Opinion is limited to matters of Danish law as currently in force and enacted by Danish legislative authorities and expresses no opinion on the laws of any other jurisdiction. In particular, we do not purport to be familiar with the laws of Germany or the laws of any jurisdiction other than Denmark and we express no opinion on matters governed by or construed in accordance with such laws.

7.2 In this Opinion, Danish legal terms are described using English terms and not their original Danish terms. The terms in question may not correspond to the terms described by the same English terms used under the laws of other jurisdictions. This Opinion may therefore only be relied upon on the express condition that any questions of interpretation or liability arising in connection herewith are governed by Danish law and are brought before a Danish court.

7.3 This Opinion is provided on the basis that it is governed by and construed in accordance with Danish law.

7.4 This Opinion is strictly limited to the matters set forth herein and should not be read as implying any other matters in connection with the proposed transaction.

*8. How to use*

This Opinion is addressed to NCB for its benefit and use and may not be relied upon by any other person or for any purpose other than in connection with the proposed transaction and may not be used, circulated, quoted or otherwise referred to for any other purpose except (i) for NCB's legal or tax advice in connection with the Transaction, (ii) where required by law, court order or by a relevant

**769**

regulatory body; or (iii) in connection with any dispute or legal proceedings to which NCB is a party, in which case we must be informed of such use."

In an email dated May 1, 2014 to L H and K, A wrote the following:

"Just a follow-up - has anything further happened compared to our draft of April 23rd."

K replied to the email the same day as follows:

"I spoke on the phone with the client on Tuesday. They are generally fine with the draft, subject to two comments.

1. The Forward Settlement Date is after the Settlement Date of the equity transaction. The use of the defined term "Settlement Date" implies that this is one and the same day.

2. In the penultimate paragraph of section 6.1.1 you refer to a specific type of dividend advice. NCB has informed me that they will not issue any type of tax opinion etc. so the best thing would be to delete the reference to "valid SWIFT payment advice".

Can you help with these two points? Alternatively, if you send us a Word version of your final draft, we can provide you with a corrected version that reflects the above."

In an email dated May 2, 2014, A wrote the following to K:

"May I ask you to insert the two change marks in the attached version. Then I will check if this will affect our analysis."

On the same day, K sent a corrected version of the draft for legal opinion together with a comparison version in relation to the latest version of the draft by email. In the email, K further stated:

"Please let me know if you wish to discuss any of the changes, or if they are acceptable to you. If so, please send us a revised final draft of your opinion letter."

The revised draft legal opinion of May 2, 2014 contained - with correction marks compared to previous drafts - the following changes in section 3:

"...

*3. Intended transactions*

We understand that USPF intends to engage in the following transactions:

3.1 On the trade date (the *"Trade Date"*), the USPF/Partnership will purchase Danish listed shares (the *"Shares"*) *through* a regulated inter-dealer broker (the *"Broker")* on the Trade Date. The purchase will take place on or before the date on which the general meeting of the issuer of the Shares (the *"Issuer"*) resolves to use all or part of the earnings and profits to distribute a dividend (the *"*Dividend *Approval* Date*")*, but no later than the Dividend Record Date (cum dividend), i.e. before the ex-dividend date. The settlement date for the *Equity Transaction* (the *"Equities Settlement Date"*) will be after the Dividend Record Date (ex dividend). The *Dividend Record Date* is the end of the trading day ending immediately before the ex-dividend date.

3.2 On the Trade Date, the seller (the *"Seller") will* sell the Shares through the Broker. The sale will therefore take place before the Ex-Dividend Date, i.e. before or on the Dividend Approval Date but no later than the Dividend Record Date (cum dividend). The *Equities* Settlement Date will be after the Divi- dend Record Date (ex dividend).

3.3 Both USPF/Partnership and the Seller have a securities account with North Channel Bank GmbH & Co. KG (the *"Custodian Bank")*.

3.4 The USPF/Partnership will receive the dividend (excluding withholding tax) declared on the Shares on the Dividend Approval Date (the *"Dividend"*) through the Custodian. The Custodian will provide the USPF/Partnership with a certificate (credit advi- ce) of receipt of the Net Dividend. At the same time, the Custodian will provide the Seller with a debit advice on the net proceeds.

3.5 On the Trade Date [Trade Date]:

3.5.1 The Seller agrees with a third party (unrelated to the Seller) to enter into a stock lending transaction (the *"Stock Lending Transaction")* on the *Equities* Settlement Date pursuant to which the third party agrees to lend the Shares (plus dividends) to the Seller on *the Equities Settlement* Date. As the Shares are delivered ex dividend, the third party will make a compensation payment to the Seller, and

3.5.2 USPF/Partnership agrees with a third party (unrelated to USPF/Partnership) to enter into a Share Lending Transaction on *the Equities* Settlement *Date* pursuant to which USPF/Partnership agrees that on the *Equities* Settlement Date it will lend the Shares (plus dividends) to the third party. As the Shares are delivered ex dividend, the USPF/Partnership will make a compensation payment to the third party.

3.6 On the Trade Date [Trade Date]:

3.6.1 The Seller enters into an OTC forward transaction with a third party (not related to the Seller) (*the "Forward Transaction")*, in order to

by which the third party will deliver the Shares (ex dividend) to the Seller on *a day after the Equities* Settlement Date (the *"Forward Settlement Date") [Forward Settlement Date]*; and

3.6.2 USPF/Partnership enters into an OTC Forward Transaction with a third party (unrelated to USPF/Partnership) pursuant to which USPF/Partnership on *the Forward* Settlement *Date* [*Forward*

**770**

Settlement Date] will deliver the Shares (ex dividend) to the third party.

3.7 On *the Equities Settlement* Date [*Equities* Settlement Date]:

3.7.1 *The share lending transaction between the Seller and the third party is settled, i.e. the third party lends the Shares to the Seller and the Seller delivers the Shares (ex dividend) to the USPF/Partnership, and*

3.7.2 *The share lending transaction between the USPF/Partnership and the third party is settled, i.e. the USPF/Company lends the Shares to the third party.*

*3.8 On the Forward Settlement Date:*

3.8.1 the Forward Transaction between the Seller and the third party is settled, i.e. the third party delivers the Shares to the Seller under the Forward Transaction and the Seller returns the Shares to the third party under the Share Lending Transaction; and

3.8.2 The Forward Transaction between the USPF/Partnership and the third party is settled, i.e. the USPF/Partnership delivers the Shares to the third party under the Forward Transaction and the third party returns the Shares to the USPF/Partnership under the Share Lending Transaction.

3.9 USPF has obtained a tax opinion from a Danish tax lawyer confirming that USPF in the above factual scenario should be entitled to obtain a full refund of Danish withholding tax paid on the Shares *In contrast to the above description, the Danish tax opinion assumes that the parties deliver the Shares pursuant to futures contracts and not forward transactions. We have been asked to assume that there is no economic difference between the originally contemplated futures contracts and the forward transactions described above.*

..."

In addition, the draft contained a proposal for an amendment to clause 6.1.1, according to which a reference to the fact that Dividend Credit Advice would typically be available in the form of a valid SWIFT payment message should be deleted.

By email of May 5, 2014 to K, A then submitted comments on the changes in the draft legal opinion. The email states:

"I have gone through the proposed changes and there seems to be no need for changes to the public opinion.

Could you briefly elaborate on the rationale for separating the Equities Settlement Date and the Forward Settlement Date so that the latter falls one day later. From my perspective, it seems to more clearly distinguish the equity loan transaction and the forward transaction, but I would appreciate knowing if there is anything else to be gained beyond this."

K replied to the inquiry by email on the same day:

"Thank you very much for your confirmation. It sounds great.

Your understanding of the timing and purpose behind it is correct. Most importantly, we need to distinguish between the Equities Settlement Date and the Forward Settlement Date, otherwise the seller will not be able to deliver the shares to the buyer as they have returned them to X and are short. The way it is now structured and described ensures that all positions are settled in the correct order.

If you agree, we will send the revised draft opinion to our client for review and approval."

In continuation of this, A wrote the following to K the same day:

"Thanks, K.

Just one thing: I would prefer to keep the wording about the SWIFT message as it is in the section describing how the Danish system normally works, i.e. without specific reference to the transaction in question and thus without regard to whether the NCB would issue such a message in this case. Let me know if this causes any problems for you."

K then stated the same day by email:

"Ok, can we word it as follows to emphasize that it is an example, but not necessarily the norm?

"... and will be obliged to attach a dividend notice as proof (e.g. in the form of a confirmed SWIFT payment message) that tax has been withheld on dividends paid on Danish shares." This wording was accepted by A on the same day.

In June 2014, Bech-Bruun then took the initiative to invoice for the advice provided, and it was initially clarified that Bech-Bruun should invoice North Channel Bank directly. K's email of June 23, 2014 to A states as follows:

"Please send the invoice and supporting documents directly to NCB. Please provide them with an explanation for the fee overrun and take into account that you will be asked to submit the opinion in the form discussed and agreed in May, without additional fees.

Let's talk."

Bech-Bruun's invoice of June 23, 2014 for 14,650 euros was then sent to T1, North Channel Bank. The sales statement contains the following information:

"Our fees for legal services in the above case in the period February 10, 2014 to the present, incl.

• Review of a draft tax opinion regarding the proposed transaction as received from Jones Day on February 10, 2014, review of your email dated February 11, legal research in relation to applicable law and jurisdiction and our response thereto dated February 11, 2014.

• Preparation of our opinion in relation to the proposed transaction where NCB acts as custodian bank, as sent to you on February 18, 2014.

    **771**

• Review of the comments on the Jones Day opinion and changes to the opinion.

• Review of the transaction chart, legal research in relation to OTC instruments compared to standardized financial instruments and preparation of our opinion based on the previous factual overview, replacing futures with forwards, and submission to Jones Day on 15 April 2014.

• Review of Jones Day's comments of April 15, 2014 and preparation of our email memorandum dated April 15, 2014

    April 16, 2014 for Jones Day.

• Preparation for and participation in conference call on April 22, 2014.

• Review of the revised summary of the transaction as received on April 22, 2014 and preparation of an amended draft opinion.

• Review of the revised opinion as received on May 2, 2014 and our comments on May 5, 2014.

• Various telephone conversations and extensive email correspondence with K H and L from Jones Day.

An accompanying letter of the same date to T1 states the following:

"Dansk tax opinion - North Channel Bank

As agreed with K, I attach our invoice for assistance in the first half of 2014.

Please note that the invoiced amount exceeds our first estimate in February 2014 of EUR 6-7,000 excluding VAT, which was based on very preliminary information. However, our estimate was more or less accurate (except for an overrun of EUR 1,700) when we finalized our draft opinion on 21 February based on the factual description provided at that time and after incorporating comments from Jones Day. We sent our fee status of EUR 8,700 to Jones Day on April 3, 2014.

Subsequently, the proposed transaction was amended and we received a more detailed description - first in German and then in English - which required a new analysis to determine the required changes to the original draft opinion as a result. The new information added further complexity to the analysis and required further discussions with Jones Day and the submission of amended draft versions of our opinion. We did not anticipate this work when we provided our initial estimate based on a different factual description.

The amount invoiced according to the attached is determined on the basis of time spent and at our standard hourly rates, but also includes the completion of our opinion on the basis of actual circumstances herein and in its present form.

I hope the above explains the invoice deviation from the original estimate, but we are of course happy to elaborate if you wish."

On July 18, 2014, K contacted A by email, stating that North Channel Bank had requested to receive the signed opinion. The email states, among other things:

"...

I am attaching an updated version of the draft that we agreed (along with a comparison version to the latest version) and would like to ask you to draft it on your letterhead.

Would you please send me a copy of the opinion by e-mail and also send the original to my address. I will then send all the documents to NCB.

Please call us if you have any questions."

Attached to the email was a draft legal opinion dated May 5, 2014 with a few corrections.

The final legal opinion of August 4, 2014, signed by A and sent to Jones Day on the same day, which corresponds in content to the draft sent by Jones Day on July 18, 2014, reads as follows:

"Danish Opinion

1. Introduction

This opinion ("Opinion") has been prepared at the request of Jones Day, Germany, on behalf of North Channel Bank GmbH & Co. KG ("NCB").

This Opinion addresses the Danish liability consequences for NCB of acting as custodian bank in certain transactions in Danish listed shares entered into by a US pension fund ("USPF").

2. Scope

This Opinion only assesses whether NCB is taxable in Denmark, NCB's civil liability for a loss suffered by the Danish State and Danish criminal law issues for NCB as a result of the transaction on the basis of the factual background and assumptions in 3 and 4 below. This Opinion does not assess:

2.1.1 the tax treatment in Denmark of parties other than NCB in the proposed transaction

2.1.2 NCB's liability for claims raised by parties other than the Danish state if the intended Danish tax treatment is not ultimately achieved

2.1.3 the calculation of the amount of non-contractual liability potentially incurred by the NCB

2.1.4 the issue of liability of parties other than the NCB for claims raised by the Danish state as a result of the transaction

2.1.5 whether Danish law is applicable to determine the non-contractual liability of the NCB, which is a non-Danish entity, under the international conflict of laws rules

2.1.6 questions relating to the contemplated transactions under legislation other than Danish law

2.1.7 the Danish tax authorities' ability to pursue a Danish or criminal claim, or

**772**

civil liability against NCB in Germany for a small loss, where applicable.

*3. Intended transactions*

We understand that USPF intends to engage in the following transactions:

3.1  On the trade date (the *"Trade Date"*), USPF/Partnership will purchase Danish exchange-traded shares (the *"Shares"*) through a regulated inter-dealer broker (*the "Broker"*). The purchase will take place on or before the date on which the general meeting of the issuer of the Shares (the *"Issuer"*) resolves to use all or part of the earnings and profits to distribute a dividend (the *"Dividend Approval Date")*, but no later than the Dividend Record Date (cum dividend), i.e. before the ex-dividend date. The Settlement Date for the Equities Transaction (the *"Equities Settlement Date")* will be after the Dividend Record Date (ex dividend). *The Dividend Record Date* is the end of the trading day ending immediately before the ex-dividend date.

3.2 On the Trade Date, the seller (the *"Seller") will* sell the Shares through the Broker. The sale will therefore take place before the Ex-Dividend Date, i.e. before or on the Dividend Approval Date but no later than the Dividend Record Date (cum dividend). The Equities Settlement Date will be after the Divi- dend Record Date (ex dividend).

3.3 Both USPF/Partnership and the Seller have a securities account with North Channel Bank GmbH & Co. KG (the *"Custodian"*).

3.4 The USPF/Partnership will receive the dividend (excluding withholding tax) declared on the Shares on the Dividend Approval Date (the *"Dividend"*) through the Custodian. The Custodian will issue [issues] to the USPF/Partnership a certificate (credit advice) of receipt of the Net Dividend. At the same time, the [issues] Custodian will issue to the Seller a debit advice on the net proceeds.

3.5 On the Trade Date [Trade Date]:

3.5.1 The Seller agrees with a third party (unrelated to the Seller) to enter into a share lending transaction (the *"Share Lending Transaction"*) on the Equities Settlement Date pursuant to which the third party agrees to lend the Shares (plus dividends) to the Seller on the Equities Settlement Date. As the Shares are delivered ex dividend, the third party will make a compensation payment to the Seller; and

3.5.2 USPF/Partnership agrees with a third party (unrelated to USPF/Partnership) to enter into a Share Lending Transaction on the Equities Settlement Date pursuant to which USPF/Partnership agrees that on the Equities Settlement Date it will lend the Shares (plus dividends) to the third party. As the Shares are delivered ex dividend, the USPF/Partnership will make a compensation payment to the third party.

3.6 On the Trade Date [Trade Date]:

3.6.1 The Seller enters into an OTC forward transaction with a third party (not related to the Seller) (the *"Forward Transaction"*) pursuant to which, on a day after the Equities Settlement Date (the *"Forward* Settlement Date*"*), the third party will deliver the Shares (ex dividend) to the Seller; and

3.6.2 The USPF/Partnership will enter into an OTC Forward Transaction with a third party (unrelated to the USPF/Partnership) pursuant to which the USPF/Partnership will deliver the Shares (ex dividend) to the third party on the Forward Settlement Date.

3.7 On the Equities Settlement Date [Equities Settlement Date]:

3.7.1 The share lending transaction between the Seller and the third party is settled, i.e. the third party lends the Shares to the Seller and the Seller delivers the Shares (ex dividend) to the USPF/Partnership; and

3.7.2 The share lending transaction between the USPF/Partnership and the third party is settled, i.e. the USPF/Partnership lends the Shares to the third party.

3.8 On the Forward Settlement Date:

3.8.1 the Forward Transaction between the Seller and the third party is settled, i.e. the third party delivers the Shares to the Seller under the Forward Transaction and the Seller returns the Shares to the third party under the Share Lending Transaction; and

3.8.2 The forward transaction between the USPF/Partnership and the third party is settled, i.e. the USPF/Partnership delivers the Shares to the third party pursuant to the Forward Transaction and the third party returns the Shares to the USPF/Partnership pursuant to the Share Lending Transaction.

3.9 USPF has obtained a tax opinion from a Danish tax lawyer confirming that in the above factual scenario USPF should be entitled to obtain a full refund of Danish withholding tax paid on the Shares. Contrary to the above description, the Danish tax opinion assumes that the parties deliver the Shares pursuant to futures contracts and not forward transactions. We have been instructed to assume that there is no economic difference between the originally contemplated futures contracts and the forward transactions described above .

*4. Prerequisites*

For the purpose of this Opinion, we have assumed the following:

1.  USPF is a resident of the United States for tax purposes.

**773**

2.  USPF does not have a permanent office in Denmark.

3.  Dividends received by USPF on the Shares are not derived from the conduct of business by USPF or through a related entity.

4.  USPF is covered by Article 22(2)(e) of the current double tax treaty between Denmark and the US

    *"Double Tax Treaty between Denmark and the United States"*), which means that USPF is:

    a.   a legal entity organized under the laws of the United States to provide pension or other similar benefits to employees, including self-employed persons, under a plan; and

    b.   more than 50% of USPF's recipients, members or participants are residents of either the United States or Denmark.

5.   On the Trade Date, USPF will acquire unconditional ownership of the Shares and will have full ownership rights over the Shares on the Dividend Approval Date, including the right to receive the Dividend declared on that date.

6.   The Shares will be held by USPF through NCB as custodian bank. USPF's ownership of the Shares will be registered with NCB and,

depending on the NCB/sub-custodian bank's other long and short positions, Værdipapircentralen i Danmark.

7. NCB's records will show that USPF is the legal owner but will not contain information about the beneficial ownership of the Shares on the Dividend Approval Date and that the Danish Dividend represents actual dividends on the Shares passed through to USPF by the depositary bank. It is further assumed that NCB will, upon request from USPF , provide USPF with standard ownership documentation for the Shares in the custody account showing the legal ownership of the Shares and the dividends received.

8. NCB will not issue ownership documentation relating to the Shares involved in the proposed transaction to any party other than USPF during the period from the purchase of the Shares by USPF until dividends are paid to USPF on the Shares or issue documentation showing ownership other than USPF during that period.

9. The proposed transaction was not structured by the NCB.

10. NCB will perform the role of securities depositary bank but no other role, such as assistance in applying for a refund of Danish withholding tax withheld on the Shares, and NCB will perform its role as depositary bank in connection with the contemplated transaction in accordance with its standard procedures, which are consistent with the normal procedures of depositary banks generally.

11. The NCB charges a fee for the custodian services provided in this transaction which does not differ from the fees charged for custodian services in general.

12. The NCB has been requested to perform the role of custodian bank.

13. NCB has no reason to believe that, or information or knowledge as to whether, any person or entity other than the USPF will file an application for a tax refund in respect of the dividend withholding tax withheld on the Shares.

*5. Opinion*

Based solely on our understanding of the facts described in paragraph 3 and the assumptions described in paragraph 4 above, which we have not separately examined or verified, and with the qualifications described in paragraph 7, we find that:

5.1 NCB will not be subject to Danish tax liability as a result of the proposed transaction.

5.2 The NCB should not be subject to Danish civil liability, which entails an obligation to compensate the Danish state for any losses resulting from its role in the proposed transaction.

However, the following circumstances prevent us from reaching a more definitive assessment of NCB's position:

1. The fact that USPF in the Forward Transaction enters into OTC forward contracts (and not, for example, listed futures) to hedge their position may in principle allow for a

"perfect hedge" of USPF's position in the Shares, which eliminates the ownership risk, and may possibly also point to another identified party assuming such ownership risk, who may thus be deemed to be the beneficial owner of the dividends received on the Shares instead of USPF. This could present an opportunity for arbitrage that is identifiable to NCB and where the standard ownership documentation issued by NCB may be misleading in a manner known or suspected by NCB.

2. The fact that USPF (or NCB) has not obtained a tax opinion on the precise transaction carried out by USPF (tax opinion assumes futures and not OTC forward contracts) will make it more difficult for NCB to claim that the bank by definition has acted in good faith (and thus is not liable) with regard to the

Danish tax treatment of

Copyright © 2024 Karnov Group Denmark A/S

the transaction which could reasonably be regarded by a professional party as containing problematic issues in relation to the ownership of the Shares.

3. The cases described in 6.2.1 below regarding the sale of "empty" companies have demonstrated the willingness of the Danish tax authorities and Danish courts to place liability for the tax authorities' losses on other parties involved in the transactions that have

**774**

triggered the loss when the transactions are deemed to be of a doubtful nature. In light of this, it is not certain how the Danish tax authorities would perceive the contemplated transaction regarding the Shares and, if deemed doubtful, how the Danish legal system would react. However, even if it were to be deemed doubtful, we believe that NCB's role in the proposed transaction cannot be compared to the role of the responsible parties, including the banks, in the "corporate fraud cases", which were more serious and contributed to the tax authorities' losses.

5.3 The NCB should not be subject to Danish criminal liability as a result of its role in the proposed transaction.

*6. Danish tax rules and analysis*

6.1 Responsibility for Danish withholding tax

6.1.1 The legal basis in brief

Generally, the legal owner of the shares on the date of the resolution to distribute the dividend will also be considered the owner of the dividend from a Danish tax and company law perspective, even if the purchaser is not (yet) registered as the owner of the shares, which constitutes the security deed under Danish law, on the date of the general meeting (both Dividend Approval Date and Dividend Record Date).

The standard settlement terms for a sale and purchase transaction concerning listed Danish Shares registered with VP Securities A/S are T+3.

VP Securities A/S thus generally settles dividend payments on day 4 after the general meeting of the Issuer. The actual dividend payment is based on the Issuer's share register as of the date of the general meeting of the Issuer and as updated at the end of day 3. Distribution on day 4 is therefore based on the assumption that all T+3 share trades executed up to and including the date of the general meeting are registered when the dividend is paid. The shareholder information to be submitted to the Danish tax authorities by (or on behalf of) the Issuer is the list of shareholders on the date of the general meeting of the Issuer as updated at the end of day 3.

For trades executed on standard T+3 terms, an application by the buyer of the Danish shares for a refund of withheld Danish withholding tax should therefore generally not give rise to disagreements between the dividend recipient and the legal owner of the shares, and furthermore, the legal owner of the shares should not have problems in obtaining a refund of excess withholding tax as the legal owner will also be registered with the Danish tax authorities as recipient of the dividend.

Under Danish national law, foreign shareholders holding less than 10% of the share capital of an Issuer (listed or unlisted) will initially be subject to Danish withholding tax of 27% of the dividends received, unless (for listed companies) the Issuer or the Danish Central Securities Depository has specifically agreed with the Danish tax authorities that a reduced tax rate applies to dividends from the distributing company to the relevant foreign company in accordance with the double tax treaty applicable to the relevant shareholder.

In practice, the dividend distributing company withholds and remits 27% tax on all dividends not eligible for a lower withholding tax. If the Issuer withholds insufficient withholding tax on dividends,

he shall be liable for the tax not withheld, unless the failure to withhold cannot be regarded as negligence.

The shareholder (if the shareholder is the beneficial owner) may apply to the Danish tax authorities for a refund of any Danish withholding tax in accordance with the applicable double taxation treaty by filing a dividend refund form with the Danish tax authorities.

Since 2002, the Danish tax authorities have focused on the concept of beneficial ownership. In 2010, the Danish tax authorities officially changed their interpretation of the Danish rules on withholding tax on dividends for foreign shareholders to the effect that the Danish tax rules contain a non-avoidance requirement in the form of a beneficial ownership condition.

When a foreign dividend recipient does not pass a beneficial ownership test as applied by the Danish tax authorities, withholding tax on dividends may thus be required. The beneficial ownership test is based on the beneficial ownership requirement in Article 10 of the OECD Model Tax Convention and as further explained in the OECD comments.

In all cases where the Danish withholding tax is waived or reduced under a double tax treaty, the recipient of the dividend must submit an application for refund of the excess withholding tax to the Danish tax administration. The Danish tax administration will then refund the excess amount of withholding tax withheld.

To apply for a refund of excess withholding tax, the dividend recipient must complete a printable refund form 06.003 EN, which is available on the Danish tax authorities' website (www.skat.dk). The dividend recipient must confirm on the refund application form that he/she is the beneficial owner of the dividend and is obliged to attach a dividend advice (e.g. in the form of a valid SWIFT payment message) as proof that tax has been withheld on dividends paid on Danish shares.

The payment is usually made by the Danish tax authorities within one month. Recent changes to the applicable interest rules stipulate that if withholding tax on

**775**

dividends are not repaid within six months from the tax authorities' receipt of the refund application and documentation for the refund application, an interest rate of 0.5% (2014) per month or part thereof will be charged.

6.1.2 Danish tax liability of dividends for NCB

As NCB does not at any time directly or indirectly acquire the Shares, NCB will not for Danish tax purposes be deemed to be subject to Danish withholding tax on the Shares as this will only apply to the owner of the Shares and, in case of negligence with respect to withholding and/or paying withholding tax, the Issuer.

6.2 Civil liability

6.2.1 The legal basis in brief

Under Danish civil law, non-contractual liability generally requires that three criteria are met:

- There must be a legal basis for liability, usually negligence or misconduct.
- There must be a financial loss.
- There must be a causal link between the negligence/offense and the financial loss.

The Danish state (the tax authorities) will generally only suffer a loss if the taxable person or entity (the taxpayer) does not pay or is unable to pay the taxes due. Furthermore, a loss is only incurred if the tax due would

would have been paid by or on behalf of the taxpayer but for the proven negligence or misconduct.

In general, the relevant issues in relation to liability for losses suffered by the state in tax matters will be the existence of negligence or wrongdoing and the connection with the loss suffered.

Legal precedent shows that managers, board members and liquidators etc. who have an executive or controlling function in a legal entity may, under certain circumstances, be liable for losses suffered by the tax authorities as a creditor if the legal entity becomes insolvent or goes bankrupt.

Furthermore, but less frequently, auditors and legal advisors have been held liable for tax authorities' losses.

To our knowledge, a custodian bank has never been held liable in Danish case law for losses incurred by the tax authorities as a result of having granted an incorrect application for a refund of withheld dividend tax. Furthermore, we are not aware of any cases tried before Danish courts or in the Danish administrative system where Danish tax authorities have erroneously paid out a refund amount and attempted to recover a loss from such incorrect payment from parties other than the claiming party.

In a series of court cases ("the company steamer cases") initiated by the tax authorities in the late 1990s and early 2000s, civil claims for damages were brought against various participants in a certain type of transaction whereby "empty" Danish companies that owned an amount in cash and owed an equivalent amount in Danish taxes were sold to buyers who essentially withdrew the cash, used it for their own benefit and thus never paid the taxes due. It was immediately clear that the buyers of such companies were liable for the tax authorities' losses, and many also faced criminal sanctions. However, the tax authorities also pursued the selling shareholders of the companies, as well as their advisors and the banks that were involved in the financing or simply made the cash transfers in connection with the acquisitions. A number of cases against the sellers of the companies were won by the tax authorities, including in the Danish Supreme Court, when it was ruled that the sellers had not fulfilled a specific obligation to ensure that the taxes due would ultimately be paid, even though the sellers (or their advisors/banks) were not directly involved in the company's failure to pay such taxes, as this occurred after the sale.

In a 1999 Supreme Court case, the bank involved in the sale of the "empty" company was held liable for the tax authorities' losses on the basis that the bank was aware of every single transaction leading to the purchase, which meant that the company's money in a bank account was used to finance the buyer's acquisition of it, which the bank had considered to be crucial in the risk assessment made by the bank (and resulted in a higher than normal fee to the bank). By its actions, the bank was considered to be irresponsibly contributing to self-financing [Financial assistance], which was not in accordance with Danish company law, and the bank had done nothing to prevent the risk of the tax authorities' interests being disregarded. The above cases concerning the shell companies are generally considered to be somewhat extraordinary. The legal basis for the claims raised is also - at least partly - found in special rules in the Danish Companies Act prohibiting certain forms of self-financing. However, the case also demonstrates the ability and determination of the Danish legal system to place liability on parties other than the Danish tax authorities if the tax authorities are deemed to have suffered a loss as a result of questionable actions performed by several parties, even if a single party has only played a limited role.

Copyright © 2024 Karnov Group Denmark A/S

6.2.2 Civil liability of the NCB in the proposed transaction

Generally, there is no applicable case law to support a claim against NCB for acting as custodian bank for USPF in relation to the Shares.

If parties other than USPF apply for a refund of Danish withholding tax, NCB's possible role in such an application will be

**776**

reimbursement application process, if any, should in our view be so remote that it has no connection to the loss suffered in connection with the payment of the reimbursement application.

The occurrence of a claim against NCB would, in our view and based on the circumstances and assumptions set out above, initially require that USPF has erroneously applied for a refund of withheld dividend tax in Denmark. In order to make such a refund application, the Danish tax authorities will generally require that the refund form is accompanied by documentation that the tax has been applied to the taxpayer seeking the refund, often in the form of a dividend certificate issued by the depositary bank. If the NCB issues such (standard) documentation to the USPF, and the USPF is deemed not entitled for Danish tax purposes to apply for a refund of withheld Danish dividend tax - after the refund has been made - the role and actions of the NCB will be relevant for the analysis of liability of the NCB under Danish law.

In this regard, specific reference is made to our assumptions that (i) USPF will acquire the Shares ex dividend, which means that USPF will become the owner of the actual dividend on the Shares as of the Trade Date, (ii) USPF shall only deliver shares ex dividend in the subsequent Share Lending Transaction (ii) that USPF will only deliver shares ex dividend in the subsequent Share Lending Transaction, (iii) that NCB will only issue standard documentation regarding USPF's formal legal ownership, which does not address beneficial ownership, (iv) that NCB will only issue such documentation to USPF, (v) that a Danish tax opinion has been obtained regarding USPF's Danish tax position in an almost identical structure, which has been submitted to NCB, and (vi) that NCB - apart from the possible issuance of standard documentation to USPF - has had no role in or actual knowledge of the process of applying for a refund of withholding tax in Denmark in respect of the Shares or the information or documentation submitted to the Danish tax authorities.

It is therefore our opinion that NCB should not be liable for incorrect repayment of withholding tax to USPF by the Danish tax authorities.

However, the following circumstances prevent us from reaching a more definitive assessment of the NCB's position:

1. The fact that USPF enters into OTC forward contracts (and not, for example, listed futures) to hedge its position may in principle allow for a "perfect hedge" of USPF's position in the Shares and may possibly also point to another identified party who may be deemed to be the beneficial owner of the dividends received on the Shares instead of USPF as beneficial owner. This could present an opportunity for arbitrage that is identifiable to the NCB and where the standard ownership documentation issued by the NCB may be misleading.

2. The fact that USPF has not obtained a tax opinion on the precise transaction carried out by USPF (the tax opinion assumes futures and not OTC forward contracts) will make it more difficult for NCB to claim that the bank by definition has acted in good faith (and thus is not liable) with regard to the Danish tax treatment of the transaction.

3. The cases described in 6.2.1 above regarding the sale of "empty" companies have demonstrated the willingness of the Danish tax authorities and Danish courts to place liability for the

tax authorities' losses on other parties involved in the transactions,

triggered the loss when the transactions are deemed to be of a doubtful nature. In light of this, it is not certain how the Danish tax authorities would perceive the contemplated transaction regarding the Shares and, if deemed doubtful, how the Danish legal system would react. However, even if it were to be deemed questionable, we believe that NCB's role in the proposed transaction cannot be compared to the role of the responsible parties, including the banks, in the "company steamer cases", which were more serious and contributed to the tax authorities' losses.

6.3 Criminal liability of the NCB

6.3.1 The legal basis in brief

According to section 13 of the Danish Tax Control Act, anyone who, with intent to evade tax, provides false or misleading tax information to determine tax liability or tax assessment or the amount thereof, is punishable by criminal sanctions in the form of a fine or imprisonment. If the taxpayer is not a natural person, the sanction is a fine. This also applies if the false or misleading tax information was provided as a result of negligence. Aiding and abetting such tax fraud is subject to the same sanctions.

According to section 15 of the Tax Control Act, anyone who with intent to evade tax fails to file a tax return is subject to criminal sanctions in the form of a fine or imprisonment. If the taxpayer is not a natural person, the sanction is a fine.

Any failure to correctly submit information to the Danish tax authorities will not be subject to criminal sanctions if such failure is not due to gross negligence or intent.

According to section 23 of the Danish Criminal Code, an offense is considered to have been committed by any person who by incitement, advice or connivance has contributed to the criminal offense.

Criminal liability generally requires the perpetrator to have criminal intent, but in certain circumstances negligence is sufficient. However, the applicable criminal sanctions in cases of negligence are generally significantly less severe.

**777**

Case law has shown a high degree of reluctance to consider anyone other than the taxpayer to have participated in tax evasion or tax fraud, and generally this will require a fairly direct involvement in the criminal offense, such as assistance in completing and filing an incorrect tax return.

6.3.2 Criminal liability of the NCB arising from the proposed transaction

As a general rule, NCB will not be required to submit information to the Danish tax authorities as a result of the Transaction. NCB will, if at all, only be indirectly involved in the refund application by issuing the dividend certificate generally required by the Danish tax authorities.

Based on the circumstances and assumptions stated in 2 above and in particular taking into account the same circumstances as described under 6.2.2 regarding civil liability, there should be no basis in Danish law to consider NCB as contributing to Danish tax fraud.

*7. Qualifications*

7.1 This Opinion is limited to matters of Danish law as currently in force and enacted by Danish legislative authorities and expresses no opinion on the laws of any other jurisdiction. In particular, we do not purport to be familiar with the laws of Germany or the laws of any jurisdiction other than Denmark and we express no opinion on matters governed by or construed in accordance with such laws.

7.2 In this opinion, Danish legal terms are described using English terms and not their original Danish terms. The terms in question may not correspond to the terms that are used in the

is written using the same English terms that appear under the laws of other jurisdictions. This Opinion may therefore only be relied upon on the express condition that any questions of interpretation or liability arising in connection herewith are governed by Danish law and are brought before a Danish court.

7.3 This Opinion is provided on the basis that it is governed by and construed in accordance with Danish law.

7.4 This Opinion is strictly limited to the matters set forth herein and should not be read as implying any other matters in connection with the proposed transaction.

*8. How to use*

This Opinion is addressed to NCB for its benefit and use and may not be relied upon by any other person or for any purpose other than in connection with the proposed transaction and may not be used, circulated, quoted or otherwise referred to for any other purpose, except (i) to NCB's legal or tax advisors in connection with the Transaction, (ii) where required by law, court order or by a relevant regulatory body or (iii) in connection with any dispute or litigation to which NCB is a party, in which case we must be informed of such use."

In the summer of 2015, Bech-Bruun was again contacted by Jones Day about the legal opinion issued on August 4, 2014, as North Channel Bank now wanted to receive confirmation of its content. H's email of July 15, 2015 to A states the following:

"...

Since you issued your opinion, the client has carried out a number of transactions for its customers under the scheme on which you issued your opinion last year.

We have been asked to confirm that the transactions were completed as described in the German opinion and to confirm that there are no legal developments that may affect these opinions since it was issued.

We have reviewed sample book entries for a few "real" transactions and can confirm that the transactions were executed as previously intended. Of course, we can confirm that the German legal situation has not changed [since] the German opinion was issued. However, we need your help to confirm that the legal/tax situation in Denmark has not changed since the opinion was issued.

We kindly ask you to prepare a document referring to the original opinion, confirming that there have been no (relevant) changes in Danish law and that you can repeat the content of your opinion today. Ideally, we would like to send a draft of such a document to the client [during] next week.

Please contact me if you have any questions."

By email dated July 20, 2015, Bech-Bruun confirmed the previously submitted legal opinion. At the same time, Bech-Bruun I/S drew attention to section 3 of the Danish Tax Assessment Act as inserted by Act no. 540 of 29 April 2015 amending the Danish Tax Assessment Act, the Danish Estate Duty Act, the Danish Foundation Taxation Act, the Danish Tax Administration Act and various other acts (Tax relief package on trusts, valuation of assets in connection with binding answers and international circumvention clause and postponement of the deadline for self-assessment for companies etc, relaxation of the penalty for failure to register losses and correction of the rates for road tax on passenger cars, etc.), which among other things introduced a general circumvention clause. The email states, among other things:

"The Danish law increases the uncertainty in relation to claiming double tax treaty benefits in a number of cases. In our view, the new avoidance clause may affect USPF's ability to claim treaty benefits in relation to the transactions described in the opinion. It

is

**778**

however, our assessment that the risk will be USPF's and not NCB's." By email of the same date, H requested Bech-Bruun to prepare a letter - ideally in the same format as the legal opinion from 2014 - discussing whether the changes had an impact on the analysis/opinion from the previous year.

A confirmation of the content of the previously submitted legal opinion, which in point 6.1. includes a paragraph corresponding to the above quoted from the email of July 20, 2015, was then sent to Jones Day on July 24, 2015. In A's absence, the confirmation was signed by

N. It appears from the case that Bech-Bruun I/S received a fee of EUR 3,900 for the confirmation. The invoice states that Bech-Bruun I/S' assistance included: "... review of legal opinion regarding the Danish liability consequences for NCB of acting as custodian bank in certain transactions and for issuing a confirming legal opinion of July 24, 2015."

It appears from the case that in November and December 2015, Bech-Bruun and Jones Day were in contact by email, as Jones Day had been contacted by North Channel Bank due to concerns that the transactions in which the bank was involved could be subject to investigation by the Danish authorities in connection with the now pending case of fraud involving applications for refund of Danish withholding tax. For this advice, Bech-Bruun received a fee of EUR 3,200 from North Channel Bank. In 2017, Bech-Bruun was again contacted by Jones Day about the case in light of, among other things, an inquiry to North Channel Bank from the German deposit guarantee scheme, and by letter dated 5 April 2017, Bech-Bruun wrote the following to Jones Day:

"With reference to our conference call last Friday, I can confirm that Danish law has no concept of secondary tax liability for withholding taxes.

Furthermore, I can confirm that current case law and administrative practice do not support a liability for Danish withholding tax for a custodian bank acting solely in its capacity as a custodian bank without any involvement in the process of applying for a refund of Danish withholding tax. North Channel Bank's position in relation to Danish withholding tax liability, as described in our legal opinion of August 4, 2014, has in our view not changed."

*North Channel Banks conditions*

North Channel Bank GmbH & Co. KG (hereinafter North Channel Bank) is a bank headquartered in Mainz, Germany. The bank is ultimately owned by the US-based company Oban Holdings LLC.

In the period from June 2013 to April 2014, North Channel Bank was considering establishing custody services as a new business area. The case documents email correspondence between the bank's management at the time, directors T2 and T1, the bank's main shareholders and a number of external partners, including P, Q and R, regarding the detailed organization of this. In this connection, draft transaction descriptions and project plans were exchanged.

In November 2013, a number of spreadsheets were exchanged within the group describing the various steps involved in trading shares and futures respectively. At the bottom of one spreadsheet for equity trades, the following is written in red: "MOST IMPORTANT: All settlements must be done at once. All settlements should be made "free of payment" to avoid credit risk."

On January 29, 2014, a milestone plan was circulated internally at North Channel Bank. It appears from the plan that legal opinions were to be obtained as part of the project and that

the task was allocated to North Channel Bank. There is no agreement between the parties as to whether it can be deduced from the plan that the task was to be completed by the end of week 9 in 2014.

On February 11, 2014, T1 wrote to P, R, S, M, ... and T2:

"Please only use our email address @bankingbusiness.de for all email traffic related to the "special" trades.

All emails to the official bank addresses are automatically saved and cannot be deleted."

The applications for refund of dividend tax relevant to this case were submitted to SKAT in the period from May 12, 2014 to July 22, 2015.

On June 17, 2015, the German Financial Supervisory Authority (BaFin) wrote to the Executive Board of North Channel Bank that, based on the audit report for the bank's annual financial statements for 2014, it was found that 567 customer transactions in shares issued in Danish, Belgian, Japanese and German companies had been carried out and that none of the customer deposits showed a holding at year-end. The letter further states that the transactions appeared to be very similar to dividend ripping transactions or dividend arbitrage transactions, which is why BaFin asked the bank to explain how the bank had ensured that there were no such legal or reputational risks for the bank.

By letter dated July 1, 2015, North Channel Bank at T1 and T2 responded as follows:

"During the preparatory work in connection with the customer transactions, we have dealt with the legal and - especially due to the issues mentioned in your letter - tax law aspects. In order to exclude possible legal and reputational risks, we obtained an opinion from a reputable international law firm at the beginning of 2014 prior to the execution of the customer transactions.

Within the framework of the drafting of the opinion, the law firm has obtained corresponding

**779**

preparatory opinions for the countries Belgium and Denmark from attorneys ... domiciled in these countries, the content of which has been taken into account in the opinion. In the case of Japan, only five test transactions have been carried out, which is why it was decided not to prepare a specific opinion. After conferring with our customers, no further transactions are planned in Japan. As far as the German transaction is concerned, the capital gains tax has been paid as required for tax purposes. Since the opinion commissioned by us during the preparatory work for the transactions was prepared on the basis of statements by the customers, we have in the meantime asked the law firm to confirm the statements in their opinion once again on the basis of the transactions actually carried out and to take into account any legal or tax changes. In our opinion, the original descriptions do not deviate from the completed transactions.

We expect to present the updated opinion by the end of July.

Any remaining reputational risks will also be taken into account in our risk capacity model."

On March 31, 2016, BaFin informed the management of North Channel Bank that BaFin had decided to initiate an audit of the bank's business conduct. The audit was to be carried out by KPMG's Frankfurt am Main office.

KPMG's report was available on July 29, 2016. The report states, among other things, the following:

"*1 Audit assignment*

In a letter dated March 22, 2016 ... the German Federal Financial Supervisory Authority in Bonn (BaFin) commissioned us to conduct an external audit in accordance with section 44(1) sentence 2 of the German Banking Act [KWG] at

*North Channel Bank GmbH & Co. KG, Mainz*

- hereinafter referred to as "NCB" or "the Bank" for short

In accordance with the decision of BaFin ... of March 31, 2016 to initiate an external audit of NCB, the details of 567 customer transactions in shares issued by Danish, Belgian, Japanese and German issuers in 2014 must be investigated ... In particular, it must be clarified whether and to what extent the Bank had information on the business background of the transactions. It must also be investigated how and on whose initiative the transactions in question came about and whether the execution of the transactions, taking into account the Legal Opinions obtained in 2014 and 2015, is in accordance with due and proper business management.

According to the decision taken by BaFin to initiate an external audit, there is a high degree of similarity between the transactions in question and dividend stripping or arbitrage transactions - so-called "cum/ex transactions". It is therefore necessary to clarify the circumstances of these transactions through this external audit in order to enable BaFin to make a final assessment as to whether there has been adequate and prudent business management in the Bank (overall management responsibility).

...

In planning the audit, we have based our review of the securities transactions carried out at the NCB in 2014 on the issues described in the tender material from BaFin. On this basis, we have established the following focus areas:

- Compliance with the Danish FSA's requirements for the implementation of the obligation to exercise due care and diligence (the Know-Your-Customer principle), including in particular the requirement to obtain information and documentation of the customers' financial background or the financial background of the transactions carried out for the presumed 39 customers in 2014;

- Mapping of the securities transactions carried out in 2014 in order to identify transaction patterns;

- Review of the Legal Opinions obtained by the Bank;

- Examination of the adequacy and sufficiency of the organization of the procedure for the creation of new products in the business area Custody Services ... and the written set of rules for custody services available in 2014.

...

In accordance with the agreement with BaFin, the audit does not include an assessment of the legality of the transactions in domestic and foreign shares that take place in each case immediately before and after the dividend record date in the shares of the respective share issuer.

In agreement with BaFin, the audit also does not include an assessment of whether the structures for the respective securities transactions described and assessed by the law firms in the Legal Opinions issued by them correspond to the transactions actually carried out by the Bank and whether and to what extent the assumptions and assumptions made in these Legal Opinions have been or will be complied with.

Neither have we examined the tax implications of the transactions with regard to German and foreign tax law or possible aspects of the incompatibility of the transactions with German or foreign tax law as these [implications] are discussed

**780**

in connection with cum/ext transactions in German shares in the years before 2012. An assessment of the clearing transactions from a tax perspective

legal, civil or criminal law and possible legal consequences thereof in the jurisdictions of Belgium, Denmark, Germany, Japan and the home countries of the customers involved, as well as an assessment of the fundamental legality of the clearing transactions were expressly excluded from the audit in agreement with BaFin.

...

*2 Summary of the results of the audit conducted*

...

*Depot Services*

In 2014, the business area Secondary Services in Connection with Securities Trading ... was taken up as a new business area, and a number of large-volume share transactions were carried out with shares issued by foreign listed stock corporations, which were executed in the immediate vicinity of the dividend record date in the traded shares. A total of two transactions (two purchases and two sales), each with a volume of 100 shares, were executed with shares of a German issuer. The securities transactions carried out for NCB customers in 2014 were usually executed according to a fixed pattern.

- The Organization Manual for Securities Services (OHB Wertpapierservice) was prepared in 2014 and implemented by the Bank's management on 31 October 2014. It includes a description of the essential tasks in the Securities Services business area and a description of the settlement of securities transactions in the Custody Services business area. Thus, at the time of the inclusion of the Custody Services business area in March 2014 and until the entry into force of the Organization Manual for Securities Services, there was no written set of rules. Likewise, additional procedure descriptions and instructions relating to custody services only came into force in May and August 2014 and January 2015 respectively.

- According to the requirements in MaRisk AT 5, the bank must ensure that business activities are conducted on the basis of *organizational guidelines*. This requirement is fulfilled for custody services.

- The pattern of *securities transactions* executed in 2014 is described in section 5.2 of the Report. In general, at one point in time, a certain number of shares of a certain type ... were purchased by a Bank customer from a broker at an agreed fixed price ... and the same number of shares of the same type were sold by another Bank customer to the broker at the same agreed fixed price .... In the case of the Buyer, it was always a Pension Plan domiciled in the United States, the sellers were domiciled in Belize or the British Virgin Islands. The broker had a custodian and an account with NCB.

At the same time, the Buyer and the Seller entered into securities lending transactions with a third party that was also a customer of NCB. This meant that the Buyer lent the acquired securities to the third party and the Seller borrowed the securities. On the value date, there were thus no holdings in the custody accounts. At a later date, the shares were sold or purchased by the Buyer and the Seller via the broker at the agreed fixed price ... and the securities lending transactions were completed. On the basis of the OTC forward transactions concluded between the Buyers or Sellers and the third party, which were based on cash settlement, no price gains or losses arose in connection with the transactions.

...

In each case, the time of purchase or sale of the shares was shortly before the dividend record date for the respective

shares and settlement after the dividend record date. In accordance with

with the shareholdings existing on the dividend record date, written confirmations "Dividend Credit for non-resident tax payer status" *(Dividend Credit Advice) were* issued to the bank's customers for credits and debits of amounts corresponding to the net dividend

According to a reference on these Dividend Credit Advices, they were not tax certificates .... However, it should be noted that the format and graphic design of these Dividend Credit Advices are very similar to the format and design of the tax certificates in question.

The issuance of Dividend Credit Advices appears to have been relevant to the execution of the transactions in question. In this connection, the respective Dividend Credit Advices appear to have played a role in the process in connection with the refund of dividend tax that foreign service providers have carried out.

...

*- The procedure for creating new products within the business area*

*Depotservices* was started up in accordance with the management decision of

August 29, 2013. The intention was to complete this procedure by the end of 2013 and to be able to offer the Depotservices product from the first quarter of 2014.

The decision document/management decision to finalize the procedure for the creation of new products within the Custody Services business area was signed on

November 24, 2014, and the procedure for the creation of new products in the Depot Services business area was therefore not completed until this date.

**781**

The Custody Services business area was started before the procedure for creating new products in the Custody Services business area was completed, and the requirements of MaRisk AT 8.1 were therefore not implemented in all areas in terms of content. The requirements of MaRisk AT 8.1 were therefore not fully complied with.

The assumptions underlying the procedure for the creation of new products in the De- potservices business area as regards the average size of transactions and the average number of transactions were inadequate in relation to the actual scope of the business area. The nature and extent of the requirements placed on the organizational structure of the business area and the processing of transactions, IT systems, control concepts and integration into risk management processes must therefore be questioned.

...

*Business background*

We have not been able to identify a business background for the transactions that could justify the execution of the transactions, or we have not received any information about this when we asked the Bank's management.

- The Pension Plans and the companies in question have not realized any capital gains or capital losses from the purchase and sale of the securities, i.e. an increase in assets in the form of capital gains was apparently not intended. As the transactions were entered into as OTC forward transactions, there was no price risk for the buyers and sellers associated with the purchase and sale of the securities.

- Given that there were apparently no other motives, such as the realization of capital gains, one must get the impression that the securities transactions for the Pension Plans in question were tax-motivated and aimed at

refunding a

Copyright © 2024 Karnov Group Denmark A/S

possible foreign withholding tax. For these Pension Plans, profit-relevant incoming payment flows that were not matched by directly offsetting outgoing payment flows or that had to be reversed again were only in the form of credits from Accupay, Goal Taxback and Syntax, where this appears to be the result of a refund of foreign withholding tax. We have not received any information about this from the Bank.

- For the companies, there is only income in the form of termination fees for possible early redemption *[Footnote:* The securities lending transactions have apparently been terminated before the end of the originally agreed term; we have not received definitive information from the Bank in this respect*]* of the securities lending transactions.

...

*The initiative*

According to the information provided by the Bank's management, the initiative to establish customer relationships in 2014 always originated from the owners of the Bank, who have provided NCB with information about the customers' names and addresses.

- With one exception, the transactions for Pension Plans were ordered by Y. Y placed the orders by e-mail or signed the respective instructions for, for example, the transfer of securities within the framework of the securities loan or the transfer of money. It should be noted in this connection that Y's signature on the transfer requests we have inspected was mainly in the form of a scanned image.

- The companies acted through the authorized signatories in each case. Throughout the period, orders were placed or confirmations obtained by e-mail or by informal PDF files sent by e-mail. In the PDF documents we inspected, the signatures of the trading persons were predominantly included in the form of scanned image links.

- Given the fact that the structure of the securities transactions and the circle of parties involved as well as the necessary agreements prior to the transactions (securities lending and forward transactions) were the same in all cases in 2014, we have inquired about the relationships between the trading persons. The management of the Bank and the head of the Securities Services business area are not aware of any relationships between them.

...

*The Legal Opinions prepared*

The law firms Jones Day and Bech-Bruun have been requested by NCB to prepare Legal Opinions through the framework agreements entered into with these companies; according to the information provided by the Bank's CEO, there has not been a separately announced assignment (individual order) to prepare the respective Legal Opinions. It is therefore not possible to determine a date for the mandate.

In general, it should be noted that the Bank was not under a regulatory obligation to obtain Legal Opinions in relation to any aspects of the transactions prior to the execution of the securities transactions. However, during the discussions with the Bank, it was emphasized, as also stated in the correspondence with BaFin, that the transactions could or may involve legal or reputational risks for the Bank. The respective Legal Opinions have been prepared with a view to identifying possible risks for NCB in the Bank's role as custodian bank. The legal opinions in the Legal

**782**

Opinion's considerations regarding the tax law aspects are limited to the tax implications for NCB and the transactions as such have not been examined for this purpose." It is undisputed between the parties that there was no framework agreement between North Channel Bank and Bech-Bruun.

On February 10, 2017, the Danish Public Prosecution Service requested the Court in Lyngby to ensure that the conditions for submitting a request to the competent authorities in Germany for a search at North Channel Bank were met. In its request, the prosecution stated, among other things, that North Channel Bank had been investigated by the auditing firm KPMG in spring 2016 on behalf of the German Financial Supervisory Authority, and that SØIK had received the report through the JIT cooperation.

On September 12, 2018, SKAT filed a civil action in the English High Court of Justice against, among others, North Channel Bank with a view to recovering the unjustified refund of dividend tax paid. According to information, the case is still pending. On September 23, 2019, North Channel Bank, represented by CEO C, was fined DKK 110 million for violation of section 279, cf. section 286(2), cf. section 306, of the Danish Criminal Code in a hearing at the Court in Glostrup. It appears from the court hearing request that the charge against North Channel Bank concerned:

*"fraud of a particularly serious nature pursuant to section 279 of the Danish Criminal Code, cf. section 286(2), cf. section 306,*

by managers and employees of the accused company in the period 2014-2015 in association and by prior agreement or common understanding with several natural and legal persons for the purpose of obtaining unjust gain for the accused and his co-conspirators to have organized and executed a system in which the accused could register fictitious share and money movements, after which the accused issued documents (so-called Dividend Credit Advices) containing false information about the payment of dividends from Danish shares, which the defendant's accomplices in at least 284 cases on behalf of at least 27 American "401 K pension plans" used to mislead employees of the Danish Tax Agency (formerly SKAT) into believing that the American "401 K pension plans" had had dividend tax withheld in Denmark and were thus entitled to a refund thereof, all whereby the Danish Tax Agency (formerly SKAT) was determined to pay no less than DKK 1.1 billion in dividends. kr, and whereby the defendant obtained an unjustified gain of not less than DKK 55 million."

The court book from the hearing shows, among other things, the following:

"North Channel Bank GmbH & Co. KG by managing director, V2 was present.

V2 was informed that, as a representative of the defendant, he was not obliged to make a statement.

...

V2 explained, among other things, that since January 1, 2017, he has been the CEO of North Channel Bank. The bank is owned by 3 main shareholders residing in New York.

Shortly after taking office, he became aware of irregularities concerning the bank's involvement in the unlawful repayment of dividend tax. He contacted the German Financial Supervisory Authority and launched an investigation into the matter. In May 2017, he received the results. These showed, among other things, that there were several mysterious loans in the bank where the borrower was resident in tax haven countries.

On June 20, 2017, the bank was raided by the police. It was a harrowing experience. The authorities are still in possession of the material that was seized during the search. After the search, there was intense cooperation with the German, Danish and Belgian

authorities to solve the case. The investigations confirmed the police's suspicions.

In 2014, the bank had commission income in connection with the payment of dividend tax of EUR 4.1 million and in 2015 of EUR 7.94 million. These are the bank's fees for the transactions in question.

He explained that in 2014 the bank received EUR 2.5 million in custody fees and in 2015 EUR 6.5 million in commissions on securities. The total of €9 million was the bank's gross income on all assets that had been traded both in Denmark and in Belgium. On the Danish part, the bank's income totaled DKK 55 million."

By indictment dated July 24, 2020, the German Public Prosecutor's Office charged T1 and T2 as well as T3, T4, T5 and T6 who were also employees of North Channel Bank.

The indictment states, among other things:

"in the period from 05.02.2015 to 18.05.2017

in Mainz

by 27 independent actions

to have concealed an object [the proceeds of a criminal offense] which originates from an offense referred to in Article 261(1), third sentence and (8) [of the German Criminal Code (St-GB/Strafgesetzbuch)]. 8 [of the German Criminal Code (St-GB/Strafgesetzbuch)], namely commercial and gang-related organized tax fraud committed abroad, which is also punishable there, to have concealed the origin of the object [proceeds] or to have undermined or obstructed efforts to discover the origin, confiscate or secure such object [proceeds], in the course of which they have acted in concert and professionally.

From April 6, 2010 to January 18, 2017, defendant T1 and from July 1, 2010 to January 18, 2017, defendant T2 were registered as managing directors of North Channel GmbH, a company domiciled in Mainz and registered in the Commercial Register of the Mainz District Court under HRB 42622. In this connection, the following are involved

**783**

The general partner of North Channel [Bank] GmbH & Co. KG (hereinafter NCB), also based in Mainz. The purpose of the company is to conduct financial and banking business.

From 01.08.2009, the defendant T6 was employed as a department manager in the so-called Treasury department of North Channel Bank GmbH & Co. KG, which at that time was still called Bankhaus Oswald Gruber GmbH & Co. KG. Defendant T6 was and is in his function responsible for the organization and processing of the payment transactions of the company [bank]. In addition, from mid-2010, defendant T6 has held power of attorney in North Channel Bank GmbH. He also acted as authorized representative of OBAN Beteiligungsgesells-chaft mbH, which is a limited partner of North Channel Bank GmbH & Co. KG1.

Defendant T3 was the main responsible manager of the securities services department at NCB and has had power of attorney at NCB since 14.01.2015. He had managerial authority over the employees in the securities services department, including in particular the defendants T4 and T5 and the separately prosecuted T7.

Defendants T4 and T5 were employed in the securities services department, in which connection, however, defendant T5 only joined on 01.06.2014. Before that time, she was employed in the company's [bank's] credit department.

*A. North Channel Bank*

As of April 6, 2010, NCB has been registered in the commercial register of the Amtsgericht Mainz under HRA 41054. The general partner of the company is the previously mentioned company North Channel GmbH. The limited partner of the company during the period of the offense was the company OBAN

Beteiligungsgesellschaft mbH. The management of NCB was carried out jointly by the defendants T1 and T2 during the period of the offense.

Via shares in a number of German and Luxembourg companies, the Delaware/USA-based company Oban Holdings LLC is the beneficial owner of NCB. In this company, the Danish shareholders

separately prosecuted M ... and S exercised the voting majority from the 2013/2014 financial year. Also the defendants T1 and

With shareholdings of 7.3% and 9.0% as of the 2013/2014 financial year, T2 has had voting rights in Oban Holdings LLC. In fact, the separately prosecuted ... in particular has exerted influence on the directors and other employees of the bank.

*B. Underlying offenses - established modus operandi* An internationally operating group of perpetrators faked share trades in the form of covered short selling and wrongfully submitted a request to the competent tax authorities in Denmark and Belgium for and received a refund of the allegedly paid dividend tax. Specifically, the Danish and Belgian authorities have confirmed fictitious share transactions in which shares were traded outside the stock exchange ("over the counter") in the period around the cut-off date for the right to dividends in the company concerned. The individuals separately prosecuted in Denmark and Belgium have in connection with this - by appointing banks as custodians and companies authorized to seek refund of dividend tax ("tax reclaim agents") - pretended that the Danish and Belgian tax authorities had been paid withholding tax on the dividends allegedly paid out on the cut-off date for the right to dividends.

Through the custodians, dividend credit advices (DCAs for short) were issued, from which the fictitious share transaction and also the allegedly withheld withholding tax [dividend withholding tax] appeared. These confirmations were made available to the respective tax-reclaim-agents via an intermediary in the United Kingdom, R, who was separately prosecuted by Denmark and Belgium and traded under the company name Indigo Securities Ltd. who, together with the requests for refund of the dividend tax, submitted the relevant dividend credit advices to both the Danish tax authority SKAT and the Belgian tax authorities.

In this connection, they claimed, contrary to the truth, that the holders of the shares were American companies (pension funds) which were already taxed in the United States. Pursuant to the double taxation agreement of August 19, 1999 between Denmark and the United States and the double taxation agreement between Belgium and the United States, the Danish and Belgian tax authorities transferred the refunded dividend tax to the accounts of the "tax claim agents" who had been assigned to submit the refund requests because the fictitious dividends were allegedly taxed in the United States. In reality, the pension funds received no taxable dividends at all. From there [*Footnote:* From "tax reclaim-agents], the refund amounts in the form of batch transfers were transferred to the accounts of the alleged holders of the shares, the US pension funds.

According to the information provided by Denmark, this modus operandi was used to fraudulently obtain refunds of dividend tax in the amount of approximately EUR 1.67 billion between 2012 and 2015. This is criminal, commercial tax fraud committed by several persons in association, as referred to in sections 279, 286 and 88 of the Danish Criminal Code, which is punishable by imprisonment of up to 12 years.

According to the information provided by Belgium, this modus operandi fraudulently obtained a refund of withholding tax in the amount of approximately EUR 46,218,455.91 between 2012 and 2015. This is in particular a criminal fraud under Article 496 of the Belgian Criminal Code, which is punishable by imprisonment for up to 10 years.

28 of the pension funds established and used by the separately prosecuted individuals had accounts with NCB. NCB

acted for the group of perpetrators as one of several depositaries who prepared false dividend confirmations for the perpetrators for submission to the foreign tax authorities.

**784**

Copyright © 2024 Karnov Group Denmark A/S

The defendants T1 and T2, together with the other defendants, knowingly used the bank operated by them for their complicity in the tax fraud committed in Denmark and to cover up the encumbered [incriminated] money resulting from the tax fraud. For this purpose, the defendants T1 and T2 first set up a securities services department at the NCB that did not exist at that time and hired new employees for this department. They instructed the employees in special training courses, manuals and meetings to make the respective entries, issue and forward DCAs and receive the [incriminated] money involved and, as described below, to cover these up. In order to cover up their illegal activities, defendant T2 created, outside the company's [bank's] direction, e-mail addresses for all persons involved in the tax fraud at the e-mail provider bankingbusiness.de.

Defendants T1 and T2 were also fully involved in NCB's e-mail correspondence with Y, Q, R, S, ... and M, who were separately prosecuted in Denmark and Belgium. They held weekly telephone conferences via Skype and regularly received the shareholders of NCB, the separately prosecuted ..., M and S in Mainz for discussions.

...

The money laundering officer at NCB, the witness ... completed the second part of the law degree in 2013 and was employed at NCB in May 2015 as a junior compliance officer. However, she was ultimately, as had been planned from the beginning, appointed by the defendants T1 and T2 as money laundering officer. The defendants T1 and T2 deliberately assigned the witness ..., in addition to her actual work as money laundering officer, to primarily deal with tasks other than tasks related to the monitoring of matters of a money laundering-relevant nature. The witness ... was to implement a prepaid card project in the bank and, according to her own information, used 90% of her manpower on this project. In this way, the defendants T1 and T2 deployed an inexperienced employee as a money laundering officer and gave her other tasks to perform, so that she could not even perform a minimum of the tasks assigned to her as a money laundering officer. Defendants T1 and T2 did this in order to be able to carry out the transactions with the charged [incriminated] money without being detected. Defendant T2 was the witness ...'s immediate superior. She reported weekly to defendant T2 and asked him to take care of problematic matters himself, especially in connection with Badia Capital S.A. Here, the witness often received no feedback on the status of the case and did not feel able to write a report of suspected money laundering without the cooperation of the authorized signatory defendant T2. The witness ... was not informed of many money laundering-related matters in NCB and only received information "in small pieces".

...

The defendants T1 and T2 have also benefited financially from their participation in the offenses committed in Denmark and Belgium and the related money laundering. Defendant T2 has received special bonus payments ("special bonus") totaling at least EUR 675,000 and defendant T1 at least EUR 810,000 for his participation.

*C. Case complex money laundering of own money (conditions 1 - 26) I. Participation in organized commercial tax fraud carried out by several persons in association in Denmark*

The defendants T1 and T2, together with the NCB operated by them in accordance with the modus operandi described above, acted in part as custodian for the separately prosecuted ... M and S. That is, the NCB set up accounts for a total of 28 pension funds and simulated the trading in shares, carrying this out solely for accounting purposes, so that at the end of the day the respective custody accounts showed no holdings. Nevertheless, the defendants T1 and T2 and the employees instructed by them confirmed that

NCB in the DCAs issued for the respective pension funds that dividends had actually been paid and dividend tax withheld.

...

The concrete course of the fictitious businesses and the preparation and completion of the DCAs was as follows:

From the beginning of 2013, the defendants T1 and T2, in close cooperation with M, ... S, P, ..., ..., ..., R, Q and Y, who were separately prosecuted in Denmark, carried out fictitious trading in shares for the pension funds mentioned above. The first fictitious transactions were carried out by employees of NCB on 18.03.2014. For the purpose of the agreements in connection with these transactions, which were described in the e-mail correspondence as "special trades", the defendant T2 set up e-mail accounts with the e-mail provider "bankingbusiness.de". On 11.02.2014, defendant T1 called on the other parties involved to only conduct correspondence of any kind regarding this project, which was named "Fennec", via the e-mail addresses of bankingbusiness.de. In addition, from February 2013, there were weekly calls between the separately prosecuted M ... and S on the one hand and the defendants T1 and T2 on the other hand. In the course of 2013, a securities services department was set up at NCB for the purpose of carrying out the fictitious transactions and, for this purpose, defendant T4 was employed on October 1, 2013 and defendant T7 (born ...) was employed on January 1, 2014. In addition, defendant T5 was moved from the credit department to the securities services department on 01.06.2014.

**785**

Defendant T4, following specific instructions from the separately prosecuted R, developed a roadmap in tabular form for the implementation of the fictitious entries. Defendants T1 and T2 were always involved in its development. In connection with this, defendant T7 drew up process diagrams and communication templates and also set so-called milestones.

The employees of NCB received the payment orders by e-mail from Y, who was prosecuted separately. In this connection, he wrote to the common e-mail mailbox in the custody department pot@northchannelbank.de, which all employees in this department and the defendants T1 and T2 could access. The separately prosecuted Y was registered in the documents relating to the account opening at the NCB as the authorized signatory and disposition agent for the various pension funds. However, defendants T1 and T2 failed to inform BaFin of all cases in which the separately prosecuted Y was authorized to dispose of the respective accounts, so that the information provided in response to inquiries pursuant to § 24c of the German Financial Business Act did not correspond to the facts.

Once the separately prosecuted Y had placed a purchase order, the order was then recorded in dwp-Bank's WP2 system, which NCB used via a cooperation agreement with DZ Bank AG. For this purpose, special defendant T5 sent so-called custody account orders to DZ-Bank by fax. The dwp-Bank system automatically issues a dividend statement to the banks connected to the system on the basis of the shareholdings entered in the WP2 system. On the basis of the customer lists and the dividend data entered in the system for the individual shares, the NCB then uses the dwp-Bank system to issue the aforementioned DCAs, which look similar to the corresponding tax certificates.

...

The transaction was later completed for accounting purposes in such a way that the aforementioned shares were sold or purchased by the original buyers and sellers via the broker at an agreed fixed price. As the transaction date was immediately

prior to the dividend entitlement date for the type of shares in question, the respective DCA was prepared in accordance with the

existing holdings on the cut-off date for the dividend entitlement. The securities transaction described makes no economic sense whatsoever, as it is a zero-sum transaction. The secured timetables for the trading day show that the most important thing was that the purchases and sales (...) are equalized again and that the custody account shows a balance of "0" in the evening."

...

These "tax-reclaim-agents" sent a short letter to the Danish tax authority "SKAT", i.e. the employee of the Danish tax authorities V6, who was separately prosecuted by Denmark, and to the Belgian tax authorities on behalf of the pension funds explicitly mentioned above, with reference to the existing double taxation agreement between Denmark and Belgium and the USA respectively, together with the following attachments:

- Form explaining the claim for exemption from Danish and Belgian withholding tax (form no. 06.003 ENG), signed by a person acting on behalf of the tax reclaim agent concerned;

- Dividend Credit Advice, issued by NCB and addressed to the pension fund concerned;

- Certificate [certificate of residence] in original confirming the place of residence of the Pension Plan [pension fund] in question during the tax year in question;

- Power of attorney from the relevant Pension Plan [pension fund] to the tax-reclaim agent, in the case of all pension funds signed by "Y".

After processing the case with the Danish and Belgian tax authorities, the dividend tax allegedly paid by the pension funds was refunded to the accounts of the receiving "tax-reclaim-agents" and then transferred in batch transfers to the NCB accounts of the pension funds in question.

By making the fictitious entries and causing the respective DCAs to be drawn up, which were fraudulently submitted to the Danish and Belgian tax authorities together with the refund request, the defendants T1 and T2 were at least guilty of aiding and abetting the tax fraud committed to the detriment of the Danish and Belgian tax authorities by the persons who actually operated the respective pension funds. For the execution of the fictitious entries, the pension funds paid a commission of EUR 7,500.00 to the NCB for each individual securities transaction.

...

*IV. obtaining [lawyer] statements / Legal Opinions*

The NCB had various [lawyer] statements concerning the legal qualification of Cum-Ex transactions, some of which were submitted by the facilitators and some of which were obtained by the defendants T1 and T2.

*1. The subject of the [lawyer] statements*

The subject of the Legal Opinions is clearing transactions with Belgian and Danish shares and the attempt to answer the question whether there could be possible civil, tax or criminal law risks for NCB as custodian bank related to these transactions in Belgium, Denmark and Germany

....

...

*2. Assessment of the [lawyer] statements [Legal Opinions]*

...

*b) Jones Day of 21.07.2014 and confirmation of 30.07.2015 (= Belgian Opinion)*

**786**

At first glance, this statement assesses the transaction model implemented in the NCB. However, the statement assumes that there will actually be a trade in the shares in question in

contrary to what was in practice the case in NCB - and does not explicitly refer to the sequence [of the transactions] on the trading day in question. Thus, the description of the transaction does not take account of the fact that the purchase of the shares is recorded at a time when the sale of the shares has not yet been executed and that the lending of the securities by the pension funds to the company acting as lender and borrower takes place before the lending of the securities by Sherwood Enterprises Limited to customer Z ...

As a result of the assessment, the statement explicitly points out that transactions such as those described may be associated with tax optimization, tax evasion and aggressive tax planning and that the banks involved may be exposed to reputational risks...

*c. Bech-Bruun of 04.04.2014 with confirmation of 24.07.2015 (= Danish Opinion)*

At first glance, this statement also assesses the transaction model implemented in the NCB. However, the statement presupposes that a trade in the shares in question actually takes place - contrary to what was the case in practice in NCB - and does not explicitly refer to the sequence [of the transactions] on the trading day in question. Thus, the description of the transaction does not take account of the fact that the purchase of the shares is recorded at a time when the sale of the shares has not yet been executed and that the lending of the securities by the pension funds to the company acting as lender and borrower takes place before the lending of securities by Sherwood Enterprises Limited to customer Z...

...

*3. The process of preparing the declarations*

As stated in the invoice from the law firm Jones Day dated 15.03.2014, the law firm Jones Day has in the months of January and February 2014 provided advice to NCB in the areas "Examination of custody account conditions" and "Cum/Ex Securities Trading Transactions". In total, Jones Day charged for approximately 80 hours of consultancy services ... It also appears from [NCB's] correspondence with the law firm that on 14.01.2014, defendant T6 placed an order concerning a supplementary agreement to the custody agreement with the separately prosecuted lawyer K, who has been charged with conflict of interest to the detriment of NCB by the Public Prosecution Office in Frankfurt am Main ...

The meeting documentation in the NCB shows that shortly after January 29, 2014, a meeting took place at the law office of Jones Day in which, in addition to the separately prosecuted K, the defendants T1 T2 and T3 also participated ... On February 4, 2014, at the request of the separately prosecuted K, another telephone meeting took place in which the defendants T1 T2 and T3 also participated again. The meeting was also attended by Mr. H as a tax law expert ...

Already one day before this meeting, H contacted lawyer V5 from the above-mentioned Danish law firm Bech-Bruun and requested that they assist the law firm Jones Day in the NCB case. Already in this correspondence, H points out that there is a double request for refund of dividend tax:

*"We understand that the parties to the transaction will realize a tax benefit in Denmark which is probably consists in a double refund of dividend withholding tax but we have not seen a structure paper? Maybe you are aware of these structuers?"* ...

Even the first inquiry to the Danish colleagues clearly shows that the intentions of the perpetrators and the defendants were openly communicated from the very beginning of the advisory assistance.

The answer from Danish lawyer A from the law firm Bech-

U.2024.746H - SKM2024.123.HRH

Bruun shows that such transactions in Denmark are legally problematic.

  "*The type of transaction you are describing which may entail a possibility for two shareholders to reclaim the same withholding tax*

*has been presented to us before ("cum-/ex trades"). As I believe is also indicated by F in our experience the trades are generally problematic from a legal perspective and most often it is not possible to provide the kind of opinion legal and liability issues which is normally requested by the parties involved."* ...

Following the considerable concerns expressed by the representatives of the law firm Bech-Bruun, H, on behalf of NCB, expressly requested from Bech-Bruun a so-called "*Should*" *[footnote omitted]* Opinion in which the results desired by NCB could not be definitively established, but could at least be considered possible.

In H's e-mail of 06.02.2014 it states:

*"Do you think you opinion could be a reaseoned "should" opinion (i.e. "NCB should not be subject to criminal prosecution etc.") subject to certain reasonable sumptions (e.g. acting in good faith, relied on expert opinion, no participation in - potentially - unjusti- fied tax advantage, etc.) an reservations (no precedent/case law etc.)."* ...

As the law firm Bech-Bruun would have come to a negative result within the framework of their investigation of the legal aspects and would have confirmed that the transaction was illegal even if it had been a real and not just a fictitious cum/ext transaction, the previous requirements for such a statement were subsequently significantly reduced. For the legal advisors hired by defendants T6 T1 and T2, as well as for the defendants themselves, it was a question of getting a free pass

**787**

[free hands] to the alleged cum/ex transactions made in NCB. When they realized that they would not easily get such an opinion from the Danish lawyers, they tried to influence the representatives of the law firm Bech-Bruun so that they could at least get an assessment that considered it possible that the transactions were legal.

After the Danish lawyer had requested to receive a detailed overview of the transactions, H informed the accused T1 and the separately prosecuted K on 10.02.2014 of the outcome of the discussions with the Danish colleagues. Specifically, he stated in his e-mail:

*"In each case, the colleagues point out that they need access to the opinions prepared for "x" in order to prepare their opinions (Opinions) and that the opinions would include reservations and limitations as the legal situation in the jurisdictions was not clear-cut."* ...

On the same day, defendant T1 forwarded the following documents to the separately prosecuted K :

- Danish-US PF opinion.pdf
- Opinion Argremgt-Pension Funds-Us Treaty 20052012 (2).docx ...

As far as these documents are concerned, they are declarations dealing with the issue of claiming withholding tax refunds to US pension funds. Moreover, from the file name of the second file "Argremgt", the reference to the authors is clear. It was ultimately employees of Argre Management who forwarded the documents from the pension funds to NCB for account opening... The female director [Managerin] of Argre Management also took over parts of the business of Fla- man Capital LLC.

After these statements had been forwarded to lawyer K, he forwarded the documents to his colleagues in Brussels and Copenhagen ...

On 25.02.2014, the first drafts of the Belgian statements were forwarded to defendants T1 and T2 entitled "Cum / Ex Trades, Entwürfe Belgische Opinion"...

In these initial assessments, two key points attract attention. Firstly, it is explained that legal consequences for NCB can only be ruled out if they are not perpetrators or accomplices in a conspiracy to abuse tax law. Furthermore, in important respects, the expert contradicts the statement from the law firm Freshfields submitted by the defendant T1. Contrary to the statement in the submitted declaration, it had to be assumed that both the prevailing view in the literature and the Belgian Ministry of Finance, with reference to the respective OECD recommendations, would not be satisfied with the formal ownership of the pension funds, but would instead involve the beneficial owner at the end of the chain of holding companies....

Consequently, if one compares this draft, which was sent to defendants T1 and T2 even before the execution of the first transactions in March 2014, with the version submitted later in mid-2014, it is clear that the problematic points are no longer mentioned...

With regard to the statement prepared in Denmark, the "deal structure" requested by Bech-Bruun, which was forwarded on the same day by the separately prosecuted K of defendant T1, was submitted on 03.04.2014 ... In his e-mail of 16.04.2014, the Danish lawyer A expressed significant concerns about this deal structure and the question whether NCB was acting in good faith.

*"As NCB is acting both for Seller and USPF (note: American pension funds) and knows the nature of the transaction, this would in our view make it further difficult for NCB to distance its role from the transaction."* ....

Related to this email, the conversation between those involved was conducted verbally only...

The finalization of the final and, when comparing the different versions, incomplete declarations finally took place at a time when the fictitious trading in shares had already been consummated by the defendants. While the declarations were only signed in mid-2014, the first fictitious transactions in NCB had already begun in mid-March 2014.

Finally, in his e-mail of 09.10.2014, defendant T1 drew defendant T2's attention to a decision of the Bundesfinanzhof [Federal Tax Court] of 15.04.2014 ..., which specifically states:

*"Beneficial ownership of the shares in this sense, however, cannot be considered in so-called cum/ex transactions with shares when the purchase of the shares is linked to an overall contractual concept initiated by a bank and presented as a model, according to which the initiator finances the purchase of the shares with borrowed capital, the buyer of the shares immediately after the purchase of the shares transfers them to the initiator in connection with a so-called securities lending, and the buyer transfers the market risk associated with the shares to the initiator within the framework of a so-called Total&Return Swap transaction."*

*4. Summarizing*

In the present case, it is ultimately decisive that the declarations at no point in time take a position on what actually took place in NCB. All statements are based on the assumption that it is a classic cum/ex trade. However, such a trade never took place at NCB, as the shares that were "traded" there were only traded for accounting purposes and the actors involved never had the right to dispose of the shares at any time. This is already evident from the fact that the dividend confirmations show that an identical number of shares on one and the same day are simultaneously

**788**

bought by several pension funds. Or put more simply: The traded shares existed in principle on the market, but these were never purely

actually present in one of the depots maintained by NCB. They were simply fictitious entries ...

However, even if shares had actually been traded, these would have been illegal transactions, as evidenced by the declarations, especially the early versions. Defendants T1 and T2 were also aware of this, as they were in frequent and intensive contact with their respective legal advisors. On the contrary, the defendants T1 and T2, together with H and K, tried to influence the foreign lawyers and caused changes to be made to the various "Opinions". This was done for the sole purpose of being able, in the event of a possible prosecution, to rely on the fact that there was an unavoidable mistake regarding a prohibition and thus to be able to pretend that they had not acted culpably.

..."

As far as we know, no verdict has yet been handed down in the case.

On April 13, 2021, the Danish Public Prosecution Service indicted six persons for violation of section 279, cf. section 286(2), of the Danish Criminal Code in connection with the payment of DKK 1,135,775,447.99 in dividend tax refunds in association with North Channel Bank. No judgment has yet been handed down in the case.

*Transactions*

North Channel Bank has documentation for a total of 284 transaction chains that have led to the payment of refunds of withheld dividend tax.

It is agreed between the parties that in North Channel Bank there were in fact no dividends, shares or cash flows and therefore no real transactions.

It is further agreed that the single transaction chain includes the following 45 contractual confirmations in total:

*Initial transactions:*

- Purchase confirmation: Pension plan and broker
- Purchase confirmation: Broker and seller
- Confirmation of potential share loan between seller and third party
- Share loan confirmation: Seller and third parties
- Share Loan Confirmation: Third parties and the pension plan
- Transfer of collateral: Seller to third party
- Transfer of collateral: Third party to the pension plan
- Forward: Seller and third parties
- Forward: Third parties and the pension plan
- Transfer of shares: Pension plan to a third party
- Transfer of shares: Third party to seller
- Compensation payment: Pension plan to a third party
- Compensation payment: Third party to seller

*Settlement:*

- Forward: Seller and third parties
- Forward Pension Plan and third parties
- Cash settlement of forwards: Seller and third party
- Cash settlement of forwards: Pension plan and third parties
- Purchase confirmation: Seller and broker
- Purchase confirmation: Pension plan and broker
- Share loan termination: Seller and third parties
- Share loan termination: The pension plan and third parties
- Repayment of share loan collateral: Third party to seller
- Repayment of share loan collateral: Pension plan to third parties
- Confirmation of termination of share loan: Pension plan and third parties
- Confirmation of termination of share loan: Seller and third parties

- Cancellation fee: Pension plan to a third party

- Cancellation fee: Third party to seller
- Return of shares from share loans: Third party to the pension plan
- Return of shares from a share loan: Selling to a third party

*Money loan:*

- Money loan recall, settlement: Pension plan and third parties
- Money loan recall, settlement: Seller and third parties
- Money loan recall, initial: Seller and third party
- Money loan recall, introductory: Pension plan and third parties
- Cash loan disbursement, settlement: Third party to seller
- Money loan payout, settlement: Third party pension plan
- Money loan payout, initial: Third party to the pension plan
- Cash loan disbursement, initial: Selling to a third party
- Money loan confirmation, settlement: Pension plan and third party
- Money loan confirmation, settlement: Seller and third party
- Money loan confirmation, preliminary: Pension plan and third parties
- Money loan confirmation, initial: Seller and third party

  **789**

- Money loan repayment, initial: Third party to seller
- Repayment of money loan, initial: Pension plan to a third party
- Repayment of money loan, settlement: Seller to third party
- Money loan repayment, settlement: Third party to the money plan

However, it is not agreed that the overview is accurate in terms of the order of the transactions listed.

During the case, an example of a chain of transactions based on the Margaux Ventures Pension Plan's purchase of 1,025,500 B shares in Coloplast A/S has been documented. In the example, Bastion Capital London Ltd. acts as broker, Claghan Capital Limited as seller and Sherwood Enterprises Limited as third party.

In the example, on May 6, 2015, Margaux Ventures Pension Plan entered into an agreement with Bastion Capital London Ltd.

1,025,500 B shares in Coloplast A/S.

The agreement states that the settlement date is May 11, 2015. At the same time, Claghan Capital Limited sold the same shares to Ba- stion Capital London Ltd. also with a settlement date of May 11, 2015. Margaux Ventures Pension Plan and Claghan Capital Limited both have a securities account with North Channel Bank.

On May 6, 2015, Claghan Capital Limited entered into an OTC forward agreement with Sherwood Enterprises Limited under which Sherwood Enterprises Limited will deliver the shares to Claghan Capital Limited on a date after the share settlement date without dividend and on the same day Margaux Ventures Pension Plan entered into an OTC forward agreement with Sherwood Enterprises Limited to deliver the shares without dividend to Sherwood Enterprises Limited on the forward settlement date.

On May 11, 2015, North Channel Bank issued the following Dividend Credit Advice to Margaux Ventures Pension Plan:

Enterprises Limited



North Channel Bank

North Channel Bank GmbH & Co. KG | Einheit 1 · Turm B · 60136 Mainz

Margaux Ventures Pension Plan
99 John Street Apt. 1710
New York, NY, 10038
USA



**Dividend credit**
for non-resident tax payer status

| Per share no. | Security description | DKK | (WKN) |
|---|---|---|---|
| Share 1,025,500 | COLOPLAST AS | | |
| | NAVNE-AKTIER B DK 1 | | |

| Payment date | 11.05.2015 | Dividend per unit | 4.50 | DKK |
| Holdings as at | 06.05.2015 | Country of origin | | Denmark |
| Ex-date | 07.05.2015 | Type of dividend | | interim dividend |
| Financial year | 01.10.2014 - 30.09.2015 | | | |
| Exchange rate | EUR / DKK  7.4880 | | | |

| Dividend income | 4,614,750.00 | DKK | 616,286.06+ | EUR |
| Conversion in EUR | | 616,286.06 | EUR | |
| Overseas tax deducted at source 27 % on 4,614,750.00 DKK | | | 166,367.24- | EUR |
| Dividend subject to withholding tax | | 616,286.06 | EUR | |

| Actual payment | | | 449,888.82+ | EUR |

We will credit the amount with value date 13.05.2015 to the account no.        ...

Not a tax certificate.

 

The handwritten amount is reportedly applied by V6.
North Channel Bank issued a Debit Advice to Claghan Capital
Limited on the same date.

**790**
On May 11, 2015, Claghan Capital Limited and Sherwood
Enterprises Limited entered into an agreement whereby Sherwood

on the settlement date (also on May 11, 2015) lends the shares with dividend to Claghan Capital Limited against cash collateral. As the shares are delivered without dividend, Sherwood Enterprises Limited makes a compensation payment to Claghan Capital Limited. The settlement of the share lending is documented by an order from Sherwood Enterprises Limited to transfer the shares to Claghan Capital Limited.

Also on May 11, 2015, Margaux Ventures Pension Plan and Sherwood Enterprises Limited entered into an agreement for Margaux Ventures Pension Plan to lend the relevant shares with dividends to Sherwood Enterprises Limited against cash collateral. As the shares are delivered without dividend, Margaux Ventures Pension Plan makes a compensation payment to Sherwood Enterprises Limited. The settlement of the share lending is documented by an order from Margaux Ventures Pension Plan to transfer the shares to Sherwood Enterprises Limited.

August 13, 2015 was the forward settlement date in the specific example. On this date, Claghan Capital Limited received the shares from Sherwood Enterprises Limited pursuant to the forward agreement and returned the shares to Sherwood Enterprises Limited pursuant to the share loan. On the same day, Margaux Ventures Pension Plan received the shares from Sherwood Enterprises Limited under the share loan and delivered the shares to Sherwood Enterprises Limited under the forward agreement.

On May 26, 2015, the reclaim agent Goal TaxBack Ltd. sent the following letter to SKAT:



The attached application form 06.003 ENG was completed as follows:



Attached was a certificate from the US tax authorities dated April 13, 2015, which in Danish translation reads as follows:



Furthermore, the following authorization was attached to Goal TaxBack Ltd.'s letter to SKAT, which in Danish translation reads as follows:

*"Margaux Ventures Pension Plan 99 John Street Apt 1710 New York, NY 10038*

*Power of attorney*

THIS POWER OF ATTORNEY, executed this 25th day of April, 2014 by Margaux Ventures Pension Plan (the "Company"), WITNESSES AS FOLLOWS:

1. The Company hereby appoints Goal TaxBack, ("GTB") as agent of the Company and to execute, seal, execute, deliver, complete and perform in the name of the Company and otherwise on behalf of the Company and as the word and deed of the Company all documents, instruments, acts and things, which may be required (or which GTB deems necessary) for or in connection with the provision of tax services to the Company at any time, including applying for refunds from any tax authority in any jurisdiction (as the case may be) in respect of payments made to the Company or through GTB on behalf of the Company. The Company also authorizes GTB to determine the procedure for the recovery of the amounts claimed.

2. The Company ratifies and confirms all transactions entered into, documents executed and things done by GTB or its delegates by virtue of the authorization granted in paragraph 1 of this document, unless it is proven that GTB or its delegates have acted negligently, with willful default or fraud.

3. The Company agrees to indemnify GTB against all costs, liabilities and expenses, including (without limitation) all reasonable attorneys' fees and disbursements, arising directly or indirectly out of the exercise or purported exercise of GTB's powers hereunder; PROVIDED, HOWEVER, that GTB shall not be indemnified against any such liabilities, costs and expenses arising out of the willful default, negligence or fraud of GTB or any designated person or agent or the Company itself.

4. The Company represents that any person dealing with GTB should not be concerned to see or inquire into the propriety or propriety of any act, document, matter or thing which GTS may do or perform in its name by virtue of this document.

5. This document may be terminated by the Company's unilateral action provided that GTB is given at least five working days' notice of such termination. The provisions of clauses 2 and 3 shall survive termination of this document.

6. This document shall be governed by and construed in accordance with English law and the Company hereby irrevocably submits to the non-exclusive jurisdiction of the English courts.

**791**

...

IN WITNESS WHEREOF, this document has been executed by the Company and is intended to be delivered and is hereby delivered on the date first above written. *Execution of a document by a company incorporated outside the United Kingdom.*

*The document executed by*

*Company Name: Margaux Ventures Pension Plan By: Y*

*Duly authorized signatory/authorized signatories:*

"

It is stated that Y has signed powers of attorney for all 27 pension plans covered by this case.

Other examples of certificates from the US tax authorities bearing the watermark "void" have been presented. In this connection, the US authorities stated the following in an email dated January 27, 2022 to O from SKAT:

"It is our understanding that form 6166 is issued on a special paper which protects it against inter alia being copied by changing the watermark to "void". Sending form 6166 without the void-water- mark would thus have required - we understand - the pension plans to apply for several forms.

Your understanding of the watermark of Form 6166 and its inten- ded purpose to prevent copying is correct."

*Conditions in SKAT*

The Problem Catalog - Dividend Tax of November 7, 2006 points out a number of challenges in dividend tax administration. Among other things, it is described that the use of the Internet and nominee deposits - i.e. deposits where the deposited shares are owned by others than the registered deposit holder - makes it more difficult to control trading in securities etc.

On May 10, 2010, Internal Audit at SKAT (SIR) issued an audit report entitled "Investigation of Proceeds from withholding tax on foreigners - dividend tax". The purpose of the report was to investigate the issue that it could not be ruled out that too much withholding tax was refunded via the so-called refund scheme. In the report, Internal Audit made a recommendation that an overall responsibility be established for the entire process for handling dividend taxation, that a control environment be established to ensure consistency between declaration and reporting, and that a new assessment be made of a previously established working group's problem catalog for dividend tax.

On May 30, 2013, Internal Audit issued a report entitled "Revision of dividend and royalty tax for 2012".

**792**

The purpose of the audit was to assess whether SKAT had organized the accounting function in a satisfactory manner, including established procedures and internal controls that contribute to ensuring correct financial reporting, and whether the initiatives launched by SKAT as a result of Internal Audit's report from 2010 were sufficient and adequate. The report concludes that, based on the audit performed, Internal Audit's overall assessment is that the management of the dividend and royalty area had not been entirely satisfactory. Among other things, it also states that there is a need for SKAT to better protect itself against unlawful refunds of dividend tax, which is indicated with importance 2 on a scale from 1-3, where 1 is the most important. Finally, it appears that there is a need for the procedures for the payment of dividend tax refunds to describe what must be checked/checked before the request is granted, which is indicated with importance 3. On June 16, 2015, Assistant Director V13 received an inquiry from a Danish tax lawyer. The email stated the following:

"Dear V13.

With reference to our recent telephone conversation, I hereby inform SKAT by email about a suspected fraud concerning payment of withheld dividend taxes in the amount of up to DKK 500,000,000. The fraud is allegedly taking advantage of the DBO between Denmark and Malaysia, through shell companies registered as domiciled on an island called Labuan. A large number of companies (18?) have, under the pretense of owning shares in Danish listed shares, through a total of 4 foreign companies that specialize in recovering withheld dividend taxes, managed SKAT to pay the taxes. The fraud allegedly consists of "borrowed" shares circulating between a number of companies,

all of which are controlled by one or perhaps a total of three British citizens, but who all seem to live in Dubai. The protagonist is allegedly a Mr. B who owns the Solo Capital group, which has companies in the UK and Dubai.

The four reclaim companies that submit forms to SKAT - and which must therefore be on the list of those requesting payment of dividend taxes, are, according to the information provided: Goal Taxback Ltd, Tim Partners, acupay's, SEB Futures and SynTax GIS.

I have received bank statements from my client - who for fear of reprisals - wishes to remain anonymous, which show a small selection of transactions from late 2014 to early 2015, where several of the names I mention above appear, stating amounts etc. and which concern both Denmark and Belgium.

I will send these tomorrow when I return from London - however, I request that I can also be considered an anonymous reporter until there is clarity on the matter."

On the same day, V13 forwarded the email to V3 and Ø, among others. On June 17, 2015, the same lawyer sent an email to V13 with the following content:

"Dear V13.

Thank you for your email and as promised I am forwarding bank statements for the period December 16, 2014 - January 15, 2015 in both DKK and Euro. In addition to B receiving 7.8 million Euro, it appears that the four mentioned reclaim agents have received payments - Goal Trueback LIM, Syntruc GIS Ltd, The TIM Partners and ACUPAY. I can further state that B's two partners are and - who are originally trained as accountants specializing in tax (with KPMG and/or E & Y) allegedly own together a company called Agrius Management Ltd - which, according to the information provided, has been responsible for the formation of a large number of the companies that have acted as "buyers" of listed shares, which subsequently applied for payment of withheld dividend taxes, even though they were not owners of the shares.

Apparently, B owns together with others the following companies that are presumably involved in the circulation of shares: Solo Capital Dubai ltd and Solo V.S. Pension (fund), as well as Ganymede, Caymann Ltd, Leda Caymann ltd, Matis Caymann Ltd, Athena Equity Trading, Pallas Equity Trading and Pandia Equity Trading.

I hope this information can help you get a little more overview of this very special case - You are welcome to contact me by phone to review the information I have submitted, as I can inform you that I have a handwritten list of the companies that have allegedly appeared as fictitious owners of the shares that the 4 - 5 reclaim agents have submitted the requests for payment of withheld sub-exchange taxes.

I'm on my way to an all-day meeting and therefore have an appointment tomorrow, but you are welcome to contact me by phone today so that we can discuss the next steps."

On June 18, 2015, the same lawyer sent an email with the following content to V13:

"Dear V13.

In continuation of my email the other day, I hereby forward a list of the foreign companies that have allegedly been the formal owner of the shares that the Reclaim agents have presented in connection with their request for payment of withheld dividend taxes.

I have written the list by hand from a list handwritten by my client, so I do not know if names etc. are correct or spelled correctly:
...

I am in possession of some additional information about the alleged
"sellers" of shares to the above 25 companies, but my client has
asked me to wait with

**793**

to disclose these, as he fears, as previously stated, that it could reveal who might be behind the report.

Of course, I understand that SKAT is bound by strict confidentiality regarding the further course of the case, but for the sake of my client and his personal safety, I would very much like to get a "hint" that the report has been taken seriously and forwarded to SØIK, so that he can get ready to protect himself as best he can."

It appears from the case that on July 27, 2015, SKAT received a telephonic inquiry from HM Revenue & Customs informing about the transmission of information regarding suspected dividend tax fraud against the Danish state. SKAT (Special Control) received the inquiry in writing on July 30, 2015. On August 6, 2015, SKAT received an email from the British authorities with information about 184 named companies that allegedly could have been used to recover dividend tax.

On August 6, 2015, SKAT held a meeting about the case, and on the same day an immediate stop was imposed on payments. On August 24, 2015, SKAT filed a report with SØIK about suspected fraud against the Danish state covered by section 279 of the Danish Criminal Code by unjustified recovery of withheld dividend tax for the period 2012 to 2015 for no less than DKK 6.2 billion.

On September 24, 2015, Internal Audit issued a report on SKAT's administration of dividend tax and refund of dividend tax. Among other things, it shows that there has been a significant increase in the refund rate from 11.6% in 2012 to 47.2% in June 2015. It also shows that the average amount per reimbursement request has increased from DKK 47,197 in 2013 to DKK 250,466 in June 2015. The rate of increase in the average reimbursement amount was significantly higher for the blanket scheme than for the bank scheme in the period 2012 to 2015, while the schemes were at the same level in the period from 2010 to 2012. The report concludes, among other things, that the approval control has to a limited extent included a verification of whether the refund requests received can be attributed to a shareholder relationship and whether the refund request can be attributed to a prior withholding of dividend tax. It is also found that the follow-up on accounting data in connection with the ongoing approval of the accounts has been deficient. It also appears that SKAT has not been given overall responsibility for the entire process regarding dividend tax, and that SKAT has not yet implemented previous recommendations on the establishment of an overall response, protection against unlawful refund of dividend tax and reconciliation between declaration and reporting.

On November 16, 2015, SKAT filed a report with SØIK about suspected fraud with refund of dividend tax for an additional DKK 2.9 billion.

In February 2016, SKAT's Head of Citizenship and Legal Certainty issued a factual report on the administration of dividend refunds in the period 2010-2015. The report was prepared as part of an internal investigation of SKAT's administration of the dividend area, which was initiated after Internal Audit's report of September 24, 2015. The report includes, among other things, the organizational placement of the task, management decisions on follow-up on the reports from 2010 and 2013 from Internal Audit, internal guidelines and processes for the administration of the area and any warnings internally from the organization about the problem with the administration of the area.

In February 2016, the National Audit Office submitted a report to the State Auditors on SKAT's administration and the Ministry of Taxation's supervision of dividend tax refunds. The report states, among other things, that the Auditor General's overall assessment is that SKAT's administration and the Ministry of Taxation's supervision of dividend tax refunds has been highly criticized, that SKAT has conducted a completely inadequate control of the payment of dividend tax and that SKAT has

the refund of dividend tax, and that the Ministry of Taxation's supervision of the area has been extremely inadequate. It also appears that SKAT has been aware of problems with the refund of dividend tax since at least 2010, but that SKAT only became aware of the suspected fraud when SKAT received information about it from outside. Finally, Rigsrevisionen notes that the Ministry of Taxation's supervision has been fragmented and reactive, as the Ministry of Taxation has not compared the information it received as part of its ordinary supervision with the other indications of problems with dividend tax refunds that the Ministry has received over the years. Had the Ministry of Taxation conducted a more proactive supervision, including comparing the information received in various ways, it would have clearly pointed to the need for a closer investigation of the area.

In response to the National Audit Office's report from February 2016, the Minister of Taxation stated in the ministerial statement of 4 May 2016 to the State Auditors' report number 11/2015 on SKAT's administration and the Ministry of Taxation's supervision of the refund of dividend tax that he agreed that the case handling process for the refund of dividend tax had not been organized properly.

On August 24, 2016, SKAT filed a complaint with SØIK for fraud with recovery of dividend tax for an additional DKK 3.2 billion. The following is stated in the report:

"...

*Additional report of fraud with recovery of dividend tax of DKK 3.2 billion.*

**794**

Between August 24 and November 13, 2015, SKAT filed a report of suspected fraud with recovery of withheld dividend tax of DKK 9.1 billion for the period 2012 - 2015.

SKAT has previously notified the following foreign companies/Cu- stodians.

- SOLO CAPITAL PARTNERS LLP
- OLD PARK LANE CAPITAL PLC
- TELESTO
- WEST POINT

The companies have used the following professional companies - so-called reclaim agents to recover the dividend tax through.

- SYNTAX GIS LTD
- ACUPAY
- GOAL TAXBACK

SKAT has subsequently reviewed all payments to the above-mentioned agent companies and has, on the basis of the available information, found a further 81 companies/pension plans domiciled in e.g. the USA that may be associated with or presumed to have used the same or similar methods as the companies in the previous reports.

Of the amount of DKK 3.2 billion, DKK 2.0 billion can be attributed to the above 3 agent companies.

During the review, it was also found that several of the claims from ... and North Channel Bank come from the reclaim agent .... The remaining DKK 1.2 billion can therefore be attributed to this agent.

The material shows that it is mainly American pension plans and a few Canadian pension plans that have used the following custodians/brokerage companies:

1. ...
2. ...
3. ...
4. ...

5. NORTH CHANNEL BANK GMBH & CO. KG
   Erthalstrasse 1

Bonifazius
Tower B 55118
Mainz

The agent business

6.    ...

Comments on the above:

Re 1 and 2)

SKAT has received information from ... about very large trades in Danish shares made close to the dividend day by ... and ... Information has also previously been forwarded to SØIK.

The information shows that all trades "break even" as there are equal purchases and sales of each share, which in turn enables the broker/custodian companies to make very large applications for refund of withheld dividend tax.

In connection with the processing of applications received but not paid out, SKAT has requested further documentation in cases where ... has been used as custodian. SKAT has not received any additional material for the case.

Regarding ... it should be noted that there is a certain similarity between

... and ... the design of their Credit Advice (CDA).

Re 3)

... is a custodian/broker company located ... has only made recoveries for 2 American pension plans and 1 English pension plan. However, the recoveries amount to more than DKK 300 million, corresponding to a dividend of DKK 1.6 billion. In connection with the processing of applications received but not paid out, SKAT has requested further documentation. Among other things, SKAT has requested original CDAs, purchase and sales documents and bank statements.

The CDAs contain, among other things, incorrect ISIN numbers on the shares. No documentation has been received for the cash flows etc.

The phone number listed by ... can be traced back to a bank ...

The trustee in the English pension plan is ... resident in ...... but also has an address in ... A Google search on ... shows that he has been affiliated with ...

SKAT has also asked the US Internal Revenue Service (IRS) about the tax status of the two US pension plans. The IRS has stated that these are plans from 2012 and 2013 with assets under $250,000. Therefore, the dividend income received cannot have accrued to the pension plans.

Re 4)

... issues Tax Vouchers for a large part of the US and Canadian pension plans. Unlike North Channel Bank, the documents do not look like a "real" custody statement, but a confirmation that the pension plan has received the dividend.

Unlike all other mentioned custodians/brokerage firms, ... is registered with custody accounts of Danish shares in VP Securities.

In connection with the processing of applications received but not paid out, SKAT has requested additional documentation. Among other things, SKAT has requested original CDAs, purchase and sales vouchers and bank statements. SKAT has not received sufficient documentation of the circumstances and no cash flows have been documented to date.

Again, these are relatively new pension plans with limited funds that are making billion-dollar investments.

Re 5)

This is a German broker/bank that has acted as an intermediary between the US pension plans

**795**

and reclaim agents. The design of the documentation looks very

different from the other broker/custodian companies, as

This is a "real" looking depot overview/dividend report.

North Channel Bank (NCB) has issued many CDAs and all reclaim agents have been reclaimed with an emphasis on ... and ...

However, based on information received from VP Securities about foreign ownership interests (custody accounts) of Danish shares, SKAT has not been able to find NCBs listed with custody accounts of Danish shares.

In connection with the processing of applications that have been received but not paid out, SKAT has requested additional documentation for cash flows, but has not received the requested documentation here either.

SKAT received information from IRS about the majority of the pension plans mentioned in the notification. The information includes information about the date of formation, address, tax return status. Some pension plans have also received copies of submitted tax returns, information about trustees or other information.

Example:

... pension plan ... established Feb. 2014. ... is used as agent. NCB as custodian.

April 2015, 8 applications for recovery of withheld dividend tax of DKK 37 million and a gross dividend of DKK 138 million are submitted.

NCB has stated that they have credited the Pension Plan's account in NCB for the dividends received. Dividends have been claimed back on 8 different shares. The majority of the dividends come from an investment in Novo Nordisk of around DKK 3 billion, 12 months after the pension plan was established. According to the above, the investment and cash flow should have been made via the pension plan's account at NCB.

According to the IRS, this is a pension plan with assets under $250,000.

Re 6)

... is a relatively newly founded company (founded Nov. 2014). The remarkable thing about ... is that from April 20, 2015 to July 23, 2015, they submit refund requests for a total of DKK 1.2 billion.

... requests reimbursement based on the CDA prepared by ... and NCB.

Again, the pattern here is newly established pension plans with very large investments and recoveries, which does not match the information received from the IRS.

Finally, it should be noted that they are the same people who act as trustees in many of the plans.

Supporting material and documentation for the observations stated in the report will be forwarded to SØIK on an ongoing basis.

..."

In spring 2016, SKAT submitted several requests for assistance to the German tax authorities for SKAT's investigation of the suspected fraud.

On October 10, 2016, SKAT's contact person at Finan- zamt für Steuerstrafsachen sent an email to O, who handled SKAT's contact with the German authorities about the case. The email states the following:

"Dear Mr. O

...

Our office has information on Cum-Ex transactions carried out via a German bank as custodian bank. The following Danish shares have been traded above the dividend record date:

Share volume

A.P. Møller-Mærsk A-S (B) 250,600

Danske Bank A/S 51,100,000

Tryg A-S 4,279,500

DSV A-S 200

TDC A-S 117,200,000

Pandora A-S 11,082,000 Coloplast A-S (B) 19,890,000

Novo Nordisk A-S (B) 304,700,000 (in each case half purchase and half sale)

There are also statements from the law firms Bech-Bruun, Copenhagen, and Jones Day, which have confirmed that the German bank has acted legally.

These are only transactions that took place in 2014. However, it must be assumed that similar transactions were also carried out in 2015.

It is US Pension Plans that have requested a refund of the Danish dividend tax.

The names of the pension funds in question and additional material are available in our office and can be passed on if it is of interest."

On May 23, 2018, V6 was sentenced to 5 years imprisonment for fraud of a particularly serious nature by unlawfully recovering approximately DKK 37 million in withheld dividend tax on 14 occasions in 2007 in association with a co-defendant by using false information.

On May 29, 2018, SKAT's German lawyer requested the German Financial Supervisory Authority BaFin for access to the case file regarding the previous audit of North Channel Bank, or alternatively to the report prepared by KPMG dated July 29, 2016. On June 27, 2018, BaFin forwarded the KPMG report to SKAT's German lawyer. The legal opinions of Jones Day and Bech-Bruun were included as appendices.

Extracts of statements made by V17, V4, V3, V18, V19, V20, V21, V1, V22, V7, V8, V9, V10 have been documented during the case,

V11, V12, Ø, V13, V14, V15 and V16 for the Commission of Inquiry concerning SKAT as reproduced in the interim report on the conditions regarding SKAT's payment of refunds of dividend tax 2021.

**796**

*Loss assessment and settlement*

On April 2, 2020, the Tax Administration sent Bech-Bruun a demand for payment of DKK 748,749,586 plus interest, totaling DKK 1,191,060,338.22, within 10 days.

It is undisputed that a total of DKK 1,135,775,442.18 was paid to 27 pension plans as a refund of withheld dividend tax in the period from June 17, 2014 to August 6, 2015 in accordance with applications attached to a dividend note issued by North Channel Bank. It is further undisputed that the payments were unlawful. Of this amount, DKK 282,329,482.50 was paid prior to August 4, 2014, when A signed his legal opinion, and DKK 317,898,703.83 was paid after June 16, 2015, when SKAT received the notification from the Danish tax lawyer.

On May 28, 2019, the tax administration reached a settlement with 61 pension plans, 56 natural persons and 102 companies. The settlement concerns a total claim of DKK 2,937,851,407, which also includes an amount of DKK 1,086,466,021 that was wrongly paid to 26 of the 27 pension plans, whose applications were based on North Channel Bank's involvement. The settlement is presented in excerpts below. The tax administration has reduced the claim against Bech-Bruun by an amount of DKK 413,485,128.41 in connection with payments under the settlement agreement, after which the claim is calculated to DKK 722,290,313.77. The tax administration has stated that approximately 40.9% of the payments under the settlement agreement after a proportional distribution relate to the claim against Bech-Bruun.

Furthermore, on May 28, 2019, the Tax Administration entered into an agreement with the owners of North Channel Bank under which the Tax Administration will receive at least DKK 50 million in the event that North Channel Bank is sold in free trade and the bank does not go bankrupt. On September 4, 2019, the Tax Administration entered into a conditional inter-creditor agreement with North Channel Bank and the Belgian State.

An excerpt of the agreement is presented during the case. It follows from clause 2.1.2 of the agreement that the Tax Administration undertakes, upon receipt of 86.97% of the purchase price for the sale of North Channel Bank, to pay the fine that North Channel Bank adopted in a hearing in the Court of Glostrup on September 23, 2019, and the rest of the settlement amount shall cover the civil claim.

During the main hearing, the Tax Administration stated that settlement agreements have also been reached with two of the claimants involved in this case for a total amount of DKK 26 million, of which a small part relates to this case. As a result, the claim against Bech-Bruun can be written down by an additional DKK 3.7 million according to the Tax Administration.

*Other information*

In December 2017, Bech-Bruun completed its legal investigation entitled "Investigation of the conditions regarding SKAT's payment of refund of dividend tax".

On December 21, 2018, the Ministry of Taxation filed a conduct and fee complaint with the Danish Bar and Law Society alleging that Bech-Bruun had breached professional conduct by accepting the assignment as an independent investigating lawyer despite the fact that Bech-Bruun had represented three Canadian pension plans in cases concerning matters that Bech-Bruun had investigated as an independent investigating lawyer. The Board found that four named partners from Bech-Bruun had violated the code of conduct by undertaking to conduct the legal investigation and that Bech-Bruun was not entitled to fees for this.

The Danish Bar and Law Society's decision of July 4, 2019 was brought before the courts by Bech-Bruun. The Eastern High Court ruled in the case on

June 23, 2021, after which the ruling of the Danish Bar and Law Society was upheld with regard to the conduct complaint regarding the four partners, and the Ministry of Taxation was acquitted of Bech-Bruun's claim for fees. The judgment has been appealed to the Supreme Court, which has not yet made a decision in the case.

## 3. Explanations

V1, A, V2, V3, V3, V4, V5, and V6 have given statements.

*V1*

*V1* has explained, among other things, that when he became head of department in 2012, he had two main tasks: to return the organization of the tax authorities to a classical authority structure with a "narrow" department and specialist boards rather than the previous unitary administration in SKAT and to continue the efficiency improvements in accordance with the McKinsey report. The McKinsey report's overall conclusion was that there was a significant potential for efficiency improvements in SKAT, estimated at a small billion DKK. At the time, no one questioned this analysis.

The Ministry of Taxation's Internal Audit reports are part of the Ministry of Taxation's overall group supervision. The Ministry of Taxation is not and must not be involved in the specific tax case processing. The Executive Board of SKAT was tasked with developing action plans for the control efforts in the individual areas in light of, among other things, the reports from the Ministry of Taxation's Internal Audit (SIR). There was a clear procedure for how to act in SKAT when a report was received from SIR. A report was always sent to the responsible director and the head of finance as well as to the National Audit Office, and an action plan was drawn up for follow-up etc. The SIR reports used the color codes red, yellow and green to indicate the need to react to the conclusions in the reports, but the reports

themselves did not say anything about the risk of fraud. A yellow point could well be

**797**

closed in the action plan, even if it wasn't resolved, but you had to deal with the issue.

U.2024.746H - SKM2024.123.HRH

The fact that only three SIR reports were presented to the witness in 2013 does not mean that the general procedures were not followed in relation to presentation to the responsible directors and director areas etc. After all, these were operational issues that in any case had to be clarified in the individual operating units. In 2015, the witness was presented with 43 out of 45 reports from SIR as a result of a change in work organization that was not related to the dividend case. Rigsrevisionen largely based its work on the internal audit reports etc. prepared by SIR. There was a very massive audit pressure in SKAT. He had a meeting with the Auditor General

... about her concerns about the quality of the work performed by SIR. The discussions led, among other things, to a competence boost in SIR and the hiring of more employees. In 2014, a new head of SIR was also appointed. Since then, the so-called Section 9 agreements have been terminated so that Rigsrevisionen has generally outsourced the audit. This also applies to other ministerial areas.

He was not made aware of any problems in the withholding tax area when he took office or in the period leading up to 2015. He first heard about fraud in the withholding tax area in August 2015. The period around August 2015 was highly chaotic. When he looks at the course of events today, one should probably have been a little more cautious in their conclusions then, because they were still in the initial investigation phase. As he has also explained in the Commission of Inquiry, he was informed about the case on

August 18, 2015, and, as far as he remembers, he was told at the same time that a payment stop had been initiated. Thus, he was not involved in the decision to stop payments. It was a very far-reaching decision, and he is not aware that such a decision has previously been made in other areas. He agrees with V13's statement to the Commission of Inquiry that it was not possible to initiate the payment stop earlier than happened.

The Danish tax system is largely based on a trust-based tax return model. Third-party documents and information from third parties are also generally given a high evidential value in the tax authorities' administration. This includes, for example, information from banks, insurance companies and mortgage credit institutions. Such information is generally considered valid. Today, the personal tax area is largely based on third-party reports, which are generally used as the basis for tax assessment. The VAT area is also based on tax returns (VAT returns), and very large amounts are involved in both positive and negative VAT returns. Negative VAT returns are paid without the use of third-party declarations. There are many fraud cases in the VAT area, which has led to the implementation of some control, but it has not led to payment stops, which would probably not be possible due to EU regulation in this area.

In 2012, he did not pay particular attention to the Tax Committee's report of June 11, 2012 on bill no. L 173, nor did the bill have anything to do specifically with dividend refunds, but dealt with a specific case complex regarding flow-through companies. The bill therefore had nothing to do with general issues in the dividend area. He was not involved in the processing of the bill, as this was handled by the former acting Permanent Secretary. He first read the bill in August/September 2015 in connection with a review of recent years' legislative changes in the dividend taxation area. There was no suspicion of fraud in the dividend tax area in 2012/2013, but some rule changes were made after a working group had recommended a strengthening of control in the area.

He was not presented with the SIR's report of May 10, 2010 on the examination of the revenue from taxation of foreigners - dividend tax when he took office in 2012. He has subsequently read the report, which cannot be characterized as particularly critical. Based on the report, a working group was set up that came up with some relatively clear recommendations and guidelines.

He was not presented with the SIR's report of May 30, 2013 on the audit of dividend and royalty tax for 2012 when it was submitted, and has thus only had the opportunity to read it after August 2015. Neither the report in general nor the sub-conclusion under item.

3.2. whether the accounting policies were worded in a way that could give rise to particular concern. Methodologically, the report is built on a solid foundation. SIR's 2013 report stood on the shoulders of the 2010 report and could be read independently of the earlier report. He understood what was stated about the review of Accounting 2's business processes in section 3.4, including in the sub-conclusion, to mean that SIR assessed that the form scheme worked well, while there were concerns in relation to the spreadsheet scheme (bank scheme). He must also read it as meaning that the information about the increase in reimbursements did not give SIR cause for concern. Under item 3.7. on organization and responsibility in the dividend area, SIR's partial conclusion was that there were many actors and process owners in the dividend area, and that an overall responsibility with management focus should be established. It could thus be appropriate with a clear process owner. What was stated in the sub-conclusion was not something that he would have paid particular attention to. Shared process ownership does not mean that there is no

**798**

an overall responsibility, nor can it be used to draw a conclusion that a clear process owner responsibility could have prevented fraud. He does not understand the sub-conclusion in section 3.8. on follow-up on SIR's report from 2010 to mean that there was insufficient follow-up. The overall conclusion in section 4.1 is not an alarming conclusion in SKAT's area. If SIR had been concerned about fraud, they would have gone directly to SKAT's director. SIR is not far up on the criticism scale in this report. The yellow marking regarding refund of dividend tax under section 4.2. in the report relates solely to the banking scheme. The presentation of the SIR's report to SKAT's Executive Board on June 7, 2013 followed the usual procedure. Had there been a specific suspicion of fraud in the submitted report, it would have been stated in the presentation. Nor did SIR's report from 2013 give rise at that time to the implementation of specific measures aimed at combating fraud.

It is very rare that the conclusion in SIR's reports is in the top two categories, where the conclusion regarding the audited area is "very satisfactory" or "satisfactory", as there is a reason why an area is selected for inspection.

SIR's report of June 27, 2014 on SKAT's follow-up on SIR's recommendations and identified, uncorrected errors from previous years led to the implementation of guidelines for separate follow-up on SIR's reports. However, this is a general report that does not specifically address dividend tax. In addition, a larger, general rotation analysis was carried out, the results of which were available in the summer/autumn of 2015. It revealed some potential for improvement across SKAT's area.

SIR's report of September 24, 2015 on SKAT's administration of dividend tax and refund of dividend tax was prepared in a short time in light of the payment freeze and at a time when there

U.2024.746H - SKM2024.123.HRH

was a huge fraud case. The report was commissioned by the then Minister of Taxation and was characterized by "looking backwards". The conclusions were clearly different from those in the 2013 report, but they were also aware that there had been

Copyright © 2024 Karnov Group Denmark A/S

committed fraud, and the context was therefore completely different. This was also reflected in the conclusions, which were characterized by a lot of retro- rationalizations. It was in connection with this report that he realized that the control functions in the area of withholding tax were deficient. However, it should be noted that the statement in section 9.6. that there is no verification of whether the dividend recipient is the rightful owner is written in light of the fact that it had now become clear that extensive fraud had been committed. He agrees with the partial conclusion in section 10.5 of the report about the lack of consolidation of the process owner responsibility, but it must be read taking into account that the individual directorate areas etc. under SKAT were still responsible for an overall and efficient dividend process, as it also appears from the partial conclusion. The partial conclusion under point 8.1. on "lines of defense" contains a very general and overall description that does not say much.

 Rigsrevisionen's report from February 2016 to the State Auditors on SKAT's administration and the Ministry of Taxation's supervision of dividend tax refunds was highly critical and was characterized by having been prepared in the context that fraud had been detected. The Ministry of Taxation did not agree with much of the criticism made by the National Audit Office. However, when the Auditor General's report was published in 2016, the Ministry had to take note of the report, even though the Ministry did not agree with all the conclusions. The report contained some ef- terrationalizations, which led to a criticism that, in his opinion, is not entirely justified and rather unnuanced. This was also reflected in SKAT's ministerial statement of May 4, 2016 regarding the report. However, the Minister's comments in section 1 of the statement naturally express the Minister's and the Ministry's position. He agrees with the conclusions stated in the ministerial statement, but the statement must of course be read in light of the very critical report from the National Audit Office. One should therefore also be cautious about drawing individual conclusions from the report. He does not fully agree with Rigsrevisionen's remarks under point 44 of the report, which is inserted in the context that it is known that fraud had been committed. In his opinion, this could not be seen in real time, and in addition, the employees in dividend administration had referred to the fact that there had been an increase in share purchases from American pension funds as the reason for the development in the dividend figures. In his opinion, the graphical presentation in the report under item 64 stating indications to the Ministry of Taxation of problems with refund of dividend tax in the period January 1, 2010 to August 5, 2015 is highly misleading. He did not see indication 1 in the form of SIR's report from 2010 as critical at all, and the report was also followed up on. As far as he was aware, the inquiries from V4 did not go any further up the system, as V4 was unable to convince his superiors of the problem. "It's a completely normal procedure to go to your manager, who then assesses whether it's a matter that should be taken further. It was unusual for V4 to contact the Ministry of Taxation directly, as they are responsible for drafting the legislation in this area. He did not see indication 4 in the form of SIR's report from 2013 as critical at all. In Rigsrevisionen's report under indication 5, dividends were briefly outlined, but not mentioned as a problem. The follow-up reports from SKAT did not contain any warning signals either. Indication 7 did not relate to the

**799**

dividend tax. Moreover, the "early warning" mentioned under indication 8 concerned a completely different issue about share

loans and had nothing to do with dividend tax. Thus, it is highly misleading to conclude that there was a flood of problem indicators. If Rigsrevisionen had found a basis for it, a reservation could also have been made on the basis of SIR's report from 2013

Copyright © 2024 Karnov Group Denmark A/S

in the government accounts. However, Rigsrevisionen found no reason for this.

He was not provided with accounting approvals, including the accounting approval from May 2015, where it is stated, among other things, that part of the increase in the paid refund of dividend tax can be attributed to American pension funds making acquisitions in Danish companies. He has no recollection of having heard anything about this at the time. SKAT submitted the accounting approvals to the Ministry for use in the calculation of the so-called revenue lists to the Danish Parliament. The Ministry thus received the accounting approvals in order to be able to monitor the area from a cyclical point of view.

Table 7.1 in SIR's 2013 report showed that both revenues and re- mergers were increasing. However, for highly volatile tax types, such as dividend tax, corporate tax and pension taxation, it is difficult to estimate revenue development. The figures sent by the Ministry of Taxation to the Danish Parliament gave no real-time indications that anything was wrong in the period from 2005-14. Both revenue and dividend tax refunds increased during the period. You couldn't just have done an analysis in 2014 and found out that something was completely wrong. An analysis based on monthly or quarterly figures is also more uncertain. No one had noticed that the increase in reimbursements was so particularly large that, also in light of what was said about the American pension funds' acquisitions, it gave cause for action. Furthermore, there is no necessary correlation between an increase in dividend taxes and an increase in dividend refunds - what matters is how many foreign buyers there are.

SKAT resumed the payment of refunded dividend tax in March 2016. This was not a quick resumption of payments, and initially there were only a few payments. The case processing time for dividend tax refunds has increased significantly, and it is difficult to meet the six-month deadline. The tax authorities currently have around 90,000 requests pending, covering requests for refunds worth several billion DKK. Today, responsibility for the dividend area is divided in a different way than before, and a deputy director has been appointed with responsibility for the overall process in the Tax Agency.

The period during the payment freeze was characterized by efforts to establish a control regime that ensured that the fraud could not be repeated. He was involved in organizing the new strategy. Over the years, more than 100 FTEs were added, and one FTE was created in an analysis unit. An exceptionally high control pressure has now been established in this area. This is particularly evident when compared to the control in the VAT area, where a similar control pressure would require the hiring of several thousand additional employees. The establishment of the extensive control regime should be seen in light of the fact that it was assessed that it would be devastating if there was another case of a similar nature. Developing a new dividend administration was a complex task. SIR's reports from 2010 and 2013 did not provide any relevant basis for introducing a similar regime already at that time, when the fraud was not known. It was not even an issue to consider in 2013, nor would it have been possible to introduce such a control, as the resources would have had to be taken from another area in SKAT.

An owner register was not established in connection with the introduction of the new control regime. Such a register would in any case not be able to stand alone in connection with the control, as information about the beneficial owner was not available at the time of distribution of dividends. An owner register could also have a negative impact on the investment

appetite in Denmark.

Copyright © 2024 Karnov Group Denmark A/S

A net retention model has also been considered and is still being worked on. However, this is a very complicated area.

He had no specific knowledge of the administration of the dividend area, including the control of the area, before August 2015, and he had not previously considered whether the administration of the area was considered a mere typing and bookkeeping task, as stated by the Head of Citizen and Legal Security in his factual report from February 2016 on the administration of dividend refunds in the period 2010-2015.

He is familiar with the accounting instructions and that controls must be based on risk and materiality criteria. In the cases he has seen, the genuine documents have been present, but their content has been incorrect. He therefore believes that the formal requirements for checking the authenticity and validity of third-party declarations have been met. In the report from 2013, SIR assessed that the checks on the form system were sufficient. Substantive checks are not carried out on very many tax types, and there is no requirement to carry out a thorough check. What is stated about substantive control in section 38 of the Ministry of Taxation's accounting instructions is a stylized picture of how control can be performed. If such a substantive audit were to be carried out in all cases, it would be a completely different

**800**

other number of employees in the tax authorities. It was up to the management of SKAT to assess how the control resources should be used.

At the time of SKAT's memo of August 25, 2015 on suspicion of extensive financial crime committed against SKAT, he had no knowledge of whether SIR's previous recommendations had been followed. That was what needed to be investigated.

He has not seen appendix 16 to follow-up protocol 12-014 on revision of dividend and royalty tax, and he has not considered the memorandum of August 17, 2015 on the current status stated therein.

He has not studied the reasoning in the Eastern High Court's judgment in the criminal case against V6, but he has probably been made aware in the subsequent course of events that payments from the tax authorities in the dividend tax area could be made at the request of a single employee. It is not his understanding that there was no real control in the dividend area, as there was a real control that the necessary documentation was present. In general, the tax authorities trust the information received from third parties, and this is especially true when there is no concrete risk picture.

He has only seen examples of specific applications for refund of dividend tax after September 2015. The amounts varied greatly in the individual applications. In the new system established after the fraud case, checks are carried out on applications for amounts over DKK 250,000. This should be seen in the light of the fact that new cases of this nature cannot be tolerated either administratively or politically. He has not had the opportunity to consider individual parts of the applications or their attachments, such as signatures and stamps. The reimbursement amount in Goal Group's application of May 28, 2014 regarding KB Ventures Pension Plan cannot be considered unusual. The letter from North Channel Bank documents that dividends have been paid and that tax has been deducted. At the time, this documentation had to be considered solid and valid as it was based on information from an independent third party in the form of a bank subject to the German Financial Supervisory Authority. It was thus the best evidence of the correct recipient of the dividend refund. He has no knowledge of "repeaters" in terms of companies and share sizes in the specific applications. He only

became aware of the name "Y" in connection with the subsequent processing of the case complex.

Only after August 2015 has he seen the Ministry of Taxation's memo of September 17, 2007 on accelerated repayment of withheld Danish dividend tax etc. What is written in a document from 2007 is irrelevant in the witness' opinion. If there had been a concern about fraud at that time, it would also have come to light in the reports etc. that were subsequently prepared.

The Tax Agency's status of 30 October 2018 on the banking scheme and share lending in the dividend area is an expression of making some post-rationalizations in light of the fraud, which had not previously been known.

The tasks related to the legal settlement after the dividend case, including the lawsuit in the UK, are handled by the Danish Tax Agency, but he is regularly informed. In connection with the lawsuit in London, he was informed that a limitation issue had been raised. He was involved in the tender process for setting up the legal investigation, which ended up being conducted by Bech-Bruun. In connection with the tender, there was a relatively general formulation that Bech-Bruun had provided advice on the dividend area, but this was not something that gave rise to particular concern at the meeting held on February 22, 2017. This information came from Bech-Bruun. North Channel Bank was not mentioned in this context. If the Ministry had known that Bech-Bruun had provided advice to North Channel Bank, it would probably have reacted differently. However, there was a lot that was not known in 2017.

*A*

*A* has explained, among other things, that in 2014 and a period of approximately 5 years prior to this, he was involved in dividend tax in various contexts. In addition to him, N and, until 2012, I also worked with dividend tax at Bech-Bruun. He has previously advised on tax arrangements where the purpose was presumably to achieve tax savings - also in relation to dividend tax and refund of dividend tax. He has not previously advised on cases where the purpose of owning shares was to obtain a dividend tax refund. When advising, he always considers the reality of the arrangement he is advising on. If an arrangement is purely pro forma, there is no reality and the advice stops there.

The statement in the e-mail of February 3, 2014 from him to H that cum/ex transactions have previously been presented to them should not be understood to mean that he has previously advised on cum/ex transactions. This type of transaction was not something that was used in Denmark. The problem is that cum/ex transactions formally legitimize two persons for the refund of dividend tax. He understands a cum/ex transaction to mean that shares are bought with dividends but delivered without dividends, and that a compensation payment is made later. With the statement

"generally problematic from a legal perspective" in the same email, he said that double reimbursement is out of the question as it would be illegal. The email was a polite rejection.

At the time of the advice, he was aware of VP Securities' registration of securities and shares. He was probably also aware that there were omnibus depots

**801**

registered with VP Securities. He does not know what information VP Securities has about the owner of a given share. It is probably the bank and not the owner that is registered in VP Securities. He cannot say whether he knew in 2014 whether there was an owner register in VP Securities. He would not assume that VP Securities could see who owned listed shares, and he does not know if such registers existed elsewhere. At the time of the advice, he knew that dividends were paid from the distributing company to the registered owner three days after the

general meeting. The ex-date is after the date of the general meeting.

In advising North Channel Bank, his focus was on the tax ownership, as this determined who was entitled to a refund of withheld dividend tax. He did not focus on civil law ownership.

He wrote in an email dated February 18, 2014 to K and H that it seemed unusual that North Channel Bank would make a declaration of beneficial ownership, as a bank would not normally make a declaration of tax ownership, as this is a qualification. Tax ownership was still central to his advice, even though the bank was not responsible for qualifying it. If the bank did consider the tax ownership, the bank would go further than what a bank normally does. The more knowledge the bank has, the greater the risk of liability.

In his opinion, the civil law ownership of shares is transferred when a purchase agreement is concluded, so that one is the owner from the time of the agreement and not the delivery. In the case of a share loan, the borrower is the owner of the shares in civil law terms because it is effectively a "loan to own". For tax purposes, the ownership remains with the lender until the borrower transfers the shares.

Entering into hedging agreements does not necessarily affect ownership. The problem in relation to tax ownership is that registered legal ownership is not enough, as you are not necessarily a beneficial owner. A hedging agreement that involves full risk coverage removes the substance of ownership, as you no longer bear any risk. If there is a temporal overlap between the transfers, it will be looked at more strictly.

A dividend advice is a statement from a custodian bank about the dividend that has been paid on a given share. There is no specific recipient of the statement, as it is the bank customer who uses the statement to apply for a refund of withheld dividend tax. You must ask your bank to make such a declaration yourself. The bank's basis for issuing the declaration is that the bank can see that a dividend has been paid on some shares. He cannot explain how the bank can technically see that dividends have been paid. The bank customer's contracting party sends an amount to the bank customer, who designates the amount as a dividend. The bank can verify that it is actually a dividend through the customer's contract party's bank. This is necessary for the bank to be able to trace the amount back to the person who distributed the dividend. He does not know how much documentation a bank requires. In point 4, no. 7, of the draft legal opinion of July 21, 2014, he has used the term "standard ownership documentation" as a standard term when the bank had to do what it used to do. He would assume that the term includes a "dividend advice". If the bank deviates from what it usually does, it would indicate that something is not as it should be.

He has previously been asked to advise on a "dividend stripping transaction" as stated in the email of February 3, 2014 from H to V5. He has not advised on obtaining a double refund, which was referred to in the same email, but he was aware of the phenomenon. He has previously been asked about the risk of incurring criminal sanctions in the tax area, but he does not remember whether this was also prior to the implementation of a given event. He doesn't remember if he had heard anything about criminal offenses in Germany, but it was not something he related to Denmark. It was obvious that Jones Day should take care of German legislative matters.

He did not note that in the e-mail of February 5, 2014 to him and V5, H wrote "one of the parties to the cum/ex transaction". He received the email at an early stage, so he did not know what it was actually about.

A "should-opinion" is a legal judgment with a degree of certainty. The categories 'will', 'should' and "more likely than not". "Will" indicates the highest degree of certainty.

more than 90%, and "more likely than not" indicates a certainty of at least 51%. "Should" is somewhere in between. It is customary to accept the "should" level when asking about criminal liability, even if the assessment concerns banks and transactions that have not yet been completed. He has been asked by banks in the past about the risk of incurring criminal liability.

He wrote in an email dated February 7, 2014 to H that he needed to have a full overview of the transaction and the client's role in order to make the assessment, as this was necessary to make a decision. At this point he knew nothing. You shouldn't read too much into the choice of words, as it's just an email. He doesn't remember if he knew what he was advising on at the time, but it doesn't seem so. I had the same level of overview of the transactions that you normally have when you advise. He primarily read I's conclusion. I's tax opinion is also a should-opinion, as it was not entirely clear when there was ownership. He relied on I's conclusion.

**802**

He wrote in an email dated February 11, 2014 to H that he agreed that
"the transaction described does not reveal a factual pattern that certainly implies a cum/ex trade". He doesn't remember why he chose this wording, but the point was that the model no longer resembled a cum/ex transaction. The wording in the same email that "we have also typically seen in the cum/ex trades" simply alludes to the fact that they have seen cum/ex trades in the past and that the specific element of the trades resembles cum/ex trades. You can't read that much into an email. He doesn't remember what he was referring to with the statement that they have been able to find a solution in the past regarding the short ownership period, but he has previously discussed with customers whether an ownership period could be made longer. He has not been presented with a split-second ownership period in the past. He wrote that he would hesitate to give his opinion on a purchase and sale that both occur on the registration date because the shorter the ownership period, the greater the risk that there is no ownership for tax purposes.

They received the assignment with K's email of February 13, 2014. He didn't pay much attention to the wording, as K was not a tax expert. It stated what they could assume was important, including the definition of the bank's role. He did not find the assignment striking, as it was a natural extension of the bank's decision to take on the role of custodian bank. At the time, the assignment did not seem particularly complex, and the fee was not particularly high. The transaction description in point 3 of the draft legal opinion of
February 18, 2014 was copied from I's tax opinion. He assessed that I's tax opinion was correct. The description in point 5 implies that there could be as little as one day's ownership time. He cannot answer why there was a difference in the settlement date for the pension plan's respective purchase and sale of shares. He thought there was a reason to do so. It was a deviation from "T+3", but he did not consider whether it gave rise to abuse. He had no idea what was customary abroad. He doesn't know if
"T+3" was the norm on all exchanges. He did not have the impression that the parties making the trades were known. It was his starting point that there was no relationship between the parties. However, the fact that the parties are not independent of each other is not necessarily a problem. He cannot explain why the shares should be lent as described in section 3.6 of the draft when they were to be bought and sold on the same day, but it may be that the parties had a reason. It happens that customers

know about transactions that he does not know himself. He had confidence in Jones Day. It was a German bank and a reputable law firm that gave him no reason to be suspicious.

The key to premise 5 in the draft of February 18, 2014 is who is the owner of the proceeds. It would not be natural to put in

that the pension plan was the rightful owner, as the bank would then argue that it could not know this. As far as premise 10 is concerned, it is natural in an assessment of liability to emphasize whether the bank was just doing what it usually did, which did not include fraud. Premise 13 is also taken from K's email. In the draft opinion of February 20, 2014, he added on his own initiative "reason to believe" in premise 13 because "ought to know" is important in Danish law. He could not write as a precondition that no one other than the pension plan filed an application for a refund of dividend tax, because the bank would then argue that it could not know this.

The description of the 1999 Supreme Court ruling in the legal basis section of the draft opinion of February 18, 2014 was a standard caveat that they inserted in advice dealing with banks and tax. He does not remember if he had the judgment in front of him when he wrote the paragraph. Section 6.3.2. in the same draft refers to the bank's customers' possible tax fraud.

The change in the arrangement from futures to forwards did not necessarily matter. With a forward, you had a better opportunity to remove a risk from the trade, so you could create a "perfect hedge" as opposed to a futures agreement. He doesn't know the futures instrument in detail. He understood futures as a standardized contract as opposed to OTC, where parties can negotiate as they please. In OTC, the parties are typically known to each other, unlike in futures.

By email dated April 10, 2014, K sent an "updated diagram". However, the witness had not seen any diagram beforehand. He has never been presented with a transaction description like the German one for the purpose of a legal opinion. Usually he only gets a text. He is not aware of anyone advising in German at Bech-Bruun. He does not know who X and Z, whom K mentions in the email, are. He does not remember if he wondered why K used the terms X and Z.

He wrote in an email of April 14, 2014 to K that his knowledge of German was not sufficient to understand the German transaction description because he did not understand it. He tried to look at it a couple of times to see if it made sense, but he is absolutely sure that it was not something he had understood. He had German in grades 7-9 and two years of high school. He suggested three different solutions. Initially, Jones Day chose the first solution, using the previous description and replacing futures with forwards. The statement "Review of the transaction diagram" as stated in the sales statement of June 23, 2014 probably refers to the German diagram. He himself contributed to the preparation of the statement. He spent his energy on the English description and not the German one. He mentioned the German description in the statement when the invoice was

**803**

challenged, and then you take it all in. He doesn't remember if he expected to have to work more on the case at the time of settlement, but the legal opinion had not been signed at that point. When you sign, you have to make sure that an opinion is still correct. His email to K of April 10, 2014 immediately after receiving the German diagram indicates that he expected to be able to understand the German at that time, but that was not the case. He did not talk to K about the German diagram. He may understand some terms in the description, but it is crucial to understand the context of the whole document. He can neither now nor then see from the diagram that it was a short sale. It is very atypical with a "herringbone setup", but he has seen it before. He has not considered the broker's interest in participating in the event. He agrees that it doesn't make sense to start the distribution by debiting the bank that will receive the

dividend, but he didn't understand that at the time.

Copyright © 2024 Karnov Group Denmark A/S

He asked for a different description, which he got. He did not consider whether it differed from the German description, and he was not surprised that the English one was much shorter than the German one. He couldn't compare the two descriptions when he didn't understand one.

He hardly got as far as seeing the six zeros at the bottom of page 5 and page 7 in the German diagram, but it is also not certain that he would have seen the problem there. He does not remember how far he got with the German transaction description. He has never based his advice on a German document.

He understood the email of April 15, 2014 from K to mean that the English description corresponded to the German diagram. He does not remember how he got an overview of the transaction process, but it is possible that he drew it for himself. Point 5a in the English description differs from I's tax opinion. It could be significant for his legal opinion that the shares are acquired via the seller's loan of shares. It is essential to ensure that the seller has title to the shares acquired by the buyer. He also noted that both the seller and the buyer were customers of the bank, and he also touched on this in his opinion. There was no indication in the English transaction description that there would be no shares in the arrangement. He particularly noted the word "delivered". The fact that there was a broker involved did not bother him much. A broker was one way of doing it, and he did not find that strange, as North Channel Bank was only the custodian bank. In his email of February 11, 2014 to H, he wrote that, to be safe, he would normally also build in a condition that the seller of the shares to the US pension fund was actually the owner of the cum dividend shares ultimately delivered, at the time of sale or at least at the dividend record date. He did not add a corresponding presumption that the seller was the owner of the stock loans because he deemed it unnecessary. If there was no ownership on the date of the general meeting, both the tax opinion and his legal opinion would be wrong.

According to the tax opinion, the pension plan's lending of shares should be without dividend, while according to the English transaction description it should be with dividend. He does not remember whether he considered whether this had an impact. It could perhaps mean that, as a pension plan, you were no longer the tax owner of the dividend if the borrower resold the shares. He cannot answer whether such a maneuver made it easier to make fictitious trades. The fact that the bank knows something about both the seller and the buyer means that the bank gets closer. This could have an impact on the bank's potential criminal liability. In an email dated April 16, 2014, he wrote to K that he read the new letter as an indication that the transaction is a cum/ex transaction, which was their original concern because cum/ex trades increase the risk of double refund of withheld dividend tax. However, the paragraph should be read in context with the rest of the email. He did not wonder why the timing of the purchase had been changed. He does not remember any considerations other than what is stated in the email. He wrote in the same email that it would make it even more difficult for North Channel Bank to distance its role in relation to the transaction that North Channel Bank acts for the seller and the pension plan and knows the nature of the transaction. By this he means that they were told from the outset that North Channel Bank would play a very small role, which was no longer the case. However, there was no reason to believe that the bank had a very large role. He does not remember if he asked if the bank knew the third parties of the transactions.

He thought it was a bit strange that the client wanted to insert a condition that the dividend approval date was identical to the dividend record date as stated by L in the email of April 22, 2014, to which the revised summary of the transaction description was attached.

Copyright © 2024 Karnov Group Denmark A/S

t. He did not consider why the settlement date should be after the usual time. The arrangement meant that there was a risk of double reimbursement because there were two people receiving credit advice, but his legal opinion was that there was no double reimbursement. The Danish state could suffer a loss if I's tax opinion was wrong. He did not consider whether it was a third party that wrongly received the refund. It was far-fetched for him to believe that the seller would unjustifiably seek a refund, regardless of whether they had a

"credit advice". In that case, the seller had to cheat. He probably knew that the bank also knew that there were two people who had the formal legitimacy to receive a refund of dividend tax.

**804**

With regard to section 3.4 of the draft legal opinion of April 23, 2014, it was crucial that the pension plan received the dividend and that this was confirmed by the bank. He does not remember what he specifically thought about section 3.6.2 on forward transactions, but it shows that he assumed that shares were received without dividends. The forward agreements are non-dividend bearing. It was not assumed that the third party who had borrowed the shares from the pension plan could resell the shares. The addition in point 3.8 is due to the difference to the tax opinion.

In the draft legal opinion of April 23, 2014, "dividend" was changed to

"Dividends" in point 4, no. 5, to clarify that it was the same dividend in question. Point 6.1.1. was a general description of the VP format in Denmark, and he thinks it was a result of the general discussion with Jones Day. Jones Day had difficulty understanding the distinction between "Dividend Approval Date" and "Dividend Record Date", the former of which was crucial in a Danish context. The new paragraph inserted in section 6.2.2 was due to the fact that more information had been added, so it was necessary to clarify what the liability assessment was based on. In the draft legal opinion of May 2, 2014 with Jones Day's comments, a special "forward settlement date" and a

"equities settlement date". In section 3.9 there was an addition describing the changes compared to the tax opinion. The did not give rise to any further reservations from him. In the draft

p. 8 deleted a remark about SWIFT. The discussion about SWIFT mentioned in his email of May 5, 2014 to K concerned the description of the general rules, which he did not think should be changed. It would be better to change the specific description, but it was a minor thing.

The statement in point 3.5.1. of the draft legal opinion of July 21, 2014 that the third party is not related to the seller is not something he has written. This appeared from Jones Day's description. He cannot answer whether it had any significance. If the parties are not related, it increases the likelihood of arm's length transactions. He could not imagine that the third parties in the two forward agreements could be the same. He imagined that there were four parties in total in the two forward agreements and he assumed that they all pursued their own interests. He did not consider whether the pension plan had a commercial interest in the arrangement, but it could be in the agreements with third parties. The whole purpose was that the pension plans could take advantage of the dividend tax refund if they bought shares from a party that did not have the same right to a refund, which he could not know. He could not know whether there were other purposes. In that sense, it was a tax arrangement. The pension plan bought shares from the seller and obtained financing by lending the shares and at the same time entering into a forward agreement, but it depends on the specific agreements whether the pension

plan could profit from the arrangements. He is not aware of any Danish listed company not making the distribution proposed by the board of directors. The pension plan's only risk was that the distribution did not happen as expected. The description does not state whether the risk is fully hedged by the