**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re

CUSTOMS AND TAX ADMINISTRATION
OF THE KINGDOM OF DENMARK
(SKATTEFORVALTNINGEN) TAX REFUND
SCHEME LITIGATION

This document relates to:  18-cv-07828;
19-cv-01785; 19-cv-01867; 19-cv-01893;
19-cv-01781; 19-cv-01783; 19-cv-01866;
19-cv-01895; 19-cv-01794; 19-cv-01865;
19-cv-01904; 19-cv-01798; 19-cv-01869;
19-cv-01922; 19-cv-01800; 19-cv-01788;
19-cv-01870; 18-cv-07827; 19-cv-01791;
19-cv-01792; 19-cv-01928; 19-cv-01926;
19-cv-01868; 18-cv-07824; 19-cv-01929;
19-cv-01803; 19-cv-01806; 19-cv-01906;
19-cv-01801; 19-cv-01894; 19-cv-01808;
19-cv-01810; 19-cv-01809; 18-cv-04833;
19-cv-01911; 19-cv-01898; 19-cv-01812;
19-cv-01896; 19-cv-01871; 19-cv-01813;
19-cv-01930; 18-cv-07829; 18-cv-04434;
19-cv-01815; 19-cv-01818; 19-cv-01931;
19-cv-01918; 19-cv-01873; 19-cv-01924;
19-cv-10713; 21-cv-05339.

MASTER DOCKET

18-md-2865 (LAK)

**PLAINTIFF SKATTEFORVALTNINGEN'S**
**MEMORANDUM IN OPPOSITION TO DEFENDANTS'**
**MOTION *IN LIMINE* TO EXCLUDE THE ELYSIUM DOCUMENTS**

HUGHES HUBBARD & REED LLP
William R. Maguire
Marc A. Weinstein
Neil J. Oxford
Dustin P. Smith
Gregory C. Farrell
One Battery Park Plaza
New York, New York 10004
(212) 837-6000

*Counsel for Plaintiff Skatteforvaltningen*
*(Customs and Tax Administration of the*
*Kingdom of Denmark)*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................................1

STATEMENT OF FACTS .......................................................................................................3

ARGUMENT ..........................................................................................................................8

I.     Defendants' preserved authenticity objections to the Solo trading records within the
       Elysium documents are meritless. ...............................................................................8

II.    The Solo custodians' trading records within the Elysium Documents are not subject to the
       rule against hearsay because SKAT does not offer them for their truth............................14

III.   The Solo custodians' trading records in the Elysium Documents are admissible as
       statements of co-conspirators or under exceptions to the rule against hearsay. ................15

       A.    The Solo custodians' trading records are admissible statements of a co-
             conspirator.......................................................................................................15

       B.    The Solo custodians' trading records are admissible under Rule 803(6). ......17

       C.    The Solo custodians' trading records are admissible under Rule 807's
             residual exception. ..........................................................................................22

CONCLUSION...................................................................................................................24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Blecker v. Picard (In re Bernard L. Madoff Inv. Secs. LLC)*,
    605 B.R. 570 (Bankr. S.D.N.Y. 2019).......................................................................21

*Chevron Corp. v. Donziger*,
    974 F. Supp. 2d 362 (S.D.N.Y. 2014).................................................15, 17, 18, 23

*Curtis v. Perkins (In re Int'l Mgmt. Assocs., LLC)*,
    781 F.3d 1262 (11th Cir. 2015) .......................................................................10, 20

*Gonzalez v. Digital Equip. Corp.*,
    8 F. Supp. 2d 194 (E.D.N.Y. 1998)..........................................................................10

*Harig v. City of Buffalo*,
    No. 22-30-CV, 2023 WL 3579367 (2d Cir. May 22, 2023) ...................................22

*Jacobson v. Deutsche Bank, A.G.*,
    206 F. Supp. 2d 590 (S.D.N.Y. 2002)......................................................................22

*JPMorgan Chase Bank, N.A. v. Yuen*,
    No. 11 Civ. 9192 (NRB), 2013 WL 2473013 (S.D.N.Y. June 3, 2013)............13, 17

*Lakah v. UBS AG*,
    996 F. Supp. 2d 250 (S.D.N.Y. 2014).......................................................................10

*Link v. Mercedes-Benz of N. Am., Inc.*,
    788 F.2d 918 (3d Cir. 1986).....................................................................................10

*In re Ollag Const. Equip. Corp.*,
    665 F.2d 43 (2d Cir. 1981)........................................................................................17

*Rentas v. Ruffin*,
    816 F.3d 214 (2d Cir. 2016).....................................................................................14

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    528 F. Supp. 3d 219 (S.D.N.Y. 2021)......................................................................19

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*
    *(In re Bernard L. Madoff)*, 592 B.R. 513 (Bankr. S.D.N.Y. 2018) .............11, 20, 21

*Stamm v. New York City Transit Auth.*,
    No. 04-CV-2163 (SLT) (JMA), 2013 WL 244793 (E.D.N.Y. Jan. 22, 2013).........23

*In re Terrorist Attacks on Sept. 11, 2001*,
No. 03-MD-1570 (GBD) (SN), 2021 WL 5414948 (S.D.N.Y. Nov. 19, 2021)..................8, 12

*United States v. Amato*,
15 F.3d 230 (2d Cir. 1994)...........................................................................................16

*United States v. Arrington*,
634 F. Supp. 3d 57 (W.D.N.Y. 2022)..........................................................................23

*United States v. Gagliardi*,
506 F.3d 140 (2d Cir. 2007)........................................................................................8, 9

*United States v. Ganias*,
824 F.3d 199 (2d Cir. 2016)........................................................................................12

*United States v. Kaiser*,
609 F.3d 556 (2d Cir. 2010)..................................................................................16, 17

*United States v. Kalish*,
403 Fed. App'x 541 (2d Cir. 2010).............................................................................14

*United States v. Maldonado-Rivera*,
922 F.2d 934 (2d Cir. 1990)...........................................................................9, 10, 15

*United States v. Panebianco*,
543 F.2d 447 (2d Cir. 1976)........................................................................................14

*United States v. Prevezon Holdings, Ltd.*,
319 F.R.D. 459 (S.D.N.Y. 2017).....................................................................9, 10, 11, 13

*United States v. Reyes*,
157 F.3d 949 (2d Cir. 1998)........................................................................................19

*United States v. Sliker*,
751 F.2d 477 (2d Cir. 1984)..................................................................................10, 14

*United States v. Tellier*,
83 F.3d 578 (2d Cir. 1996)..........................................................................................15

*United States v. Tin Yat Chin*,
371 F.3d 31 (2d Cir. 2004)...........................................................................................9

*United States v. Turner*,
718 F.3d 226 (3d Cir. 2013).................................................................................11, 13

*United States v. Vayner*,
769 F.3d 125 (2d Cir. 2014)........................................................................................8, 9

*United States v. Wedd*,
   993 F.3d 104 (2d Cir. 2021)..................................................................................15

*United States v. Williams*,
   205 F.3d 23 (2d Cir. 2000)..................................................................................17

**Statutes and Rules**

Fed. R. Evid. 104(a)...............................................................................................8, 9

Fed. R. Evid. 703....................................................................................................14

Fed. R. Evid. 801(c)................................................................................................13

Fed. R. Evid. 801(d)(2)(E)................................................................................14, 15

Fed. R. Evid. 803..............................................................................16, 17, 21, 22

Fed. R. Evid. 807..........................................................................................21, 22, 23

Fed. R. Evid. 901.................................................................................................8, 17

Fed. R. Evid. 901(a)..................................................................................................8

Fed. R. Evid. 901(b)(4)..............................................................................................8

Plaintiff Skatteforvaltningen ("SKAT") respectfully submits this memorandum of law in opposition to the defendants' motion *in limine* to exclude the Elysium documents (ECF No. 1142).

## PRELIMINARY STATEMENT

There is no merit to defendants' arguments that the Solo custodians' records of their fraudulent trading in Danish shares are inadmissible hearsay or to the authenticity objections they claim to preserve in their motion.[1]  Defendants purported to purchase billions of dollars in Danish shares in trades supposedly cleared by the Solo custodians and to have "financed" their share purchases by lending the supposedly just-purchased shares to the Solo custodians' other clients.  Based on these purported transactions, the defendants submitted to SKAT tax refund claims enclosing dividend credit advices issued by the Solo custodians—which defendants still contend were true—purporting to show that their pension plans had received dividends, net of withholding tax, on the Danish shares they supposedly purchased.

As evidence that their trades were legitimate, defendants have produced in this litigation trading records issued by the Solo custodians, including account statements, trade confirmations, and other documents.  Although defendants rely on Solo-issued records to prove their trading was real, they now nonetheless seek to exclude from trial all the rest of the relevant Solo trading records, recovered at the Dubai offices of Sanjay Shah's Elysium companies, showing their supposed trades and stock loans were illusory in that the Solo trading was all circular.

But as an initial matter, there is substantial evidence from which a reasonable juror could conclude that the trading records are what they appear to be, notwithstanding any objections

---

1.  The "Solo custodians" are Solo Capital Partners LLP, WestPoint Derivatives, Old Park Lane and Telesto Markets.

defendants may make to the contrary. The Solo custodian records recovered from Elysium show that for each of defendants' over one thousand supposed share purchases and loans, their trading counterparties and other Solo clients entered perfectly offsetting share trades and loans such that they all collectively offset to zero, *i.e.*, such that nobody owed anybody else any shares or cash. The records appear identical in form and substance to defendants' Solo trading records, many of which were found at Elysium. And the defendants and Solo's other clients' supposed trades in many instances appear on multiple Solo records found at Elysium. There is no reason to believe that Shah or Elysium would have generated or maintained the records of the purported trading for certain of Solo's clients any differently than they did for the defendants, particularly when the purported trading among all these counterparties was intertwined and integral to the scheme.

Defendants' hearsay objection is likewise unfounded because SKAT does not offer the records for the truth of the matter asserted therein, *i.e.*, to show any of the trades happened, so the rule against hearsay does not apply in the first place. SKAT offers the records to show that the supposed trading reflected therein was all fake. And even if SKAT were in some sense offering the records for their truth, they would still be admissible as non-hearsay statements of defendants' co-conspirators, *i.e.*, Shah and the Solo custodians, or under the business records or residual exceptions to the rule against hearsay.

Defendants do not contend that the Solo custodians did not create and maintain records of the purported trading as a regular practice. Nor could they. Implicit in defendants' own reliance on Solo's trading records and dividend credit advices as proof of their share ownership and dividend receipt is that the Solo custodians did keep such records and that they are sufficiently trustworthy to be admissible. Rather, defendants' principal arguments are that there is supposedly no reason to think that the Solo trading records would have been found at Elysium

and that they contain irrelevant, and in some instances, offensive, material in addition to the Solo trading records. But Shah, who owned both the Solo custodians and Elysium, and many of Solo's key employees were based in Dubai during the relevant period, so it is hardly surprising that the Solo custodians' records were found there. How else could Elysium contain a trove of documents that match to the date, issuer, number of shares, and to the dollar and to the Kroner, the terms of defendants' purported Solo transactions? That one document in millions might match a defendant's transaction could be attributed to coincidence. But that the nearly twelve hundred defendant trades match, exactly? That, surely, is more than a coincidence. And the fact that Elysium also had material irrelevant to this litigation or, for that matter, offensive, has nothing do with whether the Solo trading records are authentic or trustworthy records of the transactions the Solo custodians purport to have executed for their customers.

## STATEMENT OF FACTS

### Solo's trading records

As Sanjay Shah testified in SKAT's English action against him, in 2012, Solo Capital Partners LLP obtained a "license" from the U.K. Financial Conduct Authority such that it "could take client money and shares" and "created its Global Securities Services ("GSS")," which Shah described as "a generic clearing platform, which . . . enabled Solo's clients to trade in dividend arbitrage." (Declaration of Marc A. Weinstein, dated September 3, 2024 ("Weinstein Decl.") Ex. 1 (First Witness Statement of Sanjay Shah, dated January 19, 2024 ("Shah Witness Statement")) ¶ 296-97.) In 2013 and 2014, Shah acquired or incorporated the other Solo custodians WestPoint Derivatives, Telesto Markets, and Old Park Lane and "installed" the "GSS business" in those entities too. (*Id.* ¶¶ 228, 230, 232-34, 236, 238-39, 241.)

The clients of the GSS business included U.S. pension plans, "short sellers," "stock lending intermediaries," and "brokers." (*Id.* ¶¶ 406-453, 475-512.) The so-called "dividend

3

arbitrage" trades that Solo's clients executed through GSS comprised circular, offsetting transactions in which a pension plan purchased shares, through one or more brokers, from a short seller, who borrowed the shares, through one or more stock loan intermediaries, from the pension plan. (*See* Weinstein Decl. Ex. 2 at Tr. 116:4-118:3.) Since all the participants were clients of Solo's GSS business, Solo in its role as the purported custodian and clearing firm supposedly settled the trades without any shares or cash. (*See id.*; Weinstein Decl. Ex. 1 (Shah Witness Statement) ¶ 566 ("The trades only happened because they were designed to work without these external movements" of "cash or shares.").)

In August 2012, when Solo first went "live with the GSS platform" in advance of the upcoming Danish dividend "season," Solo's "operations team produced a trading sheet . . . comprised of all of the share trades." (Weinstein Decl. Ex. 1 (Shah Witness Statement) ¶¶ 299-300, 304.) Solo, however, subsequently "hired a couple of software developers to build [its] own" IT "system" and "create a ledger or database where changes could not be made to the automated data without creating an audit trail." (*Id.* ¶ 304.) The "first system" created was called "Trade Approval System ("TAS")," which was "an online database that held all of the trade data" and that "was used by the clearing entities," *i.e.*, the Solo custodians. (*Id.* ¶¶ 342.1, 344.)

Automated account statements were sent to the GSS clients using the data maintained in TAS. (*Id.* ¶¶ 554-56; *see also* Weinstein Decl. Ex. 3, at Tr. 12:11-13:3 ("I believe that the statement production was automated . . . TAS recorded all the historic data, so it would have been possible to produce an automated statement from using the data in TAS.").) And Solo relied on the TAS data to create and review the dividend credit advices that defendants submitted to SKAT in their tax refund claims. (Weinstein Decl. Ex. 4 (Excerpts of First Witness Statement

of Graham McKenzie Horn, dated October 27, 2023 ("Horn Witness Statement")) ¶¶ 32, 41, 88-89.)

"In 2012 and 2013, however, the trades still had to be entered into the [TAS] system manually with the trade data from the emails sent from brokers or clients." (Weinstein Decl. Ex. 1 (Shah Witness Statement) ¶ 344.) As such, Solo's software developers created "Brokermesh," which was "a platform used by the brokers . . . to receive requests to trade (buy or sell shares) and find a match." (*Id.* ¶ 342.2.) Before Brokermesh, all the pension plans and short sellers' "buy and sell orders" "were sent by email." (*Id.* ¶ 345.) Brokermesh "automate[d]" that process in that the "brokers received orders from buyers or sellers in Brokermesh and the system then matched the orders based on the number of shares and the price." (*Id.*) It also "generate[d] automated confirmations, via emails, to the buyers and sellers," and sent "the information to Solo where it was entered into the database." (*Id.*)

And to "automate" the clients' orders," Solo created "a third system" called "Octave," which was "an order-generation system that was developed to generate orders automatically from a set of rules such as comparison of the current date to dividend ex dates." (*Id.* ¶¶ 342.3, 346.) Solo's pension plan clients "knew that they had to buy shares before the ex-date," which "was known several months in advance." (*Id.* ¶ 346.) Octave allowed the clients to "place their orders . . . in advance" and "then sent the orders to Brokermesh" and "generated emails to replace the emails manually generated by the clients." (*Id.* ¶¶ 346-47.)

"The TAS data" was "kept in the file server of Solo Group," which was "always" "securely maintained" and "backed up at the end of each day to ensure that, if there were any technical interruptions in the server, the data was always secure." (*Id.* ¶¶ 20, 348.) And "[a]ll email accounts across the Solo Group," including Shah's, were "archived and stored." (*Id.* ¶ 20.)

As Shah testified, all "the data, documents and evidence which demonstrates exactly how the trading was operated" was "preserved." (*Id.* ¶ 21.)

**The Elysium Documents**

Despite that the Solo custodians were in the U.K., from 2009, Shah himself had lived in Dubai. (*Id.* ¶ 47.) In 2011, Shah "incorporated a company in the [Dubai International Financial Center] which was then called Solo Capital (Dubai) Ltd" and that is "now called Elysium Global (Dubai) Ltd." (*Id.* ¶¶ 217-18.) The company was created in part to "support" Solo's "business in the UK." (*Id.*) For instance, in 2012, when Solo Capital obtained a legal opinion on its purported Danish dividend arbitrage trade from the Danish law firm Hannes Snellman, the firm addressed its opinion to Solo Capital Dubai at its Dubai office. (Weinstein Decl. Ex. 5.) In addition to Shah, many of Solo's "key employees" moved to Dubai to work for Solo or Elysium, including Guenther Grant Klar ("one of Solo's first employees"); Raj Shah ("a chartered accountant and tax structurer"); Graham Horn (who "manag[ed] the London office before he later moved to Dubai"); Sanjeev Dave (who "worked" in "Dubai as the office's sole accountant with oversight of the London business"); Anupe Dhorajiwala (a supposed "clearing/custody expert[]"); and Mark Patterson (who "spent a lot of time talking to clients to make sure they were getting what they needed and were happy with Solo and Ganymede"). (Weinstein Decl. Ex. 1 (Shah Witness Statement) ¶¶ 145, 148, 155, 165, 170, 201, 306.)[2]

On June 27, 2018, the Dubai International Financial Centre court ("DIFC Court") issued a search order against Elysium Global (Dubai) Ltd. ("Elysium Dubai") and another of Shah's

---

2. As Graham Horn testified in SKAT's English action, "[t]hroughout 2011 and 2012, many of Solo's key employees moved to Dubai" and since he "remained keen to be a part of the business," he "decided to move to Dubai" too. (Weinstein Decl. Ex. 4 (Horn Witness Statement) ¶ 49.) His "appointment as a member of [Solo Capital] was terminated on 14 March 2013 and at th[at] time [he] became an employee of [Elysium Dubai]." (*Id.*) "[T]hough now in Dubai, this change of employer did not really have any major change in [his] day-to-day work for the company other than removing governance and administrative responsibilities." (*Id.*)

companies, Elysium Property Limited.  (Weinstein Decl. Ex. 6 (Report of the Supervising Legal Representative, dated July 10, 2018 ("SLR Report")) ¶ 1.1 & Annex 1.)  As described in the declaration of Rana Shashaa, a Partner and Middle East Forensic Leader at Deloitte Professional Services (Dubai) Limited, in June and July 2018, Deloitte Dubai collected documents from the business offices of Elysium under the supervision of a court-appointed supervising legal representative.  (Weinstein Decl. Ex. 7 (Declaration of Rana Shashaa, dated November 26, 2021 ("Shashaa Decl.")) § B.)

Deloitte Dubai executed the search order by inspecting and forensically imaging electronic material found on the premises of the Elysium offices and from cloud-based repositories controlled by the Elysium companies, supervising the scanning and uploading of hardcopy materials from the premises and from Elysium's off-site storage facility, and subsequently forensically imaging the electronic materials from hard drives that Elysium representatives removed from the premises during the original search.  (Shashaa Decl. §§ B-C.) As reported by the DIFC Court-appointed supervising legal representative, Philip Punwar, a partner at Baker Botts LLP, Sanjay Shah was physically present as the director and authorized representative of Elysium during the entirety of Deloitte Dubai's search and asserted privilege on behalf of Elysium.  (*See* Weinstein Decl. Ex. 6 (SLR Report) ¶¶ 2.8, 2.11-16, 2.21, 2.36, 2.55-58 & Annex 2.)

Subject to a privilege review by a Deloitte Dubai team under Mr. Punwar's supervision (Weinstein Decl. Ex. 7 (Shashaa Decl.) § D), Deloitte Dubai produced the Elysium documents to SKAT.  And SKAT then produced the Elysium documents and the Shashaa Declaration to defendants during discovery in this litigation.  (*See* Order Granting SKAT's Consent Mot., ECF No. 286; Weinstein Decl. Ex. 8.)  Included among the documents seized from the Elysium

7

companies were records from Solo's GSS business showing the defendants, short sellers, and stock loan intermediaries' purported trades, including trade confirmations, account statements, invoices, and spreadsheets of trades. As Shah acknowledged in his English testimony, the documents seized from Elysium show the supposed Solo GSS trading. (Weinstein Decl. Ex. 1 (Shah Witness Statement) ¶ 561 (claiming that the "massive number of documents" seized "from me" during the search "demonstrate that I was not engaged in a massive conspiracy to defraud SKAT").) Shah has never claimed that there is a missing trove of records in England that paint a different picture of the trading than what SKAT has presented in England or that SKAT intends to present at trial here.

## ARGUMENT

### I. Defendants' preserved authenticity objections to the Solo trading records within the Elysium documents are meritless.

Defendants' motion does not seek to exclude the Solo trading records within the Elysium documents on authenticity grounds, but rather just states that defendants "preserve their objection" and "reserve the right to object at trial should SKAT not lay sufficient foundation for the authenticity of the records." (Defs. Br. 4.) Any such objection would be meritless for much the same reasons the Court held that the trading records had sufficient "indicia of reliability" to form the basis for SKAT's experts' testimony that the Solo trading was circular and fictitious. (Mem. Endorsed Order, ECF No. 1119, at 2-3; *see also* SKAT's Mem. Opp. Defs. Mot. to Exclude the Proposed Expert Reports, Opinions, and Testimony of Bruce Dubinsky, ECF No. 1092, at 9-14.)

Under Federal Rule of Evidence 901, all that is required for authentication is "evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). That is not a "particularly high" "bar," but rather a "minimal" "standard" "of reasonable

likelihood." *United States v. Gagliardi*, 506 F.3d 140, 151 (2d Cir. 2007) (citations omitted). For instance, "circumstantial evidence may establish authenticity." *In re Terrorist Attacks on Sept. 11, 2001*, No. 03-MD-1570 (GBD) (SN), 2021 WL 5414948, at *3 (S.D.N.Y. Nov. 19, 2021) (internal quotation omitted). "The appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances," may be sufficient. Fed. R. Evid. 901(b)(4).

"The preliminary decision regarding authentication is committed to the" Court. *United States v. Vayner*, 769 F.3d 125, 129 (2d Cir. 2014). And under Federal Rule of Evidence 104(a), "in making its determination, the court may consider evidence, other than that subject to privilege, that would not necessarily be admissible at trial." *United States v. Maldonado-Rivera*, 922 F.2d 934, 957 (2d Cir. 1990) (citing Fed. R. Evid. 104(a)). It is "[g]enerally" enough in this respect if the Court finds that "a reasonable juror could find in favor of authenticity." *Gagliardi*, 506 F.3d at 151 (citing *United States v. Tin Yat Chin*, 371 F.3d 31, 38 (2d Cir. 2004)). The Court's preliminary determination "renders evidence admissible," with "the issue of its ultimate reliability" left for "the jury." *Vayner*, 769 F.3d at 131 (internal quotation omitted).

Defendants' argument that SKAT "fails to materially link the documents to the specific relevant entities," *i.e.*, the Solo custodians, ignores the appearance and content of the documents themselves and the circumstances of their collection. (Defs. Br. 4.) Defendants collectively purported to enter nearly one thousand two hundred share purchases and corresponding stock loans cleared by the Solo custodians. And for every single one of them, the trading records included among the Elysium documents show not only those very "trades" by the defendant plans, but also "interlocking" and offsetting "transactions" supposedly executed by the same parties from and to whom defendants purportedly purchased and lent shares with other Solo

clients that likewise match defendants' supposed transactions to a tee in terms of timing and share price and volume. *United States v. Prevezon Holdings, Ltd.*, 319 F.R.D. 459, 466 (S.D.N.Y. 2017).

The trading records found at Elysium's offices include the same distinctive characteristics in terms of logos, addresses, and other markings as the Solo-issued trading records that defendants produced in this litigation as evidence that their trades were real.[3] *See Maldonado-Rivera*, 922 F.2d at 957 (affirming authenticity of document in part because it "bore a . . . logo that was indistinguishable from the . . . logo that appeared on other documents whose authenticity was not challenged").[4] Many of the trading records defendants produced were likewise found at Elysium.[5] The other trading records found at Elysium in many cases reflect defendants' purported trades and the same purported trades (involving defendants or otherwise) show up on multiple records.[6] *See Prevezon Holdings*, 319 F.R.D. at 466 ("most of the bank

---

3.  *Compare, e.g.*, Weinstein Decl. Exs. 9, 10, 12 *with* Exs. 24, 25. The trade approvals, confirmations, account statements and invoices found in the Elysium documents are identical in form and substance to the documents from the Solo custodians that defendants produced in this litigation. For instance, stock loan confirmations for a circular loop of purported loans were sent from addresses called "tradeapprovals@[Solo Custodian]" to the purported stock lender, and appear identical to those relied on by the defendants other than the names of counterparties involved. (*Compare, e.g.*, Weinstein Decl. Ex. 13 *with* Weinstein Decl. Exs. 14 & 15.) Invoices were created on the Solo Custodians' letterhead, dated shortly after the period covered by the invoice ended, and again appear identical to those sent to the defendant plans. (*Compare, e.g.*, Weinstein Decl. Ex. 10 *with* Ex. 24.)

4.  *See also United States v. Sliker*, 751 F.2d 477, 488-89 (2d Cir. 1984) (distinctive characteristics and contents of alleged bank records seized at the purported bank office was sufficient to establish authenticity); *Lakah v. UBS AG*, 996 F. Supp. 2d 250, 255 (S.D.N.Y. 2014) (finding letter authenticated in part because the letterhead "matche[d] those in a number of additional exhibits that have not been objected to"); *Gonzalez v. Digital Equip. Corp.*, 8 F. Supp. 2d 194, 197 (E.D.N.Y. 1998) ("All the materials, including the videos, are clearly labeled as Apple's, IBM's, and other corporations' materials developed by these companies for their own use."); *Link v. Mercedes-Benz of N. Am., Inc.*, 788 F.2d 918, 928 (3d Cir. 1986) (finding documents in question had sufficient distinctive characteristics, such as company logos, trademarks and a consistent professional appearance, to overcome the "slight authentication admissibility burden").

5.  *Compare, e.g.*, Weinstein Decl. Exs. 16 and 17 *with* Exs. 19 and 20; *compare* Weinstein Decl. Exs. 22, 23 *with* Exs. 24, 25; *and compare* Weinstein Decl. Ex. 26 *with* Ex. 27.

6.  Specific transactions recorded in the Solo Custodians' records among the Elysium Documents are also reflected in the broker confirmations, account statements, trade approvals, and stock loan confirmations produced by the

records" at issue "can be corroborated: (1) by reference to one another and (2) by reference to records obtained from other" sources).[7]  And specific cash entries in the defendants' Solo account statements found in the Elysium documents are corroborated by the bank statements produced by defendants or their banks showing the same transactions.  *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*, 592 B.R. 513, 526 (Bankr. S.D.N.Y. 2018) (records of customers' cash withdrawals were sufficiently authenticated in part because they were corroborated by "bank records").[8]

Taken together with the defendants' trading records, the Elysium documents show that each of defendants' trades was one part of a set of circular transactions that collectively netted to zero.  That is consistent with defendant Richard Markowitz's testimony that the sellers and other participants in the trading also were Solo's clients.  (Weinstein Decl. Ex. 41 at Tr. 173:19-

---

defendants.  For example, the February-March 2015 spreadsheet of Telesto's customer trades on which SKAT relies includes the Basalt Ventures plan's purported March 26, 2015 purchase of Carlsberg shares identified in the email trade confirmation Sunrise Brokers sent to the Basalt Ventures plan on that date, which was produced by defendant van Merkensteijn, and identified in the plan's Telesto-issued 2015 yearly account statement. (*Compare* Weinstein Decl. Ex. 28 at ELYSIUM-09140791 (identifying the Basalt Ventures plan as "BVL01") *with* Weinstein Decl. Ex. 29 at JHVM_0001406 *and* Weinstein Decl. Ex. 30 at GUNDERSON 00009438.) Similarly, trade requests and trade confirmations within the Elysium Documents show details of the same defendant trades and non-party trades. (*Compare, e.g.*, Weinstein Decl. Ex. 18 *and* Ex. 31 *with* Weinstein Decl. Ex. 21 *and* Ex. 32).)

7.  *See also Curtis v. Perkins (In re Int'l Mgmt. Assocs., LLC)*, 781 F.3d 1262, 1267 (11th Cir. 2015) (affirming finding of authenticity where "documents were found at [company's] offices and . . . the information in those documents substantially matched the records kept by the financial institutions and clients with which [company] had transacted").

8.  For example, defendant Basalt Ventures plans' June 16, 2015 $775,000 "Cash Withdrawal" from the plan's USD account reflected on its Telesto statement is corroborated by the plans' Wells Fargo bank account records reflecting a credit in that same amount (minus wire transfer fees) on the same date. (*Compare* Weinstein Decl. Ex. 33 at ELYSIUM-04773847 *with* Ex. 34 at JHVM_0001837.) Similarly, defendant Calypso Investments Pension Plan's Solo Capital account statement reflects a January 15, 2014 $107,894.55 payment to itself from its USD account, which is corroborated by an entry showing the receipt of wired funds from Solo Capital in the plan's First Republic Bank account statement, (*compare* Weinstein Decl. Ex. 35 at ELYSIUM-03779092 *with* Ex. 36 at MPSKAT00002043), and defendant Edgepoint Capital plan's West Point account statement reflects a June 18, 2015 $850,000 "Cash transfer" to itself from its USD account, which is corroborated by an entry showing the receipt of $849,980 transfer (minus wire fees) in the plan's Wells Fargo bank account statement (*compare* Weinstein Decl. Ex. 37 *with* Ex. 38 at KLUGMAN00003531). In each case, the bank statements show the receipt of transfer from a bank account under Solo Capital's name.

174:17.)  And it is consistent with SKAT's expert's Bruce Dubinsky's finding that despite that the defendants purported to purchase billions of dollars of Danish shares, the Solo custodians never held a single Danish share on their behalf.  *See Prevezon*, 319 F.R.D. at 466 (that "reports" were "consistent with, and largely corroborate, the Government's own tracing analysis, gives credence to the authenticity of the facts borne out by the" records).

"[T]he circumstances surrounding the documents' discovery" provide further "circumstantial evidence" that they are authentic.  *United States v. Turner*, 718 F.3d 226, 232 (3d Cir. 2013).  There is no dispute that the Elysium documents "were recovered in Dubai pursuant to a search authorized by the Dubai International Financial Center courts."  (Mem. Endorsed Order, ECF No. 1119, at 2; *see also* Weinstein Decl. Ex. 7 (Shashaa Decl.) §§ A-B, Weinstein Decl. Ex. 6 (SLR Report) ¶¶ 2.1-2.73.)  And "Sanjay Shah, who controlled the Solo custodians," testified in SKAT's English action "that Elysium Global (Dubai) Ltd.—the records of which were contained in the Elysium Documents—formerly was known as Solo Capital (Dubai) Ltd." (Mem. Endorsed Order, ECF No. 1119, at 3; *see also* Weinstein Decl. Ex. 1 (Shah Witness Statement) ¶¶ 217-19.)  Elysium Dubai, Shah testified, was created "to support the business in the UK" and the "staff located in Dubai and working for Elysium Dubai" were involved in Solo Capital's so-called dividend arbitrage business.  (Weinstein Decl. Ex. 1 (Shah Witness Statement) ¶¶ 201, 217-19, 306, 539.)[9]

---

9.   Nor has Shah challenged the authenticity of the Elysium documents in SKAT's English action against him, or claimed that there is a missing trove of trading records that reflect a different pattern or method of trading, despite the opportunity to do so.  (*See* Weinstein Decl. Ex. 39, at C/199/7 ¶ 28, C/271/7 ¶ 12(c), C/324/4 ¶ 4; Ex. 40, at Tr. 109:16-111:22 (discussing Elysium document at trial).)  Just the opposite, Shah acknowledged that the Elysium documents include Solo's records, testifying that "SKAT took control of a massive number of documents from me via a search and seize order executed against Elysium Dubai in the DIFC in 2018" that he believes "demonstrate that [he] was not engaged in a massive conspiracy to defraud SKAT."  (Weinstein Decl. Ex. 1 (Shah Witness Statement) ¶¶ 561-64.)  That Shah "has consented to" the documents "admission" in England, "despite . . . being well placed to" challenge them if they were not genuine or complete is further

There is thus no merit to defendants' argument that "there is no assurance that any of these documents are legitimate sources of the information they appear to reflect." (Defs. Br. 4.) That is not the standard. SKAT is not required to "rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be." *United States v. Ganias*, 824 F.3d 199, 215 n.33 (2d Cir. 2016) (internal quotation omitted). And there is substantial evidence from which a reasonable juror could conclude that the Solo trading records in the Elysium documents are the authentic records maintained by the Solo custodians to reflect the transactions purportedly executed for their customers, including defendants.

In the face of all the evidence that the Solo trading records are authentic, all defendants can muster are vague arguments that maybe the documents are not "a fair and accurate representation of the Solo custodians' records." (Defs. Br. 4.) But the risk that "the records are forged or inauthentic" is "diminished here, where an artificial construction of these records would have required preternatural abilities to coordinate and reconcile [thousands] of transactions in [myriad] data-rich records kept in different formats with a zero error rate." *Prevezon*, 319 F.R.D. at 467. To say nothing of why Elysium Dubai "would have been storing" thousands of inaccurate Solo trading records "that implicated" Shah and his companies in "fraud." *Turner*, 718 F.3d at 235.[10]

Nor does it at all matter that the Elysium documents also "contain an enormous volume of material with no relevance to this litigation," including "pornographic videos," and what defendants say is a "sprawling and chaotic character." (Defs. Br. 4.) SKAT does not seek to

---

evidence that the trading records in the Elysium documents are authentic records reflecting the transactions Solo claims to have executed. *In re Terrorist Attacks on Sept. 11, 2001*, 2021 WL 5414948, at *4.

10. *See also JPMorgan Chase Bank, N.A. v. Yuen*, No. 11 Civ. 9192 (NRB), 2013 WL 2473013 (S.D.N.Y. June 3, 2013) ("J.P. Morgan and Chase had absolutely no incentive to falsify or alter the" records at issue, which were "not generate[d]" "for personal purposes or in anticipation of litigation.").

admit into evidence any of the irrelevant material. Pursuant to the DIFC court's order, Deloitte Dubai collected all the material found at Elysium's Dubai office and additional material located offsite, including by imaging several hard drives, not just material relevant to these cases. That this material included irrelevant and even offensive documents or videos does not mean that the Solo trading records collected during the search are inauthentic or untrustworthy, *i.e.*, that they are not what SKAT purports them to be.

## II.    The Solo custodians' trading records within the Elysium Documents are not subject to the rule against hearsay because SKAT does not offer them for their truth.

Because SKAT does not offer them "in evidence to prove the truth of the matter asserted" therein, *i.e.*, to show that any of the supposed trading reflected therein was real, the Solo custodian trading records among the Elysium Documents are not subject to the rule against hearsay. Fed. R. Evid. 801(c). Defendants miss the point in arguing that "SKAT relies on the truth of the Elysium Documents in alleging the transactions were not legitimate" and SKAT's argument "depends on the purported truth of the Elysium Documents to trace the alleged circular trading loops." (Defs. Br. 5.) Just the opposite, SKAT's point is that the trading records are false in that the purported trading reflected therein was fictitious because there were never any shares or cash to settle them. *See Rentas v. Ruffin*, 816 F.3d 214, 222 (2d Cir. 2016) (reports could not be hearsay "since Rentas did not offer the reports to prove the truth of the matter asserted within them, but rather claimed that the reports were *false*").[11] SKAT offers the records to demonstrate only that the Solo custodians' documents show nothing more than circular trades,

---

11. *See also United States v. Kalish*, 403 Fed. App'x 541, 545-46, 546 n.4 (2d Cir. 2010) (admission of "[p]laques . . . purporting to depict successful loans and satisfied customers" to show that defendant "intentionally overstated [company's] efficacy" did not violate rule against hearsay because they "were not entered into evidence for their truth"); *Sliker*, 751 F.2d at 489 (hearsay objection was "meritless" because documents "were admitted not to establish the truth of the matters asserted but rather to prove the sham nature of the bank and to link the defendants to it").

not that any such trades occurred.  Thus, "what is probative is the mere existence of the" records "rather than the meaning intended by the writer."  *United States v. Sliker*, 751 F.2d 477, 489 (2d Cir. 1984) (quoting *United States v. Panebianco*, 543 F.2d 447, 456-57 (2d Cir. 1976)).[12]

### III. The Solo custodians' trading records in the Elysium Documents are admissible as statements of co-conspirators or under exceptions to the rule against hearsay.

Even if SKAT was seeking to offer the Solo custodians' trading records for the truth of any matters asserted therein—which it is not—defendants' motion still should be denied because the records would be admissible as the statements of a co-conspirator or under the business records or residual exceptions to the rule against hearsay.

### A. The Solo custodians' trading records are admissible statements of a co-conspirator.

Under Federal Rule of Evidence 801(d)(2)(E), a "statement" "is not hearsay" if it "is offered against an opposing party" and "was made by the party's coconspirator during and in furtherance of the conspiracy."  Fed. R. Evid. 801(d)(2)(E).  There is no requirement that SKAT have pleaded the conspiracy for the rule to apply.  *See United States v. Wedd*, 993 F.3d 104, 117 n.6 (2d Cir. 2021) (citation omitted) ("[A] co-conspirator statement is admissible if it was made pursuant to any conspiracy, whether charged or uncharged.").  "Preliminary questions as to whether a proffered statement meets the requirements of Rule 801(d)(2)(E) are to be determined by the" Court "by a preponderance of the evidence."  *Maldonado-Rivera*, 922 F.2d at 959.

The Solo custodians' trading records are admissible under the rule because the evidence demonstrates that (i) "a conspiracy existed that included the defendant[s] and the" Solo custodians, and (ii) the statements made in the Solo custodians' trading records in the Elysium

---

12. It is irrelevant if SKAT's experts rely "on materials from the Elysium Documents for the truth of the matters asserted." (Defs. Br. 5.)  Under Federal Rule of Evidence 703, "facts or data" "need not be admissible" for an expert to "base an opinion on" them so long as "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject."  Fed. R. Evid. 703.

Documents were "made during the course of and in furtherance of that conspiracy." *Chevron*

*Corp. v. Donziger*, 974 F. Supp. 2d 362, 696 (S.D.N.Y. 2014) (quoting *United States v. Tellier*,

83 F.3d 578, 580 (2d Cir. 1996)), *aff'd*, 833 F.3d 74 (2d Cir. 2016).

Ample evidence shows the existence of a conspiracy among the defendants, Sanjay Shah,

and the Solo custodians, among others, to defraud SKAT out of supposed tax refunds based on

false tax refund claims. As set forth in SKAT's summary judgment brief, (SKAT's Mem. of

Law in Supp. of Its Mot. for Partial Summ. J., ECF No. 817, at 9-20), this includes, for example,

(i) emails between Shah and defendant Richard Markowitz about participating in the scheme,

(*e.g.* Weinstein Decl. Ex. 41 at Tr. 137:19-138:9; Ex. 42); (ii) agreements between and among

Solo Capital and defendants to split the profits, (*e.g.* Weinstein Decl. Ex. 41 at 200:12-202:18,

211:4-17, 451:18-453:18; Ex. 43 at Tr. 65:16-21; Ex. 44); (iii) evidence of the defendants'

formation of new pension plans and use of 40 pension plans to participate in the scheme, (*e.g.*

Weinstein Decl. Ex. 41 at Tr. 354:9-17; 369:17-21; 379:5-8); (iv) the defendants' authorizations

to payment agents to submit dividend withholding tax refund claims to SKAT, (*e.g.* Weinstein

Decl. Ex. 45 at SKAT_MDL_001_00059296-97, SKAT_MDL_001_00059302-03; Ex. 46 at

SKAT_MDL_001_00057080-81, SKAT_MDL_001_00057088-89); and (v) evidence from sub-

custodians that the Solo custodians never held the Danish shares or received the dividends the

defendant plans purported to own (Weinstein Decl. Ex. 47 (Expert Report of Bruce G. Dubinsky,

dated December 31, 2021), at ¶ 136; Ex. 48 at ¶¶ 12-13).

Nor is there any real doubt that the Solo custodians made the statements in the trading

records. (*See supra*, Section I.) And the Solo custodians' records of the fraudulent trading that

formed the basis for the false dividend credit advices that defendants submitted to SKAT were

made in furtherance of the conspiracy. *See United States v. Amato*, 15 F.3d 230, 235 (2d Cir.

1994) ("accounting records of loans, payments and vigorish—data necessary to monitor and conduct the loansharking operation"—were in furtherance of loansharking conspiracy). Without the false dividend credit advices, the fraud could not have succeeded. And the false dividend credit advices were premised on, and reconciled perfectly to, the fictitious circular trading reflected in the records SKAT seeks to admit.

### B.    The Solo custodians' trading records are admissible under Rule 803(6).

Under Federal Rule of Evidence 803(6), a "record of an act" or "event" is "not excluded by the rule against hearsay" if "(A) the record was made at or near the time by—or from information transmitted by—someone with knowledge"; "(B) the record was kept in the course of a regularly conducted activity of a business"; "(C) making the record was a regular practice of that activity"; and "(D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification." Fed. R. Evid. 803(6). The "purpose of the rule is to ensure that documents were not created for personal purposes or in anticipation of any litigation so that the creator of the document had no motive to falsify the record in question." *United States v. Kaiser*, 609 F.3d 556, 574 (2d Cir. 2010) (internal quotations omitted). And the rule "favors the admission of evidence rather than its exclusion if it has any probative value at all." *Id.*[13]

Defendants argue that SKAT cannot meet the rule's requirements because it supposedly cannot "lay a proper foundation." (Defs. Br. 9 (quoting *United States v. Williams*, 205 F.3d 23 (2d Cir. 2000).) But "neither a qualified witness nor a certification is necessary to provide the foundation in all instances." *Chevron*, 974 F. Supp. 2d at 691. "Instead, the requirements for

---

13. Where a party "can establish a foundation showing that the evidence satisfies the requirements of Rule 803(6), the Rule 901 authentication requirements are also met, and no additional foundation is necessary to admit the evidence." *JPMorgan Chase Bank, N.A*, 2013 WL 2473013, at *8 (citation omitted).

qualification as a business record can be met by documentary evidence, affidavits, or admissions by the parties, *i.e.*, by circumstantial evidence, or by a combination of direct and circumstantial evidence." *Id.* (internal quotation omitted).[14]

Notwithstanding defendants' conclusory arguments to the contrary (Defs. Br. 6-7), Shah's English testimony and the documents themselves show that the Solo trading records in the Elysium documents are the Solo custodians' business records. As Shah testified, Solo created contemporaneous spreadsheets of its clients' purported trades and recorded the supposed trading activity in its TAS database based on contemporaneous reports of the trades it received from its clients or its Brokermesh program. *See In re Ollag Const. Equip. Corp.*, 665 F.2d 43, 46 (2d Cir. 1981) (business records exception applies to "records" that "are integrated into a company's records and relied upon in its day-to-day operations").

Account statements, such as those defendants received and on which they no doubt intend to rely, were generated based on the trade data stored in TAS. (*See* Weinstein Decl. Ex. 3 at Tr. 12:11-13:3.) Solo's Brokermesh generated contemporaneous trade confirmations, including those defendants claim evidence their purported share purchases. (*See* Weinstein Decl. Ex. 1 (Shah Witness Statement) ¶¶ 342.1, 344, 348.) And the documents themselves indicate they were prepared contemporaneously by the Solo custodians.[15] Defendants themselves regularly

---

14. In the cases on which defendants rely the court found records inadmissible where the proponent failed to lay any foundation at all. For instance, in *City of Almaty, Kazakhstan v. Ablyazov*, the court declined to admit the records where the proponent had "not identified evidence that would lay a proper foundation"—"whether that took the form of deposition testimony, an affidavit, or testimony at trial." No. 15-cv-5345 (AJN), 2021 WL 5154110, at *10 (S.D.N.Y. Nov. 5, 2011). In *Bermudez v. City of New York*, the court "sustaine[d] defendants' objection" where "plaintiff ha[d] failed to offer a custodian witness to authenticate the records." No. 15-CV-3240 (KAM) (RLM), 2019 WL 136633, at *10-11 (E.D.N.Y. Jan. 8, 2019). And in *Dzhabrailov v. Decker*, the court noted that it would "not consider the medical records" because "they are not authenticated and are hearsay." No. 20-cv-3118 (PMH), 2020 WL 2731966, at *8 n.4 (S.D.N.Y. May 26, 2020) (internal quotation omitted).

15. For example, stock loan email confirmations were sent from email addresses called "tradeapprovals@[Solo Custodian]" to the purported stock lender on the same date of the purported stock loan, and on the same date

received account statements and trade confirmations identical in appearance to those of Solo's

other clients found in the Elysium documents and on which defendants intend to rely as evidence

that their supposed trades were real. Tellingly, defendants do not contest that the Solo

custodians created and maintained records of their and Solo's other clients purported trading

activity as a regular practice, despite that they would be well-positioned to do so given that they

supposedly traded billions of dollars of Danish shares through the Solo custodians for years. *Cf.*

*Chevron*, 974 F. Supp. 2d at 691 ("[R]equirements for qualification as a business record can be

met by . . . admissions by the parties.").

Instead, defendants devote much of their argument to their meritless contentions that the

trading records in the Elysium documents are "untrustworthy" and to casting doubt on the

provenance of the documents. (Defs. Br. 7-11.) For instance, defendants argue that they have

shown "a lack of trustworthiness" because the Elysium documents are "a mishmash that includes

pornography." (Defs. Br. 7.) But that the Elysium documents include irrelevant material in

addition to the Solo custodians' trading records says nothing about the trustworthiness of the

trading records. Nor is there anything to defendants' argument that the trading records are

untrustworthy because they were "collected from the computers of companies that were not

involved in the transactions at issue." (Defs. Br. 7.) Shah testified that Elysium Dubai,

originally Solo Dubai, was created in part to support the Solo custodians' business and Shah and

many of Solo's "key employees" lived and worked in Dubai during the relevant period.

(Weinstein Decl. Ex. 1 (Shah Witness Statement) ¶¶ 217-19; Horn Witness Statement ¶ 49.)

---

(usually within minutes) of the stock lending transactions purportedly entered into by the defendant plans, and appear identical to those relied upon by the defendants other than the names of the counterparties involved. (*See, e.g.*, Weinstein Decl. Exs. 14, 15.) The invoices were created on the Solo Custodians' letterhead and were dated shortly after the period covered by the invoice ended, and again appear identical to those sent to the defendant plans. (*Compare, e.g.*, Weinstein Decl. Ex. 10 *with* Weinstein Decl. Ex. 24.) And metadata from the account statements and spreadsheets of purported trades show they were also created shortly after the covered period. (*See, e.g.*, Weinstein Decl. Ex. 11.)

19

And that "SKAT's whole theory is that Solo was perpetrating a massive fraud" does not make the trading records inadmissible to show how that fraud was perpetrated. (Defs. Br. 7.) "[B]usiness records of entities engaged in fraud are commonly admitted into evidence." *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 528 F. Supp. 3d 219, 232 (S.D.N.Y. 2021) (collecting cases), *aff'd sub nom. Picard v. Jaba Assocs.*, 49 F.4th 170 (2d Cir. 2022). Likewise, that the Solo custodians "retroactively adjusted interest and fees" on stock loans such that the trading perfectly netted to zero does not make the records reflecting as much inadmissible. (Defs. Br. 7.) SKAT does not offer the records to prove the amounts of any such interest or fees actually due or paid. And, in any event, any such "residual doubts" about trustworthiness "would go to the weight of the evidence, not its admissibility." *United States v. Reyes*, 157 F.3d 949, 953 (2d Cir. 1998).

Defendants understate the extent to which the Solo trading records in the Elysium documents are corroborated by each other and defendants' own records in acknowledging "a congruence between certain documents in the Elysium Documents and materials that Defendants themselves has produced." (Defs. Br. 8.) It is not just "the appearance of the documents" bearing the same distinctive characteristics as defendants' own Solo-issued trading records. (*Id.*) The trustworthiness of the trading records in the Elysium documents is further corroborated by: the fact that the purported trades reflected therein fit with defendants trades to create perfectly offsetting trades, consistent with Shah's testimony that the trading was designed that way and that the Solo custodians never held any Danish shares on defendants' behalf; many of the trading records defendants produced were likewise in the Elysium documents; the defendants' purported trades are reflected in the trading records of Solo's other clients found in the Elysium documents; the same trades (by defendants and Solo's other clients) show up in multiple records; and cash

20

transfers reflected in defendants' Solo custodian account statements match defendants' own bank records. (*See supra*, pp. 4, 9-11.) Thus, while defendants might not need to "show that every single document" is "inaccurate to cast doubt on their overall trustworthiness" (Defs. Br. 8), they have failed to show that any of the trading records are untrustworthy.

Neither *Curtis v. Perkins (In re Int'l Mgmt. Assocs., LLC)*[16] nor *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,[17] as defendants argue, "reflect far more corroboration of the documents' trustworthiness" than SKAT has shown here. (Defs. Br. 8-9.) In *Curtis*, the court found the records sufficiently trustworthy based on the bankruptcy trustee's testimony about "his investigation into the provenance and reliability of the documents," including "his interview with one of" the debtor's "principals" and "his reconciliation of the documents with corresponding files held by [third-party] financial institutions and clients." 781 F.3d at 1267. And the court in *Madoff* found the records sufficiently trustworthy because of the "implication of" the SIPA trustee's experts' "testimony that the . . . records . . . were what they purported to be," that the records were "cross-checked . . . against . . . cash transaction records and records provided by other customers," and deposition testimony by former employees about how the documents "were created." 592 B.R. at 526. Likewise, here, Shah (and other Solo employees) have testified in England about Solo's record-keeping practices, SKAT's experts' have analyzed the trading records to show the trading was circular, and the records match defendants' trading and bank records and each other.[18]

---

16. 781 F.3d 1262 (11th Cir. 2015).

17. 592 B.R. 513 (Bankr. S.D.N.Y. 2018).

18. *See also Blecker v. Picard (In re Bernard L. Madoff Inv. Secs. LLC)*, 605 B.R. 570, 585-86 (Bankr. S.D.N.Y. 2019) (affirming admission of payment records under business records exception where they "reconcile[d]" to "bank records chronicling payments").

**C.**    **The Solo custodians' trading records are admissible under Rule 807's residual exception.**

Finally, even if SKAT were offering the Solo trading records for the truth of the matters asserted therein and they were not admissible under Rule 803(6), the Court should admit them under the "residual exception."  Under Federal Rule of Evidence 807, "a hearsay statement is not excluded by the rule against hearsay even if the statement is not admissible under a hearsay exception in Rule 803 or 804" if "(1) the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807(a).

Thus, to be admissible under Rule 807, the statement must be (i) "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts," and (ii) "supported by sufficient guarantees of trustworthiness." *Harig v. City of Buffalo*, No. 22-30-CV, 2023 WL 3579367, at *3 (2d Cir. May 22, 2023).  And as the 2019 Advisory Committee Note explains, under the rule, "a court assessing guarantees of trustworthiness may consider whether the statement is a 'near-miss' of one of the Rule 803 or 804 exceptions" and "take into account the reasons that the hearsay misses the admissibility requirements of the standard exception."  Fed. R. Evid. 807 Advisory Committee's Note to 2019 Amendments.

The Solo trading records are highly probative for the point for which SKAT offers them, *i.e.*, that the defendants' purported trading through Solo was circular.  Nor is there any other evidence besides the Solo trading records that SKAT reasonably could have obtained showing as much.  And there is a mountain of evidence corroborating the records, including Shah's

testimony in England that the trading was designed to be circular, as the records reflect; the Solo custodians created and maintained such trading records; and acknowledging that the records found in the Elysium documents show the purported trading.  (*See supra*, pps. 3-8.)[19]  The records are further corroborated by, among other things, the facts that many of the Solo trading records defendants produced were found at Elysium too and defendants' purported trades and cash transfers reflected in the Elysium records match exactly with defendants' own records trading and bank records.  (*See supra*, Sections I & III.)

None of the "four classic hearsay dangers, namely, insincerity, faulty perception, faulty memory, and faulty narration" are present here.  *Jacobson v. Deutsche Bank, A.G.*, 206 F. Supp. 2d 590, 595 (S.D.N.Y. 2002) (quotations omitted), *aff'd*, 59 Fed. App'x 430 (2d Cir. 2003). There is no reason to think that Shah, the Solo custodians or Elyisum would have created and maintained thousands of inaccurate trading records that show that all the Solo trading was circular and fictitious.  Thus, to the extent the Court finds, as defendants argue, that SKAT has not laid a foundation for admission of the records under Rule 803(6) and that they are not otherwise admissible, the Court should admit them under Rule 807 as a "near-miss" of the business records exception.  *United States v. Arrington*, 634 F. Supp. 3d 57, 65-66 (W.D.N.Y. 2022) (admitting cinema records of movie showings under Rule 807 as "near miss" of business records exception because guarantees of trustworthiness did not fully comply with Rule 803(6) certification requirement); *see also Stamm v. New York City Transit Auth.*, No. 04-CV-2163 (SLT) (JMA), 2013 WL 244793, at *10 (E.D.N.Y. Jan. 22, 2013) (finding email admissible

---

19. The U.K. Financial Conduct Authority, the Solo custodians' regulator, likewise  confirmed based on its review of "transaction reporting data" and "material received from" Solo's executing broker clients and "the Solo Group" that the purported Solo trading was circular, *i.e.*, that it was "characterized by a purported circular pattern of extremely high value OTC equity trading, back-to-back securities lending arrangements and forward transactions."  (Weinstein Decl. Ex. 49 ¶¶ 2.5, 2.7.)

under Rule 807 based on "circumstantial guarantees of trustworthiness equivalent to those underlying the business records exception").[20]

## **CONCLUSION**

For the reasons set forth above, SKAT respectfully submits that the Court deny defendants' motion *in limine* to exclude the Solo trading records in the Elysium documents.

Dated: New York, New York
September 3, 2024

HUGHES HUBBARD & REED LLP

By: /s/ Marc A. Weinstein
    William R. Maguire
    Marc A. Weinstein
    Neil J. Oxford
    Dustin P. Smith
    Gregory C. Farrell
    One Battery Park Plaza
    New York, New York 10004-1482
    Telephone: (212) 837-6000
    Fax: (212) 422-4726
    bill.maguire@hugheshubbard.com
    marc.weinstein@hugheshubbard.com
    neil.oxford@hugheshubbard.com
    dustin.smith@hugheshubbard.com com
    gregory.farrell@hugheshubbard.com

    *Counsel for Plaintiff Skatteforvaltningen*
    *(Customs and Tax Administration of the*
    *Kingdom of Denmark)*

---

20. In addition to the fact that SKAT produced all the Elysium documents to defendants in discovery and identified many of the ones it intends to rely on in its summary judgment motion papers and expert reports, SKAT intends to satisfy Rule 807(b)'s notice requirement by identifying the specific Elysium documents it seeks to introduce at trial in its disclosure of its exhibit list due October 22, 2024. *See Chevron*, 974 F. Supp. 2d at 692 (finding notice requirement satisfied by production of documents at issue months prior to trial and disclosure of same "approximately six weeks before trial began").